**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN MEAT INSTITUTE, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF )<br>AGRICULTURE, *et al.*, )<br><br>Defendants. ) | Case No. 13-cv-1033-KBJ |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 3

    I.      MEAT PRODUCTION IN THE UNITED STATES ............................................. 3

    II.     COUNTRY-OF-ORIGIN LABELING LEGISLATION ....................................... 4

    III.   THE 2009 COOL REGULATIONS ................................................................... 6

    IV.   THE WORLD TRADE ORGANIZATION DISPUTE .......................................... 7

    V.    THE 2013 RULEMAKING PROCESS ............................................................... 8

STANDING .................................................................................................................... 11

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT ................................................................................................................. 12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
    CHALLENGE TO THE FINAL RULE ................................................................... 12

    A.    The Final Rule Violates the First Amendment ......................................... 12

         1.     The Final Rule Is Subject to Heightened Scrutiny ...................... 13

         2.     AMS Has Not Asserted a Sufficient Governmental Interest in
              "Born, Raised, and Slaughtered" Designations ......................... 13

              a.     AMS Did Not Assert a Governmental "Interest" ........... 14

              b.     The Provision of Marginal Information Unrelated to
                    Health, Safety, or Consumer Protection Is Not a
                    Substantial Interest ....................................................... 15

         3.     The Final Rule Does Not Directly or Materially Advance
              Consumer Informational Interests ............................................. 19

         4.     The New Regulations Are More Extensive Than Necessary ...... 22

    B.    The Final Rule Exceeds the Statutory Authority Granted in the AMA ............... 25

i

1.       The AMA Does Not Permit Point-of-Processing Labels............................25

2.       The Ban on Commingling Exceeds AMS's Authority ..............................30

C.       The Final Rule Is Arbitrary and Capricious..........................................................32

1.       AMS's Justifications for the Final Rule Contradict the Evidence
         Before the Agency ...................................................................................33

         a.       The Final Rule Will Not Provide Consumers with
                  Accurate Information on which to Base Their Purchasing
                  Decisions....................................................................................33

         b.       The Final Rule Exacerbates, Rather Than Cures, the
                  United States' WTO Violations....................................................34

2.       AMS Arbitrarily Refused to Delay Implementation Of the Final
         Rule Until the WTO Reviews It.................................................................36

II.     PLAINTIFFS' MEMBERS WILL SUFFER IRREPARABLE HARM IF THE
        FINAL RULE IS NOT IMMEDIATELY ENJOINED .....................................................38

A.       First Amendment Injury Constitutes Irreparable Harm .........................................38

B.       Even Apart from Constitutional Harm, Plaintiffs' Member Businesses
         Will Be Irreparably Injured...................................................................................39

1.       The Final Rule Will Cause Immediate Irreparable Harm to
         Packers and Processors Who Rely on Commingling.................................39

2.       The Final Rule Will Also Irreparably Injure Suppliers That
         Depend on Imported Feeder Animals .......................................................41

3.       The Final Rule Has Had an Immediate Effect on the North
         American Meat Industry That Will Only Become More
         Pronounced Absent an Injunction.............................................................42

III.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR
        PLAINTIFFS ............................................................................................................44

A.       The Balance of the Equities Supports An Injunction..............................................44

B.       An Injunction Is in the Public Interest ..................................................................45

CONCLUSION.....................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

CASES:

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996)..................................................................................................19

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
133 S. Ct. 2321 (2013)........................................................................................12, 15

*Am. Frozen Food Inst. v. United States,*
855 F. Supp. 388 (Ct. Int'l Trade 1994) ...........................................................39

*Am. Library Ass'n v. FCC,*
406 F.3d 689 (D.C. Cir. 2005) ..............................................................................31

*Am. Trucking Ass'ns, Inc. v. EPA,*
283 F.3d 355 (D.C. Cir. 2002) ..............................................................................32

*Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. FLRA,*
22 F.3d 1150 (D.C. Cir. 1994) ..............................................................................26

*AT&T Corp. v. FCC,*
323 F.3d 1081, 1082 (D.C. Cir. 2003) ................................................................32

*Authentic Beverages Co. v. Texas Alcoholic Beverage Comm'n,*
835 F. Supp. 2d 227 (W.D. Tex. 2011)...............................................................21

*Bayer HealthCare, LLC v. FDA,*
No. 13-487 RMC, 2013 WL 1777481 (D.D.C. Apr. 17, 2013)...........................45

*Board of Trustees of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989)..................................................................................................25

* *Bowen v. Georgetown Univ. Hosps.,*
488 U.S. 204 (1988)..................................................................................................25

*Brown v. Entm't Merchants Ass'n,*
131 S. Ct. 2729 (2011).............................................................................................21

*Cellco P'ship v. FCC,*
357 F.3d 88 (D.C. Cir. 2004) ................................................................................28

* *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980)....................................................................................... *passim*

* *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984)..................................................................................................29

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) ............................................................................15, 16

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) ........................................................36

*Covad Commc'ns Co. v. FCC*,
450 F.3d 528 (D.C. Cir. 2006) ........................................................36

*CSI Aviation Servs., Inc. v. DOT*,
637 F.3d 408 (D.C. Cir. 2011) ........................................................30

*Davis Cnty. Solid Waste Mgmt. v. U.S. EPA*,
101 F.3d 1395 (D.C. Cir. 1996) ......................................................29

\* *Edenfield v. Fane*,
507 U.S. 761 (1993) ........................................................ *passim*

\* *Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................12, 38, 39

*Erlenbaugh v. United States*,
409 U.S. 239 (1972) ........................................................................27

*Gordon v. Holder*,
826 F. Supp. 2d 279 (D.D.C. 2011), *aff'd*,  2013 WL 3239742
(D.C. Cir. June 28, 2013) ..............................................................45

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ........................................................................28

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ..........................................................................27

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977) ........................................................................11

\* *International Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ....................................................18, 19, 39

*J.J. Cassone Bakery, Inc. v. NLRB*,
554 F.3d 1041 (D.C. Cir. 2009) ......................................................12

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ..................................................................13, 22

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ........................................................................33

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ................................................................16

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................33

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009) ................................................................16

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ................................................................36

*Nat'l Ass'n of Mfrs. v. NLRB*,
    No. 12-5068, 2013 WL 1876234 (D.C. Cir. May 7, 2013) ................................13

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*,
    773 F. Supp. 2d 151 (D.D.C. 2011) ................................................................44

*NLRB v. Brown*,
    380 U.S. 278 (1965) ................................................................32, 34

*R.J. Reynolds Tobacco Co. v. FDA*,
    823 F. Supp. 2d 36 (D.D.C. 2011) ................................................................39

\* *R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) ................................................................13, 19

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) ................................................................21

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006) ................................................................11

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ................................................................11

*Sottera, Inc. v. FDA*,
    627 F.3d 891 (D.C. Cir. 2010) ................................................................39, 44

*Spirit Airlines v. Dep't of Transp.*,
    687 F.3d 403 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 1723 (2013) ................16

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) ................................................................19

*United States v. Hayes*,
    555 U.S. 415 (2009) ................................................................27

*United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs,. Ltd.*,
  484 U.S. 365 (1988) ................................................................................28

*Valley Broad. Co. v. United States*,
  107 F.3d 1328 (9th Cir. 1997) ..............................................................21

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................12, 44

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ...............................................................39

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1986) ...............................................................................13

### CONSTITUTIONAL PROVISION:

U.S. Const. amend. I ............................................................................... *passim*

### STATUTES:

5 U.S.C. § 706(2) ....................................................................................32

5 U.S.C. § 706(2)(A) ...............................................................................12

5 U.S.C. § 706(2)(B) ...............................................................................12

5 U.S.C. § 706(2)(C) ...........................................................................12, 25

7 U.S.C. § 1638(2)(b) ............................................................................6, 24

7 U.S.C. § 1638a(a)(1) .............................................................................26

7 U.S.C. § 1638a(a)(2)(A) .....................................................................5-6, 29

7 U.S.C. § 1638a(a)(2)(A)(i) ....................................................................28

7 U.S.C. § 1638a(a)(2)(A)(iii) ..................................................................26

7 U.S.C. § 1638a(a)(2)(B) .............................................................5-6, 27, 28, 29

7 U.S.C. § 1638a(a)(2)(C) .........................................................5-6, 26, 27, 29, 30

7 U.S.C. § 1638a(a)(2)(D) .............................................................5-6, 27, 29

7 U.S.C. § 1638a(a)(2)(E) ..........................................................................6

7 U.S.C. § 1638a(b) ....................................................................................................6, 24

21 U.S.C. §§ 451 *et seq.*...............................................................................................3

21 U.S.C. §§ 601 *et seq.*...............................................................................................3

Pub. L. No. 107-171, § 282, 116 Stat. 533 (2002).......................................................4

Pub. L. No. 107-171, § 282(1)(2)(A), 116 Stat. 533 (2002).........................................4

Pub. L. No. 107-171, § 282(1)(2)(B), 116 Stat. 533 (2002).........................................4

REGULATIONS:

7 C.F.R. § 65.300(h) ...............................................................................................19, 24

68 Fed. Reg. 61,944 (Oct. 30, 2003)........................................................................4, 28

74 Fed. Reg. 2658 (Jan. 15, 2009) ..................................................................... *passim*

78 Fed. Reg. 15,654 (Mar. 12, 2013).......................................................................8, 9

78 Fed. Reg. 31,367 (May 24, 2013) .................................................................. *passim*

TREATY:

WTO Agreement on Technical Barriers to Trade........................................................8

OTHER AUTHORITIES:

Remy Jurenas & Joel L. Greene, Congressional Research Service, *Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling* (Apr. 22, 2003).......................................................................... 4-5, 28, 36

Leopold Center, *Understanding National Supply Chains: Fresh Cut Pork* ..............................24

National Pork Board, *The Pork Industry at a Glance* .................................................24

National Pork Board, *Today's Retail Meat Case* .......................................................40

NCBA, *Beef Market at a Glance* ...............................................................................24

Carina Perkins, *Canada Plans Retaliation Over US' COOL Stance, Global Meat News*, June 11, 2013 ...................................................................................................24

Reuters, *Mexico Says It May Suspend U.S. Trade Preferences Over Meat Labels*,
June 7, 2013 ........................................................................................................................24

USDA, Food Safety and Inspection Serv., *Country of Origin Labeling for
Meat and Chicken* ..............................................................................................................16

WTO Appellate Body Report, United States—*Certain Country of Origin Labeling
Requirements* (adopted July 23, 2012)................................................................8, 24, 34, 35

## PRELIMINARY STATEMENT

This case concerns whether an administrative agency tasked with implementing a food-marketing program can use that limited authority to restructure the meat industry in the United States and compel regulated entities to engage in burdensome speech without constitutionally adequate justification.

The United States Department of Agriculture's Agricultural Marketing Service (AMS) has issued a Final Rule imposing new country-of-origin labeling (COOL) requirements for muscle-cut meats that for the first time require labels to specify, in sequence, the country where a source animal was born, the country where it was raised, and the country where it was slaughtered.  Meats once labeled "Product of the U.S.," consistent with AMS's prior regulations, must now be designated "Born, Raised, and Slaughtered in the U.S."  Meats once labeled simply "Product of the U.S. and Canada" (or Mexico) must now explain that the source animals were "Born in Canada [or Mexico], Raised and Slaughtered in the U.S.," or some other combination as the regulations prescribe.  AMS concedes that this information has no bearing on the health or safety of meat; yet all of it must be conveyed, in detail, from seller to purchaser, all the way from ranches to retail shoppers.

To facilitate this complex labeling regime, the Final Rule bars the industry's longstanding practice of "commingling" meat from animals of different countries of origin, meaning that for the first time in history, producers and packers cannot efficiently process animals with different "Born, Raised, and Slaughtered" origins at one time, and retailers cannot sell the meat derived from these animals in a single package at retail.  And the Final Rule forces these changes upon the meat industry even though a significant percentage of meat products will ultimately be *exempted* from the requirements or labeled with inaccurate "Born, Raised, and Slaughtered" designations based on a variety of statutory and regulatory loopholes.

1

The Final Rule violates the Constitution, exceeds the agency's authority under the Agricultural Marketing Act, and runs afoul of the Administrative Procedure Act.  The Final Rule violates the First Amendment because it compels commercial speech merely in service of satisfying the curiosity of "certain" consumers about all of the production steps involved in bringing meat to market.  That interest is neither sufficient to justify compelled speech nor directly advanced by the agency's labeling scheme du jour, and it is far outweighed by the onerous burdens imposed by the Final Rule.  AMS has exceeded its statutory authority by adopting labeling requirements that contradict Congress's own definition of the term "country of origin" and by impermissibly regulating producers' and retailers' primary conduct in preparing meat for retail sale.  And the Final Rule is arbitrary and capricious because AMS's justifications for the new regulations do not withstand scrutiny and because AMS unreasonably refused requests to delay implementation of those regulations.

For each of these reasons, we submit that Plaintiffs are very likely to succeed on the merits and the Final Rule will likely be vacated.  But if it is not enjoined in the meantime, the Final Rule will irreparably harm meat-industry participants.  Plaintiffs are trade organizations that represent regulated entities facing immediate and substantial burdens and costs under the Final Rule.  The burden to their First Amendment rights and the economic costs associated with changing *how* they do business (*e.g.*, building new facilities to segregate animals of different origins) and *who* they do it with (*e.g.*, altering trade relationships to reduce reliance on foreign-origin livestock) constitute imminent and substantial injuries that cannot later be remedied.  And there is no countervailing governmental or public interest that supports immediate implementation of the Final Rule.  It should be enjoined during the pendency of this litigation.

For these reasons, Plaintiffs' request for a preliminary injunction should be granted.

# BACKGROUND[1]

## I.    MEAT PRODUCTION IN THE UNITED STATES

The meat industry in North America has long thrived on two-way trade that enables suppliers to process meat derived from both domestic animals and animals born and raised in neighboring countries. *See, e.g.*, NCBA Letter at 4; NPPC Letter at 2-4. In the United States, processors—especially those in border states—routinely purchase livestock from Canada and Mexico. *See, e.g.*, NCBA Letter at 4. Those imported animals can either be further raised in the United States ("feeder" animals) or imported for immediate slaughter ("fed" animals), and they represent a critical source of supply for processors whose access to exclusively domestic animals may be limited for seasonal or environmental reasons. Beef and pork from foreign-source animals account for as much as 50% of beef and pork production by processors in border areas of the United States during certain times of the year, and overall they represent some 4-7% of the Nation's overall production. *See, e.g.*, AMI Letter at 6-7; Declaration of Alan Rubin ¶ 4. Nor are these trade patterns one-sided: Canada and Mexico are key export markets for United States meat. *See, e.g.*, NPPC Letter at 2; NCBA Letter at 4.

All meat processed at federally inspected establishments in the United States and sold in interstate commerce is subject to the same health and safety standards no matter where the source animal was born and raised, pursuant to the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.*, and the Poultry Products Inspection Act, 21 U.S.C. §§ 451 *et seq.* The meat can

---

[1]    These facts are drawn from comment letters that were submitted during the rulemaking process and so are part of the administrative record. For the Court's convenience, the cited letters are attached as exhibits to this Memorandum. *See* Comment of American Meat Institute, attached as Exhibit 1 (AMI Letter); Comment of National Pork Producers Council, attached as Exhibit 2 (NPPC Letter); Comment of National Cattlemen's Beef Association, attached as Exhibit 3 (NCBA Letter); Comment of Canadian Cattlemen's Association, attached as Exhibit 4 (CCA Letter); Comment of the Government of Canada, attached as Exhibit 5 (Canada Letter); Comment of the Government of Mexico, attached as Exhibit 6 (Mexico Letter).

also be graded for quality pursuant to a voluntary marketing program administered by AMS, without any variation based on the animal's origin.  Under these even-handed health, safety, and meat-quality laws and regulations, beef is beef, whether the steer or heifer was born in Montana, Manitoba, or Mazatlán.

Consistent with these uniform standards, processors and retailers have long been permitted to process and package meat from animals with different heritages together—a practice known as "commingling."  *See, e.g.*, AMI Letter at 2.  And because the market for livestock and meat in North America is highly integrated, meat-industry participants have developed efficient trading relationships and production, distribution, and packaging practices.

## II.    COUNTRY-OF-ORIGIN LABELING LEGISLATION

In 2002, Congress amended the Agricultural Marketing Act of 1946 (AMA) to require retailers of covered meat products to inform consumers of the product's country of origin.  Pub. L. No. 107-171, § 282, 116 Stat. 533 (2002) (attached as Exhibit 7).  The 2002 country-of-origin provision specified that meat could be labeled as having a U.S. country of origin only if the animal was exclusively born, raised, and slaughtered in the United States—but it did not otherwise define the term "country of origin."  *Id.* § 282(a)(2)(A) & (B).  AMS subsequently proposed implementing regulations that would have required that all meat labels separately state where the source animal was born, raised, and slaughtered.  *Proposed Rule – Mandatory County of Origin Labeling of Beef, Lamb, Pork, Fish, Perishable Agricultural Commodities, and Peanuts*, 68 Fed. Reg. 61,944, 61,944 (Oct. 30, 2003) (2003 Proposed Rule) (attached as Exhibit 8).  The level of detail required by those regulations proved controversial, however, and Congress intervened to postpone the implementation of the statute while it considered amendments to the law.  *See* Remy Jurenas & Joel L. Greene, Congressional Research Service,

*Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling* 1 (Apr. 22, 2003) (COOL Report), *available at* http://www.fas.org/sgp/crs/misc/RS22955.pdf.

Congress revisited country-of-origin labeling in the Food, Conservation, and Energy Act of 2008 (2008 Farm Bill), which included a number of amendments to the 2002 statute.  The revised statute still required retailers to provide origin information—but *Congress* defined what the country of origin would be for each conceivable category of meat, rather than leave that issue to AMS.  *See* 7 U.S.C. § 1638a(a)(2)(A)-(D).  In relevant part, the statute provides:

> **(a) In general**
> **. . .**
>
> **(2) Designation of country of origin for beef, lamb, pork, chicken, and goat meat**
>
> **(A) United States country of origin ["Category A" meat]**
> A retailer of a covered commodity . . . may designate the covered commodity as exclusively having a United States country of origin only if the covered commodity is derived from an animal that was—
>
>> **(i)** exclusively born, raised, and slaughtered in the United States;
>>
>> **(ii)** born and raised in Alaska or Hawaii and transported for a period of not more than 60 days through Canada to the United States and slaughtered in the United States; or
>>
>> **(iii)** present in the United States on or before July 15, 2008, and once present in the United States, remained continuously in the United States.
>
> **(B) Multiple countries of origin ["Category B" meat]**
>> **(i)** In general a retailer of a covered commodity that is . . . derived from an animal that is—
>>
>>> **(I)** not exclusively born, raised, and slaughtered in the United States,
>>>
>>> **(II)** born, raised, or slaughtered in the United States, and
>>>
>>> **(III)** not imported into the United States for immediate slaughter, may designate the country of origin of such covered commodity as all of the countries in which the animal may have been born, raised, or slaughtered.

. . .

**(C) Imported for immediate slaughter ["Category C" meat]**

A retailer of a covered commodity . . . that is derived from an animal that is imported into the United States for immediate slaughter shall designate the origin of such covered commodity as—

    **(i)** the country from which the animal was imported; and

    **(ii)** the United States.

**(D) Foreign country of origin ["Category D" meat]**

A retailer of a covered commodity that is . . . derived from an animal that is not born, raised, or slaughtered in the United States shall designate a country other than the United States as the country of origin of such commodity.  [*Id.*]

The statute exempts meat sold by food-service establishments and meat that qualifies as a "processed food item" from any COOL labeling at all.  *Id.* §§ 1638(2)(B); 1638a(b).  And it further provides that ground meats can be labeled using "a list of all countries of origin" or "all reasonably possible countries of origin."  *Id.* § 1638a(a)(2)(E).

## III.    THE 2009 COOL REGULATIONS

In 2009, AMS issued a final rule implementing the 2008 COOL statute.  *See Final Rule – Mandatory Country of Origin Labeling of Beef, Pork, Lamb, Chicken, Goat Meat, Wild and Farm-Raised Fish and Shellfish, Perishable Agricultural Commodities, Peanuts, Pecans, Ginseng, and Macadamia Nuts*, 74 Fed. Reg. 2658, 2677 (Jan. 15, 2009) (the 2009 Regulations) (attached as Exhibit 9).  AMS concluded that "the economic benefits from COOL will be small," *id.* at 2681, but to fulfill its statutory obligation it adopted the following labeling system:

- (A) "**Product of the United States,**" for meat derived from an animal born, raised, and slaughtered in the United States, or present in the United States on or before July 15, 2008;

- (B) "**Product of the United States, Country X, and (as applicable) Country Y**", for meat derived from an animal born and raised in Country

6

> X and (as applicable) Country Y and imported into the United States more than two weeks before slaughter;
>
> - (C) "**Product of Country X and the United States**", for meat derived from an animal imported from Country X to be slaughtered within two weeks;
>
> - (D) "**Product of Country X**", for finished meat products derived from animals slaughtered outside the United States and imported from Country X. [*Id.* at 2706.]

In addition to adopting this system, AMS expansively interpreted the exemption for processed food items, *id.* at 2666-68, and provided that ground meats could be labeled with all possible countries of origin, defined to mean any origin category present in a processor's inventory within the preceding 60 days, *id.* at 2706.

Crucially, the 2009 Regulations specifically acknowledged the practice of commingling and assured flexibility to enable that normal business practice. As the agency explained, "regulated entities must . . . be allowed to operate in a manner that does not disrupt the normal conduct of business." *Id.* at 2670. Thus, "to provide . . . needed flexibility," the 2009 Regulations permitted processors, packers, and retailers to commingle livestock of different origins and the meat derived from those animals, with a designation reflecting all possible countries of origin, such as "Product of the United States, Country X, and (as applicable) Country Y." *Id.* Explaining that "[t]he COOL program is not a food safety program," AMS observed that "[c]ommingling like products is a commercially viable practice that has been historically utilized." *Id.* This flexibility permitted meat-industry participants to continue to safely and efficiently prepare meat for retail while fulfilling their statutory obligations.

## IV.  THE WORLD TRADE ORGANIZATION DISPUTE

After AMS adopted the 2009 Regulations, Canada and Mexico filed a complaint before the Dispute Settlement Body of the World Trade Organization (WTO) alleging that the COOL

program violated the WTO Agreement on Technical Barriers to Trade (TBT Agreement) and other international obligations.  A WTO Panel found that the COOL requirement for meat impermissibly discriminated against imported livestock, and the WTO Appellate Body affirmed that finding.  WTO Appellate Body Report, United States—Certain Country of Origin Labeling (COOL) Requirements, WT/DS384/AB/R, WT/DC386/AB/R (adopted July 23, 2012).[2]

Specifically, the Appellate Body concluded that the COOL program contravened Article 2.1 of the TBT Agreement because the recordkeeping and verification requirements necessary to process livestock of multiple origins created an impermissible "incentive in favour of processing exclusively domestic livestock and a disincentive against handling imported livestock"—an incentive that did not "stem exclusively from a legitimate regulatory distinction."  *Id.* ¶¶ 292, 349.  The WTO's Dispute Settlement Body adopted the Appellate Body's ruling in July 2012, and subsequently gave the United States until May 23, 2013 to bring the COOL system into compliance.  78 Fed. Reg. 31,367.

## V.    THE 2013 RULEMAKING PROCESS

After the WTO's July 2012 decision, AMS waited until March 2013 to take action in response to the WTO dispute—at which point it proposed sweeping changes to the COOL program.  *See Proposed Rule – Mandatory Country of Origin Labeling of Beef, Pork, Lamb, Chicken, Goat Meat, Wild and Farm-Raised Fish and Shellfish, Perishable Agricultural Commodities, Peanuts, Pecans, Ginseng, and Macadamia Nuts*, 78 Fed. Reg. 15,654 (Mar. 12, 2013) (Proposed Rule).  But instead of proposing regulations to alleviate the discrimination against foreign livestock, AMS *increased* that discrimination through far more onerous labeling

---

[2]    Materials from the WTO proceeding, are available at http://www.wto.org/english/ tratop_e/dispu_e/cases_e/ds384_e.htm.  For the Court's convenience, the Appellate Body's Report is attached as Exhibit 10.

requirements.  It did so by reverting to the approach Congress had rejected when it amended the statute in 2008: requiring labels of covered meat commodities to specify in sequence and in detail where the source animal was born, where it was raised, *and* where it was slaughtered.  *Id.* at 15,646.  The Proposed Rule continued to exempt from any COOL labeling "processed" meat items, broadly defined in the regulations, and meat sold in food-service establishments.  *Id.* at 15,652-15,653.  It also exempted ground meat and Category D meat, which is imported to the United States as a finished product, from the "Born, Raised, and Slaughtered" labeling regime. *Id.*  To facilitate this point-of-processing labeling for Category A, B, and C meats, AMS proposed to bar commingling—meaning that for the first time in the history of meat production in the United States, meat sourced from animals with different countries of origin could not be efficiently processed, stored, or packaged together.  *Id.* at 15,646.

AMS received hundreds of comments opposing these changes.  As commenters explained, the Proposed Rule violated the Constitution, violated the COOL statute and exceeded AMS's statutory authority, and imposed crushing costs on the meat industry with no corresponding benefit.  Several commenters emphasized that the new labeling system compelled speech but did not serve any governmental interest, in violation of the First Amendment.  *See, e.g.*, AMI Letter at 24-31.  Commenters also explained that the COOL statute did not permit point-of-processing labels or authorize AMS to restructure the meat-production industry by barring commingling.  *See, e.g.*, AMI Letter at 31-38; CCA Letter at 8-11.  Commenters further explained that the proposed regulations would not produce any benefit because point-of-processing labels would in many instances be inaccurate and thus misinform consumers about meat origin.  And commenters explained that the Proposed Rule would continue to violate the United States' international trade obligations.  *See, e.g.*, AMI Letter at 18-24.  Indeed, Canada

and Mexico—the complaining parties in the WTO dispute—submitted comments stating that, far from curing the violations found by the Appellate Body, the Proposed Rule would *exacerbate* discrimination against imported livestock.  Canada Letter at 1-2; Mexico Letter at 1-2.

In addition to all of these flaws, commenters documented the substantial costs threatened by AMS's proposed changes.  The bar on commingling would fundamentally alter how meat is produced in the United States by requiring meat of each conceivable "Born, Raised, and Slaughtered" designation to be segregated up the entire supply chain, from the moment livestock are put in a pen on U.S. soil, throughout the production, storage, and distribution process, until the meat is packaged, labeled, and placed on store shelves for sale.  *See, e.g.,* AMI Letter at 3-7.  The additional segregation, recordkeeping, and verification costs associated with the loss of commingling flexibility would drive demand away from imported livestock and cause small packing plants dependent on imports to close.  *See id.* at 8-13.  And these crippling costs—which commenters estimated would run in the hundreds of millions of dollars, *see id.* at 3-9—would all prove unnecessary in the likely event the WTO deemed the new regulations noncompliant with trade treaties; for this reason, commenters requested that at the very least AMS delay implementation of the proposed regulations until the WTO reviewed them, *see, e.g.*, *id.* at 38.

AMS made no changes in response to these concerns.  Instead, on May 24, 2013, AMS issued a Final Rule, effective immediately, that was for all relevant purposes the same as the Proposed Rule.  *See Final Rule—Mandatory Country of Origin Labeling of Beef, Pork, Lamb, Chicken, Goat Meat, Wild and Farm-Raised Fish and Shellfish, Perishable Agricultural Commodities, Peanuts, Pecans, Ginseng, and Macadamia Nuts*, 78 Fed. Reg. 31,367 (May 24, 2013) (Final Rule) (attached as Exhibit 11).  AMS emphasized that the Final Rule is "mandatory" as of May 23, 2013 and that it applies to all covered commodities produced or

10

packaged after that date.  78 Fed. Reg. 31,370.  The agency also cryptically stated that it would conduct a six-month "industry education and outreach program" to permit regulated entities "to become educated on and fully transition over to the new requirements of the final rule," but made clear that it was not "delay[ing] the effective date of the rule beyond May 23, 2013."  *Id.*

Because the Final Rule violates the Constitution, exceeds AMS's statutory authority, and is arbitrary and capricious, and because the new COOL regulations will irreparably harm meat-industry participants, Plaintiffs filed this suit.  And because Plaintiffs will face immediate and irreparable First Amendment harms and compliance expenses if the Final Rule is not enjoined soon, they now seek preliminary injunctive relief.

## STANDING

Plaintiffs are trade associations.  Their members include meat packers and processors as well as livestock producers and handlers, all of whom are either directly regulated or directly affected by the Final Rule.  *See* 78 Fed. Reg. 31,374 ("any person directly or indirectly engaged in the business of supplying a covered commodity to a retailer . . . must make available information to the buyer about the country(ies) of origin of the covered commodity").  Because Plaintiffs' members are the "object[s] of the action" under review, their standing is "self-evident."  *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (internal quotation marks and citation omitted).  *See also infra* at 38-44 (discussing irreparable harm to Plaintiffs' members).  And Plaintiffs have standing to sue on their members' behalf.  *See, e.g.*, *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343-44 (1977); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895 (D.C. Cir. 2006).

## STANDARD OF REVIEW

In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).   As this case challenges a final agency action, the Administrative Procedure Act (APA) governs the Court's review of the merits.   Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [or] . . . in excess of statutory jurisdiction."   5 U.S.C. § 706(2)(A),(B), & (C).

Because this case involves a First Amendment challenge, special considerations apply under both of these standards.   For purposes of a preliminary injunction, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and a court reviewing agency action under the APA "owes no deference" to the agency's "pronouncement on a constitutional question," *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGE TO THE FINAL RULE.

### A.   The Final Rule Violates the First Amendment.

The Final Rule compels speech by mandating that labels (or other signage) for covered muscle cuts of meat separately state the country where the animal was "born," the country where it was "raised," and the country where it was "slaughtered."   78 Fed. Reg. 31,367.   "It is, however, a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say."   *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (internal quotation marks omitted).   In the field of commercial speech, there is only one exception to this basic principle, and it is a narrow one: A compelled

disclosure can survive First Amendment scrutiny only if it advances a substantial governmental interest to a material degree and is no more extensive than necessary.  *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).  Because the Final Rule does not come close to meeting that high bar, it is unconstitutional.

### 1.    The Final Rule Is Subject to Heightened Scrutiny.

In *R.J. Reynolds Tobacco Co. v. FDA*, the D.C. Circuit confirmed that compelled commercial disclosures are subject to heightened scrutiny under the familiar *Central Hudson* test.  696 F.3d 1205, 1217 (D.C. Cir. 2012) (*RJR*).  This test requires the government to "affirmatively prove that (1) its asserted interest is substantial, (2) the restriction directly and materially advances that interest, and (3) the restriction is narrowly tailored."  *See id.* at 1212 (citing *Central Hudson*, 447 U.S. at 566).  That third element requires that there be "a reasonable fit between the [government]'s ends and the means chosen to accomplish those ends."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation omitted).[3]

The government's burden under *Central Hudson* is "not light."  *RJR*, 696 F.3d at 1218. And here it will prove insurmountable for AMS.

### 2.    AMS Has Not Asserted a Sufficient Governmental Interest in "Born, Raised, and Slaughtered" Designations.

At the outset of the *Central Hudson* analysis, the court "must identify with care the interests the [government] itself asserts."  *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).  And this

---

[3]    Compelled disclosures are sometimes subject to more lenient review under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1986).  However, *Zauderer*'s application is "limited to cases in which disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.'" *RJR*, 696 F.3d at 1213 (quoting *Zauderer*, 471 U.S. at 651).  The *Zauderer* exception does not apply here because the Final Rule does not target deceptive speech.  *See id.* at 1213-14; *see also Nat'l Ass'n of Mfrs. v. NLRB*, No. 12-5068, 2013 WL 1876234, at *9 n.18 (D.C. Cir. May 7, 2013).  Indeed, if anything, the opposite is true: The Final Rule mandates speech that is confusing and potentially misleading.  *See infra* at 20-21.

is where the problems with the Final Rule begin. AMS does not clearly assert the interests on which it justifies compelling speech. Although it appears that the agency will rely on a theory of supposed consumer informational "benefit," *Central Hudson* requires that the government identify a "harm" before it compels speech, *see id.* at 771, not merely a (fictive) benefit, and AMS has not and cannot point to any potential *harm* to consumers from the current labeling regime. The Final Rule can therefore be invalidated at the first step of the *Central Hudson* test.

### a.       AMS Did Not Assert a Governmental "Interest."

In their comments on the Proposed Rule, Plaintiff AMI and others argued that the new requirements violated the First Amendment because "AMS ha[d] not stated an interest sufficient to require labeling of specific production step information." Final Rule, 78 Fed. Reg. 31,370. Here is how AMS responded, in its entirety:

> The Agency disagrees. The [AMA] directs that a COOL program be implemented that provides consumers with country of origin information on specified commodities including muscle cuts of meat. It also provides authority for the Secretary to promulgate regulations necessary to implement the COOL program. The Agency believes that the [AMA] provides the authority to amend the COOL regulations to require the labeling of specific production steps in order to inform consumers about the origin of muscle cuts of meat at retail. [*Id.*]

That is a non-answer to the First Amendment question. AMS may purport to have the *statutory authority* to compel the disclosure of "Born, Raised, and Slaughtered" information (although even there it is on thin ice, as we next explain). But the First Amendment requires a showing of a governmental *interest*. *Edenfield*, 507 U.S. at 768. The existence of a general statutory directive to issue regulations does not satisfy AMS's burden.[4]

---

[4]       The AMA does not mandate "Born, Raised, and Slaughtered" labels; indeed, the statute's text, structure, and history suggest that Congress intended to prohibit those labels. *See infra* at 25-30. But even if Congress had directed AMS to adopt a point-of-processing labeling regime,

In a belated attempt to shore up its purported interest in compelling the new labels, AMS might now point to its statement that "Born, Raised, and Slaughtered" labels "will benefit consumers by providing them with more specific information on which to base their purchasing decisions." 78 Fed. Reg. 31,376. It is doubtful that AMS can rely on this rationale now, having failed to mention it in its First Amendment response, *see Edenfield*, 507 U.S. at 768 (court must look at the "precise interests" government identifies); but even so, all this finding accomplishes is to describe what the Final Rule *does*. It does not explain why AMS has an "interest" in doing it, which is a necessary showing under *Central Hudson*. For the Final Rule to survive First Amendment scrutiny, AMS had to have—and to *assert*—a governmental interest in the new labels. It did not, and that is reason enough to declare the Final Rule unconstitutional.

> **b.     The Provision of Marginal Information Unrelated to Health, Safety, or Consumer Protection Is Not a Substantial Interest.**

Even if AMS had identified consumer benefit as the governmental interest underlying the Final Rule, which it did not, consumer "benefit" in the absence of a risk of consumer harm is not an interest "substantial" enough to justify compelled speech under *Central Hudson*.

*Central Hudson* requires a showing of actual or potential harm. That much is clear from *Edenfield v. Fane*, where the Supreme Court explained that *Central Hudson* requires the government to "demonstrate that the *harms* it recites are real" and that its regulation "alleviates" those harms "to a material degree." 507 U.S. at 771 (emphasis added). Indeed, the government's interest in protecting consumers from "commercial *harms*" is the "typical reason" given to justify less stringent First Amendment scrutiny of commercial-speech regulation. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993) (emphasis added). And that

that would just make the statute itself vulnerable to a First Amendment challenge. *See, e.g.*, *Agency for Int'l Dev.*, 133 S. Ct. 2321 (invalidating statute that directed USAID to require government aid recipients advocate against prostitution).

is why the common thread in cases upholding compelled disclosures is that the information prevented, or was intended to prevent, some sort of harm.  *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) (upholding provision compelling bankruptcy counseling firms to make disclaimers to offset likelihood of deception); *Spirit Airlines v. Dep't of Transp.*, 687 F.3d 403, 413 (D.C. Cir. 2012) (upholding airfare advertising disclosure rule that "target[ed] misleading speech"), *cert. denied*, 133 S. Ct. 1723 (2013); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) (upholding mandatory calorie-count disclosure requirement enacted in response to obesity epidemic).

AMS does not claim that the new "Born, Raised, and Slaughtered" disclosures are related to "protecting consumers from commercial harms."  *Discovery Network*, 507 U.S. at 426.  After all, in AMS's own words "the COOL program is [not] a food safety or traceability program." 2009 Final Rule, 74 Fed. Reg. 2,679.  *See also, e.g.*, USDA, Food Safety and Inspection Serv., Country of Origin Labeling for Meat and Chicken, http://www.fsis.usda.gov/wps/wcm/connect /8d6e9075-9160-42d9-9ae7-90828c197e4b/COOL_Meat_and_Chicken.pdf?MOD=AJPERES (last visited July 11, 2013) (same).  All AMS can muster, then, is that there is "interest by certain U.S. consumers in information disclosing the countries of birth, raising, and slaughter on muscle cut product labels."  Final Rule, 78 Fed. Reg. 31,376.  But AMS does not and cannot suggest that this interest stems from a legitimate governmental concern about health or safety.

Even if the court were to depart from precedent and hold that the government has a substantial interest in providing gratuitous information to consumers, AMS's failure to articulate a coherent explanation of the benefit from the Final Rule is fatal.  A fundamental tenet of heightened scrutiny is that the government's justification must rest on evidence, not "mere speculation or conjecture."  *Edenfield*, 507 U.S. at 770.  But speculation and conjecture are all

16

AMS has on offer.   In the Final Rule, AMS's account of the consumer benefit was that "information on the production steps in each country *may* embody latent (hidden or unobservable) attributes, which *may* be important to individual consumers and result in additional but *hard to measure* benefit increases."  78 Fed. Reg. 31,377 (emphasis added).  AMS did not say that any such attributes actually exist, much less what these "attributes" might be or why they "may be" important to particular individuals.  The agency did not even clarify whether these are attributes of the animal, the meat, or something else entirely.  These gaps render any consumer informational interest too vague to qualify as "substantial" under *Central Hudson*. AMS cannot assert it has a legitimate interest in something it cannot explain.

The Final Rule is also rife with self-contradiction and inconsistencies about the extent and intensity of consumer interest.  "[T]he general rule" in reviewing a commercial-speech regulation "is that the speaker and the audience, not the government, assess the value of the information presented."  *Edenfield*, 507 U.S. at 767.  As just noted, AMS claims, citing some comment letters, that "certain U.S. consumers" have an interest in "Born, Raised, and Slaughtered" disclosures.  78 Fed. Reg. 31,376.  But the evidence before the agency showed that consumers in the aggregate do not value the information that will be presented on the new labels. *Id.*; AMI Letter, Attachment C, at 2.  The agency did not refute this; in fact, AMS *agreed* that the new labels had no observable effect on consumer demand.  78 Fed. Reg. 31,376.

AMS's own economic analysis also undermines any notion that consumers benefit from the Final Rule's new requirements, because AMS acknowledged that there "was no compelling market failure argument" with respect to country-of-origin labeling.  78 Fed. Reg. 31,377.  This finding means the market can be expected to yield voluntary "Born, Raised, and Slaughtered" labels when enough consumers value that information highly enough.  *See id.*   And, by

extension, the *absence* of such labeling indicates that most consumers do not value this information highly enough to demand it. In the end, AMS was frank to say that any economic benefits from the Final Rule are too small to measure. *See id.* at 31,376 (study findings that COOL program has not led to change in demand "may . . . imply that the economic benefits are . . . too small to be measurable in a general-population study"). Thus, AMS's apparent justification for compelling speech in this case rests on the "interest" of "certain U.S. consumers" whose numbers are too small or whose interest is too weak to move aggregate demand.

AMS's arguments in this case are likely to be similar to the ones that failed the State of Vermont in *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996). In that case the Second Circuit enjoined a Vermont law requiring labeling on milk from cows treated with the hormone rBST. There, as here, the record contained no credible evidence of any threat to public health, and it was "plain" that the State "could not justify the statute on the basis of 'real' harm." *Id.* at 73 (quoting *Edenfield*, 507 U.S. at 770). Indeed, Vermont conspicuously avoided taking a position as to "whether rBST is beneficial or detrimental" to consumers, but suggested the law could be justified by "consumer curiosity." *Id.* at 73 & n.1.

The court of appeals rejected Vermont's argument. It held that consumers' general informational interest "is insufficient to permit the State . . . to compel the dairy manufacturers to speak against their will": Absent "some indication that this [labeling] information bears on a reasonable concern for health or safety or some other sufficiently substantial governmental concern, the manufacturers cannot be compelled to disclose it." *Id.* at 74.

So too here. "Certain" consumers may be curious to know where animals are "born," "raised," and "slaughtered"—but that information, as AMS has several times confirmed, is not related to health, safety, or consumer protection. Like Vermont in *International Dairy Foods*,

AMS appears ambivalent at best about the actual value of this information to consumers.  But the First Amendment does not permit the government to resolve a tie in favor of compelling speech: "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort."  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).  *See also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996) ("speech restrictions cannot be treated as simply another means that the government may use to achieve its ends").  AMS cannot legitimately claim that it has a substantial governmental interest in the new labels.

### 3. The Final Rule Does Not Directly or Materially Advance Consumer Informational Interests.

The Final Rule also does not "directly and materially" advance whatever limited informational interest may exist, if any exists.  *RJR*, 696 F.3d at 1212.  The new labels will appear only on muscle cuts sold at retail, and even with respect to that category of products will lead to misleading and confusing results.

First, any claim that the Final Rule materially advances consumer interest in country-of-origin information is undermined by the fact that AMS did not amend the labeling regulation applicable to ground meat, which accounts for a substantial proportion of meat sold at retail. Ground beef, for example, accounts for more than 40% of beef sold at retail in the United States, *see* NCBA, Average Annual Per Capita Consumption of Beef Cuts and Ground Beef, *available at* http://www.beefusa.org/beefindustrystatistics.aspx, and yet it is not subject to the detailed "Born, Raised, and Slaughtered" labeling or to the commingling ban.  *See* 7 C.F.R. § 65.300(h). Thus, even putting aside the statutory exemptions for processed and restaurant food, the agency did not see through its mission to inform to the limited extent it could have.

The labels on muscle cuts are also inconsistent and misleading in their particulars.  A number of examples illustrate the point:

- So long as an animal spends more than two weeks in the United States before being slaughtered, the Final Rule specifies that "the production step related to any raising occurring outside the United States may be omitted from the origin designation."  *Id.* at 31,368.  Thus, meat from an animal that spent the majority of its life being raised outside the United States will be misleadingly labeled "Raised in the United States."

- When animals are imported to the United States for immediate slaughter, the Final Rule states that "the country of raising . . . shall be designated as the country from which they were imported."  *Id.* at 31,369.  This mandate applies even if the animal was not actually raised in the country from which it was imported, but rather was transferred there for some minimal amount of time before being sent to the United States for slaughter.  And when the animal has been raised in both a third country and the country from which it was imported, the Rule requires a label that will deceive customers by specifying only the latter as the country of raising.[5]

- Instead of requiring "Born, Raised, and Slaughtered" labels for meat derived from animals that are slaughtered in a foreign country, the Rule specifies that this meat "shall retain [its] origin, as declared to U.S. Customs and Border Protection at the time the product entered the United States, through retail sale (e.g., 'Product of Country X')."  *Id.* at 31,385.  But because all other meat labels will include detailed production-step information, consumers will surely interpret "Product of Country X" labels to mean that the animal was born, raised, and slaughtered in Country X.  They will accordingly be misinformed any time an animal was born or raised outside Country X, and only transferred to Country X to be slaughtered.

- Consumers will be especially misinformed when meat imported as a finished product from a foreign country has a production-step connection to the United States, because the label will not disclose that the source animal was born or raised here.  Thus, meat from a U.S.-born and –raised animal that is transferred to Country X for slaughter and then imported back into the United States will be labeled "Product of Country X"—in stark contrast to an animal born and raised in Country X and then transferred to the

---

[5]     For example, depending on feed prices, some businesses may ship U.S.-born cattle that have been raised for some time in the United States to Canada to be further raised and then later exported back to the United States for immediate slaughter.  *See* Declaration of Brad MacDowell (MacDowell Decl.) ¶ 7.

United States for slaughter, which will be labeled, "Born and Raised in Country X, Slaughtered in U.S."

These examples devastate the agency's rationale for the proposed rule. Ironically, the specificity of the new labels is their downfall: By requiring retailers to include detailed point-of-processing information that varies widely in accordance with exemptions and definitional loopholes, the agency has assured that consumers will sometimes be misinformed, or at the least confused, about the origin of their meat.

Even if AMS could show these labels would not mislead consumers, the fact that the requirements apply inconsistently among types of meat and within the four categories of muscle cuts raises a First Amendment red flag. Selective regulation "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2740 (2011). Those doubts are particularly strong here because AMS does not even appear to understand the consumer interest it is invoking. *See supra* at 16-18. The inconsistencies in the required labeling thus provide another independent reason to invalidate the Final Rule under *Central Hudson. See, e.g., Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (invalidating restrictions on beer labeling that did not apply to other categories of liquor); *Valley Broad. Co. v. United States,* 107 F.3d 1328, 1334 (9th Cir. 1997) (invalidating ban on advertising by commercial lotteries that had "myriad exceptions" for other types of gambling); *Authentic Beverages Co. v. Texas Alcoholic Beverage Comm'n*, 835 F. Supp. 2d 227, 246 (W.D. Tex. 2011) (compelled designations distinguishing "beer" from "ale" "potentially conceal[ed] as much information as they provide[d]" and thus did not advance state interest).

21

Because the Final Rule compels misleading speech, conceals relevant information, and applies in a patchwork fashion, it cannot be said to "*directly* advance" any interest in providing information to interested consumers.  It fails *Central Hudson* review for this reason as well.

### 4.    The New Regulations Are More Extensive Than Necessary.

The tailoring element of the *Central Hudson* test requires that there be "a reasonable fit between the [government]'s ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective." *Lorillard Tobacco*, 533 U.S. at 556 (citation omitted).  The detailed disclosure framework AMS has prescribed is far more extensive than the narrow (and speculative) consumer interests being served

AMS's own findings show that there is a mismatch between the ends and the means of the Final Rule.  Recall what AMS has said about the "ends": The new labels provide "certain" consumers with information on which they might—but probably will not—"base their purchasing decisions."  *Supra* at 16-18.  After all, AMS concedes, the market will provide as much information as consumers actually want, 78 Fed. Reg. 31,376, and the marginal additional benefit of the Final Rule is therefore "hard to measure." *Id.* at 31,377.  What is *not* "hard to measure" about the Final Rule is the extent of the burden it will impose on the meat industry.

The "means" AMS has chosen in this case include both a highly detailed labeling requirement, and a prohibition on commingling mixed-origin meats.  As Plaintiffs' declarations show, complying with these new rules will require the meat industry to fundamentally alter the way it does business, with small operations in distressed regions taking the worst hit of all.  *See infra* at 38-44.  Businesses that continue using imported animals must implement a complicated and inefficient segregation process.  *See* MacDowell Decl.  ¶¶ 13-17; Declaration of Bryan Karwal ("Karwal Decl.") ¶ 8.  *See also* 78 Fed. Reg. 31,380 (recognizing new segregation and sorting costs for companies that currently commingle).  As even AMS seems to concede, these

are all significant changes that will take time and millions of dollars to implement.  *See id.* at 31,373 (estimating ban on commingling would cost packers and processors $19 million to $76.3 million).  And those costs do not include retailers' expenditures to bring their storage, labeling, and signage into compliance.  *See id.* at 31,383, table 5 (estimating retailer costs of $72 million).

These costs could force many businesses to purchase strictly, or mostly, "Category A" animals, whose meat will ultimately bear the label "Born, Raised, and Slaughtered in the United States."  *See* Karwal Decl. ¶ 5 (explaining that 2009 Final Rule reduced demand for Canadian-born hogs); MacDowell Decl. ¶ 18.  Switching to Category A does not happen with a flick of a switch.  Drought and economic conditions have led to a dramatic reduction in livestock production in the United States.  *See* 78 Fed. Reg. 31,374-75.  The existing demand for this shrinking supply, combined with the additional demand from businesses reducing their import business, will mean higher costs throughout the supply chain.  *See* Karwal Decl. ¶ 5.  It also means some packers may have to build a new vertically integrated supply chain and begin raising their own feeder cattle. MacDowell Decl. ¶ 19.  Because the meat industry is a low-margin business, these costs will have to absorbed by meat-industry businesses and could lead to layoffs or even plant closings.  *See id.* ¶ 21; Karwal Decl. ¶ 10.  Some packers and processors may not even have this option available.  *See* Declaration of Alan Rubin (Rubin Decl.) ¶ 15.

In addition to the cost to U.S. businesses, trade relationships will also suffer.  In fact, they have already: Canada and Mexico *both* plan to ask the WTO for permission to impose retaliatory tariffs against specified U.S. exports.  *See* Carina Perkins, *Canada Plans Retaliation Over US' COOL Stance*, Global Meat News, June 11, 2013; Reuters, *Mexico Says It May Suspend U.S. Trade Preferences Over Meat Labels*, June 7, 2013.  *See also infra* at 37-38.  Those actions would affect U.S. businesses, consumers, and government interests alike.

To make matters worse, all of these implementation changes and costs will be incurred to provide labeling on just a fraction of meat that is sold to consumers.  The new "Born, Raised, and Slaughtered" labels apply to (1) muscle cuts (2) sold at retail (not at food-service establishments) that are (3) not "processed" (through marinating, canning, or other methods captured in AMS's broad regulations).  *See* 7 U.S.C. §§ 1638(2)(B) (exempting processed commodities), 1638a(b) (exempting food-service establishments); 7 C.F.R. § 65.300(h) (retaining "Product of" labeling for ground meats).  Those conditions narrow the field of covered products substantially[6]—yet *all* meat will be covered by the handling, recordkeeping, and disclosures required by the Final Rule because segregation of meats according to their ultimate end-use typically occurs after the meat has been processed.  *See* WTO Appellate Body Report ¶ 335.  The Final Rule thus burdens an entire industry in service of a labeling requirement that applies to only a fraction of meats sold in the United States.

There can be no constitutionally satisfactory justification for upending the meat industry in this way.  Perhaps that is why AMS barely made an effort to come up with one.

\*          \*          \*

---

[6]      In the beef industry, retail sales account for just one-third of domestic consumption, and ground beef accounts for 40% of retail sales.  *See* NCBA, Beef Market at a Glance, 2-3, *available at* http://www.beefusa.org/beefindustrystatistics.aspx; *supra* at 19.  In the pork industry, retail also accounts for one-third of consumption, and bacon, sausage, and other ground and processed products account for nearly 80% of sales.  *See* Leopold Center, Understanding National Supply Chains: Fresh Cut Pork, *available at* http://www.leopold.iastate.edu/ sites/default/files/pubs-and-papers/2007-12-understanding-national-food-supply-chains-fresh-cut-pork.pdf; National Pork Board, The Pork Industry at a Glance, 20, *available at* http://www.porkgateway.org/FileLibrary/PIGLibrary/References/NPB%20Quick%20%20Facts %20book.pdf.  In other words, the Final Rule will apply to less than 20% of the beef and less than 7% of the pork consumed in the United States—much less, in fact, because these statistics do not exclude all of the retail muscle cuts that may be exempted because they are "processed," within the meaning of AMS's regulations.

*Central Hudson* requires a demonstration that the "fit between the government's ends and the means chosen to accomplish those ends is . . . reasonable." *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks and citation omitted). The Final Rule forces the industry to implement an inefficient, economically irrational, trade-restrictive, and consumer-unfriendly way of doing business. Because AMS's reasons for doing so are as inadequate as they are incoherent, Plaintiffs are likely to prevail on their claim that the Final Rule violates the First Amendment.

**B.      The Final Rule Exceeds the Statutory Authority Granted in the AMA.**

Federal agencies must obey not only the Constitution, but also Congress: The APA prevents agencies from promulgating rules "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosps.*, 488 U.S. 204, 208 (1988).

The Final Rule exceeds AMS's statutory authority under the AMA in two respects. First, the Rule contravenes statutory limitations that do not permit country-of-origin information to be conveyed through labels that detail each individual production step, from birth to raising to slaughter. Second, the Final Rule's bar on commingling extends beyond the limited authority Congress granted AMS to regulate product labels by instead dictating how meat is processed and packaged in the first instance. For each of these reasons, the Final Rule will likely be vacated.

**1.      The AMA Does Not Permit Point-of-Processing Labels.**

The Final Rule requires that COOL labels specify where an animal was born, raised, and slaughtered. But the plain language, the structure, and the history of the AMA all demonstrate that the statute does not permit point-of-processing designations.

Beginning at the beginning—with the text—the AMA provides that retailers shall inform consumers of "the country of origin" of covered commodities, not the country where each individual step in the production process occurred. 7 U.S.C. § 1638a(a)(1). Nor can "country of origin" mean "countries of birth, raising, and slaughter." That much is clear from Congress's definition of the country of origin for Category C meat, which is derived from animals imported for immediate slaughter. For that meat, the retailer "shall designate the origin . . . as—(i) the country from which the animal was imported; and (ii) the United States"—period. *Id.* § 1638a(a)(2)(C). Congress's use of the mandatory "shall" shows that this provision applies even if an animal was born or raised in a country other than the one from which it is ultimately imported to the United States. *See, e.g., Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of a person instructed to carry out the directive."). In that event, the animal's "country of origin" has nothing to do with where it was born or raised. Instead, Congress defined its origin as two places only—the country from which it was imported and the United States. The statute therefore does not permit retailers to provide origin information for this meat broken out by individual productions steps because details regarding where the animal was born and raised may contradict the statutory definition.

The same conclusion flows from the provision concerning animals that qualify as exclusively of U.S. origin—so-called Category A meat. Congress provided that retailers may use a U.S.-only label for animals born, raised, and slaughtered in the United States *or* for animals "present in the United States on or before July 15, 2008." 7 U.S.C. § 1638a(a)(2)(A)(iii). Given the latter category, Congress at the time it enacted the statute could not have intended origin information to be conveyed through production-step details because an animal present in the

26

United States before 2008 may not have been born or raised here.  That would have made a "born, raised, and slaughtered in the United States" label not just inaccurate, but affirmatively deceptive—plainly an untenable interpretation.

The statutory language regarding Category D meat, which is exclusively processed outside the United States, likewise indicates that point-of-processing labels are impermissible. The statute specifies that the country of origin for Category D meat is "*a* country"—in the singular, rather than plural—"other than the United States."  7 U.S.C. § 1638a(a)(2)(D).  That language is significant because Congress took care in other sections of the statute to specifically authorize COOL designations listing multiple countries of origin.  *See, e.g.*, *id.* § 1638a(a)(2)(B) & (C).  Had Congress intended to permit more than one country of origin for Category D meat "it likely would have used the plural . . . , as it has done in other . . . provisions." *United States v. Hayes*, 555 U.S. 415, 422 (2009); *see also, e.g.*, *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (emphasizing that the statutory term "'place' is in the singular, not the plural").  Because Congress did not do so, Category D meats can only be labeled with one country of origin.  And that is incompatible with a point-of-processing scheme, since an animal may not be born, raised, and slaughtered all in one place.  Indeed, in apparent recognition of this statutory limitation, the Final Rule exempts Category D meat from the "Born, Raised, and Slaughtered" labeling requirement, and instead provides that the country of origin shall be the single-country origin declared to U.S. Customs when the products entered the United States. 78 Fed. Reg. 31,369.

What goes for Category A, C, and D meat goes for all meat: There is no reason to think Congress intended to limit the prohibition on production-step designations to meat from some animals but not others.  After all, "individual sections of a single statute should be construed together," *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972), especially when "only one of

the permissible meanings produces a substantive effect that is compatible with the rest of the law," *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988).  *See also, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) ("Although [the statute] does not define what a prospectus is, it does instruct us what a prospectus cannot be if the Act is to be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout.").

Consistency makes particular sense in the context of a labeling program intended to provide accurate information to consumers.  Congress could not have wanted the specificity of COOL labels to vary based on the happenstance of whether an animal was imported for immediate slaughter or imported and then raised briefly in the United States before slaughter. Nor could Congress have intended label content to turn on whether an animal was present in the United States on July 15, 2008, or not until July 16, 2008.  *See, e.g.*, *Cellco P'ship v. FCC*, 357 F.3d 88, 90 (D.C. Cir. 2004) (statute should be interpreted to "provide[] internal statutory consistency" and "avoid[] absurd results").  Thus, while Congress defined "country of origin" differently for separate categories of meat, with some categories encompassing an animal's country of birth or raising, *see* 7 U.S.C. § 1638a(a)(2)(A)(i) & (B), the statute's language and structure make clear that labels must not list this information by detailing each production step.

The statute's history bolsters this conclusion.  When AMS first proposed COOL regulations in 2003, it sought to mandate detailed point-of-processing labels for all meat because it thought the statute required "Born, Raised, and Slaughtered" designations.  *See* 2003 Proposed Rule, 68 Fed. Reg. 61,944.  That proposed labeling scheme ignited controversy, and Congress postponed implementing the statute while it considered amendments to the law.  *See* COOL Report, *supra*, at 1.  And when Congress enacted the 2008 Farm Bill, it rejected AMS's proposed

28

point-of-processing labeling system.   Rather than leave the content of labels to the agency's discretion, Congress specifically defined how to determine the country of origin for each conceivable category of meat.   *See* 7 U.S.C. § 1638a(a)(2)(A)-(D).   As noted above, for several of those categories Congress made clear that production steps concerning where the animal was born and raised are irrelevant because the animal's origin instead turns on other factors.   The history thus confirms what is plain from the statutory text: COOL labels must not specify each point of processing, from birth to raising to slaughter, because not every animal's statutorily defined "country of origin" includes those production steps.

Because Congress's intent is clear, AMS was required to follow it.   *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter."); *see also, e.g.*, *Davis County Solid Waste Mgmt. v. U.S. EPA*, 101 F.3d 1395, 1410 (D.C. Cir. 1996) (agencies do not have "authority to ignore the categories that Congress established").   But the Final Rule directly contradicts the statute.   That is most clear with respect to Category C meat.   Recall that the *statute* compels retailers to designate the origin of this meat as the country from which the animal was imported for immediate slaughter and the United States.   But the *Rule* attempts to override that command, instructing retailers that the label must instead specify "the location of the three production steps."   78 Fed. Reg. 31,368-31,369.[7]   For an animal born in one country, transferred to another,

---

[7]       In an apparent effort to reduce the conflict with the plain language of the statute, the Rule provides that "the country of raising for animals imported for immediate slaughter . . . shall be designated as the country from which they were imported."   78 Fed. Reg. 31,369.   Putting to one side the potential that this will mislead consumers—since an animal can be raised elsewhere and then briefly transported through a third country from which it is imported for immediate slaughter—the Rule still conflicts with the statute by requiring retailers to specify the animal's place of birth as one of its countries of origin.

and then imported to the United States for immediate slaughter, the Rule cannot be reconciled with the statute: According to the Rule, all three countries must be designated the country of origin, whereas under the statute the origin "shall" be only two places: "the country from which the animal was imported" and "the United States."  7 U.S.C. § 1638a(a)(2)(C).  This direct conflict standing alone requires vacatur of the Rule.

But the problems with the Rule go deeper still because, as demonstrated above, the statute's text, structure, and history establish that Congress did not authorize point-of-processing labels for *any* kind of meat.  The Rule transgresses that statutory limitation down the line, mandating "Born, Raised, and Slaughtered" labels for all animals except (arbitrarily) those that are not slaughtered in the United States but rather imported as finished meat products.  Because the Final Rule violates the statute's limits, plaintiffs have demonstrated a likelihood of success on their claim that the Rule must be set aside.[8]

### 2.    The Ban on Commingling Exceeds AMS's Authority.

The COOL statute grants AMS authority to enact regulations concerning how food is labeled for marketing purposes, but it does not empower the agency to regulate how that food is produced and packaged in the first place.  That is because—in AMS's own words—"the intent of

---

[8]    Even if AMS's adoption of point-of-processing labels were a "permissible reading of the authorizing statute"—which it is not—the agency "must also avoid acting arbitrarily or capriciously in implementing its interpretation."  *CSI Aviation Servs., Inc. v. DOT*, 637 F.3d 408, 414 (D.C. Cir. 2011).  The agency has not satisfied that duty here, given that a hodgepodge of regulatory exemptions and loopholes will ensure that "Born, Raised, and Slaughtered" labels will in many instances misinform, not educate, consumers about the origin of their food.  *See supra* at 20-21, and *infra* at 33-34.  To offer just one anomaly produced by the Final Rule, meat derived from an animal that was born and raised in Canada and then slaughtered three weeks after importation to the United States will be labeled "Born in Canada, Raised and Slaughtered in United States," *see* 78 Fed. Reg. 31,368, while meat from an animal that is born and raised in the United States, exported to Canada to be slaughtered, and then imported as a finished product into the United States will be labeled "Product of Canada," *see id.* at 31,385.  The agency does not explain how this could possibly be a reasonable interpretation of the COOL statute.

the law . . . is to provide consumers with additional information on which to base their purchasing decisions," not to "provide a basis for addressing food safety."  2009 Final Rule, 74 Fed. Reg. 2677; *see also, e.g.*, *id.* at 2679 ("[T]he COOL program is neither a food safety or traceability program, but rather a consumer information program.").  Yet by barring commingling, AMS has reached beyond the statute's scope by regulating how meat can be efficiently processed and then sold at retail.  *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (observing that an agency's power to regulate "is limited to the scope of the authority Congress has delegated to it").  The Final Rule exceeds AMS's power because it dictates not just the contents of the label, but the contents of the package of meat itself.

As previously noted, the Final Rule's bar on commingling will dramatically alter how meat is produced and packaged in the United States.  On the production side, the commingling ban will force processors to change how they segregate animals and operate their plants.  In order to keep track of meat from animals with different "Born, Raised, and Slaughtered" heritages, processors and packers will need to adjust their line processing, storage, transportation, and distribution operations to handle each origin category separately.  *See* 78 Fed. Reg. 31,373 (recognizing that the commingling ban will have these upstream operational effects).  And if those costs prove prohibitive or if retailers are unwilling to accept mixed-origin meat—as commenters emphasized is likely to happen, *see e.g.,* AMI Letter at 3-13—then the commingling ban will effectively regulate trade flows by discouraging the importation of foreign-born or -raised livestock.  On the retail side, retailers will for the first time in history be unable to package meats from animals with different origins together.  Thus, although AMS previously recognized that "[c]ommingling like products is a commercially viable practice that has been

historically utilized by retailers," 2009 Final Rule, 74 Fed. Reg. 2670, the bar on commingling will extend beyond labeling practices to govern how meat can be sold to consumers.

But Congress did not give AMS authority to dictate how to produce and package meat. Nor may AMS expand its limited power to regulate labels into power over processors' and retailers' primary conduct in preparing food for retail. Indeed, USDA's former General Counsel previously recognized as much when he interpreted the statute to expressly permit commingling in a letter submitted to the House Agriculture Committee. *See* Letter to Bob Goodlatte from USDA General Counsel Mark Kesselman (May 9, 2008) (attached as Exhibit 12). As the agency recognized in that letter, "[t]here is no indication anywhere in the [COOL] statute that it is designed to govern the handling of livestock" or to "force the segregated handling of animals with varying geographical histories." *Id.* at 4. Thus, "[i]t would be inconsistent with th[e] overall purpose [of the AMA] to read into the statute additional mandates that would impose economic inefficiencies and disrupt the orderly production, processing, and retailing of covered commodities." *Id.* That is exactly right. Because the agency has gone too far in regulating how meat is produced—and not just how it is labeled—the Final Rule impermissibly "exceeds the [agency's] statutory authority." *AT&T Corp. v. FCC*, 323 F.3d 1081, 1082 (D.C. Cir. 2003).

## C.    The Final Rule Is Arbitrary and Capricious.

The APA also directs that a court should "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2). Courts must "undertake a substantial inquiry into the facts underlying challenged agency actions," *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 364 (D.C. Cir. 2002) (internal quotation marks omitted), and avoid "rubber stamp[ing] . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291 (1965). If an agency's decision is not "founded on a reasoned evaluation of the relevant factors,"

it cannot stand.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also, e.g.*,

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (court must

determine whether an agency action "was based on a consideration of the relevant factors and

whether there has been a clear error of judgment") (internal quotation marks omitted).

The Final Rule fails this review as well.  AMS's explanation for the Rule runs counter to

the evidence before the agency and imposes staggering costs on regulated entities with no upside

benefit.  In addition, AMS unreasonably refused to delay implementation of the Rule until the

WTO determines whether the new regulations comply with the United States' trade obligations.

For these reasons, Plaintiffs are likely to succeed on the merits of their APA claims.

## 1.  AMS's Justifications for the Final Rule Contradict the Evidence Before the Agency.

It is quintessentially arbitrary and capricious for an agency to impose crippling costs on

regulated entities for no reason at all.  Yet that is what AMS has accomplished in the Final Rule.

The agency maintained that the commingling ban and the "Born, Raised, and Slaughtered"

labeling requirement would "provide[] consumers with more specific information" and "bring

the mandatory COOL requirements into compliance with U.S. international trade obligations,"

78 Fed. Reg. 31, 370.  Neither justification is supported by the evidence  *See State Farm*, 463

U.S. at 43 (agency action qualifies as arbitrary and capricious when "[t]he agency has . . . offered

an explanation for its decision that runs counter to the evidence before the agency").

### a.  The Final Rule Will Not Provide Consumers with Accurate Information on which to Base Their Purchasing Decisions.

Throughout the Final Rule, AMS emphasized that the new labels would "provide

consumers with more specific information on which to base their purchasing decisions."  78 Fed.

Reg. 31,368; *see also, e.g.*, *id.* at 31,371; *id.* at 31,374; *id.* at 31,376.  There is just one problem:

The labels will in many cases be inaccurate.  *See supra* at 20-21, 30 n. 8.  Among other things,

the labels will sometimes omit a country where an animal was raised; state that the animal was raised in the country from which it was imported when that is not accurate; or misleadingly suggest that an animal was born, raised, and slaughtered in a single country outside the United States even if these production steps occurred in multiple countries, including the United States. *See id.*  Thus, the agency's premise—that the labels will "benefit" consumers by arming them "with information they need to make informed choices," *id.* at 31,375—gets things backward. The new rule will make consumers think they have accurate information about meat origin even when that information is *wrong*.  Because the Rule "frustrate[s] the congressional policy underlying the statute," *Brown*, 380 U.S. at 291, it should be set aside.

### b.  The Final Rule Exacerbates, Rather Than Cures, the United States' WTO Violations.

AMS offered just one other rationale for the "Born, Raised, and Slaughtered" labels and the bar on commingling: that these changes were necessary to "bring[] the United States into compliance with its international trade obligations."  78 Fed. Reg. 31,370.  But the evidence before the agency pointed overwhelmingly in the opposite direction.  The new regulations will not only fail to cure the trade violation; they will make it worse.  No need to take our word for it: Canada and Mexico, the complaining parties in the WTO dispute, weighed in during the rulemaking process to explain that the new regulations would "exacerbate the adverse impact of the COOL Measure on bilateral trade" and so trigger trade penalties and retaliation.  Mexico Letter at 1; *see also* Canada Letter at 1-2 (same).  Because the agency offered no reasoned response to these concerns, it cannot justify the Rule as a means to resolve these trade disputes.

The Final Rule exacerbates, rather than fixes, the deficiencies in the COOL program.  As an initial matter, the Rule solidifies the Appellate Body's conclusion that COOL creates disincentives against handling imported livestock.  WTO Appellate Body Report ¶ 292.  That is

because the bar on commingling creates insurmountable recordkeeping, segregation, and processing difficulties for processors and retailers alike.   All the hassle and expense of segregating meat from each conceivable "Born, Raised, and Slaughtered" configuration can be avoided by simply rejecting imports and handling only domestic stock.

Nor does the Final Rule cure the disconnect between the burden on upstream producers and the accuracy and extent of information conveyed to consumers.  *Id.* ¶ 349.  For one thing, the new production-step labeling regime will affirmatively mislead consumers in some cases by falsely stating where an animal was born or raised, *see supra* at 20-21, 30 n. 8, 33-34—which will give the WTO new cause to think that COOL labels are inaccurate.  *See* WTO Appellate Body Report ¶ 343 (noting concern with the accuracy of COOL labels).   For another, the Rule arbitrarily exempts Category D meat from the "Born, Raised, and Slaughtered" labels, demonstrating that the burdens imposed by COOL are not even-handed.  *See id.* (identifying differential treatment of Category D meat as problematic).   In addition, the Rule leaves untouched the broad exemptions for processed meat and meat sold in food-service establishments—which means that "a considerable proportion of . . . beef and pork" will continue to "carry no COOL label at all."  *Id.* ¶ 344.  Finally, by ratcheting up the burden on producers through increased segregation and recordkeeping costs, the Rule ensures that "the informational requirements imposed on upstream" entities will *still* be "disproportionate as compared to the level of information communicated to consumers."  *Id.* ¶ 347.

For these reasons, the Final Rule cannot be justified on the ground that it brings the United States into compliance with its international obligations.

*      *      *

The Final Rule thus creates more problems than it solves—which is ultimately a low bar, because the Final Rule solves no problems. AMS's justifications for the Rule are at odds with the evidence before the agency, and the Rule will likely be deemed arbitrary and capricious.[9]

### 2. AMS Arbitrarily Refused To Delay Implementation of the Final Rule until the WTO Reviews It.

An agency "must respond in a reasoned manner to [rulemaking comments] that raise significant problems." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (internal quotation marks omitted). Yet AMS unreasonably dismissed commenters' concerns that immediate implementation of the Final Rule could impose enormous costs on regulated entities that would all be for naught when the WTO rules that the new regulations do not bring the United States into compliance with its trade obligations.

Commenters requested that AMS delay implementation of the regulations until the WTO ruled on whether they cured the trade violations. That made sense: if the WTO were to reject the new regulations the agency would presumably have to adopt yet another labeling system to implement the COOL statute. Commenters explained that they should not be forced to incur hundreds of millions of dollars in costs now, only to face another round of crushing expenses in the event the agency revisits the regulations after the WTO deems them noncompliant.

---

[9]     AMS's inability to identify a benefit from the Rule that is consistent with the evidence before the agency demonstrates yet another reason why the Rule is arbitrary and capricious: "serious flaw[s] undermine[d] [the agency's cost-benefit] analysis." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *see also City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) ("[W]e will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses"). The illusory consumer benefit, which AMS could not even quantify, *see supra* at 16-18, cannot measure up to the Rule's substantial costs, which AMS estimated could clock in at $192.1 million, *see* 78 Fed. Reg. 31,381, and which are actually likely to be much higher. *See, e.g.*, AMI Comment Letter at 7-8 (estimating that capital expenditures could exceed $572 million and that reductions in processing Canadian and Mexican cattle and hogs could cost $500 million); COOL Report, *supra*, at 29 (noting that if the United States does not comply with the WTO's ruling on COOL, "the damage claims could fall between $1 billion and $2 billion").

Against all this, the agency cryptically responded that "it would be impracticable and contrary to the public interest to delay the effective date of the rule beyond May 23, 2013." 78 Fed. Reg. 31,370.[10] That boilerplate invocation falls flat. As noted, AMS could barely scrape together any consumer-benefit rationale for the Rule. *See supra* at 16-18. Moreover, the agency all but admitted that there can be no public interest in implementing the new regulations *right now*, rather than after the WTO reviews them. The agency concluded that any "incremental economic benefits from the labeling of production steps . . . likely will be comparatively small relative to those already afforded by the 2009 COOL final rule," *id.* at 31,377, which itself offered only a "small" benefit accruing "mainly to those consumers who desire country of origin information," 2009 Final Rule, 74 Fed. Reg. 2683. A "comparatively small" benefit layered on top of an already "small" benefit translates into a downright miniscule benefit—and one that surely cannot justify imposing nearly $200 million (if not more) in compliance costs immediately, when those costs may prove unnecessary after further WTO review.

Nor could the agency ward off WTO-approved retaliatory sanctions by making the Final Rule effective immediately. After all, Canada and Mexico made clear during the rulemaking that they view the new regulations as even more problematic and more likely to trigger retaliation than the prior COOL program. According to Canada, "the proposed rule will increase the discrimination against foreign livestock" and force "Canada . . . to pursue all available options . . . under the WTO dispute settlement system, including requesting compensation from the United States or requesting authorization . . . to impose retaliatory measures." Canada Letter at

---

[10]     Because AMS has emphasized that the Final Rule is effective and mandatory immediately, *see, e.g.*, 78 Fed. Reg. 31,370, it cannot now claim that it addressed commenters' concerns by authorizing a six-month "education and outreach" period. In any event, that period will not give the WTO sufficient time to review the new regulations. *See* NCBA Letter at 7.

1-2.  Mexico, too, emphasized that the new regulations "leave the United States in violation of its WTO commitments," which "force[s] [Mexico] to pursue the available mechanisms for withdrawing trade benefits from the United States."  Mexico Letter at 1.

In other words, AMS's decision not to delay implementation of the Final Rule makes it, if anything, more—not less—likely that our trading partners will seek penalties.  The agency has invited the very result it aimed to prevent—that "Canada and Mexico could take action that adversely affects U.S. interests (e.g., increasing tariffs on U.S. goods)."  78 Fed. Reg. 31,385. That absurd outcome demonstrates that AMS did not reasonably respond to commenters' request that the effective date of the Final Rule be stayed pending WTO review.

*      *      *

Because Plaintiffs have shown a likelihood of success on their claims that the Final Rule violates the First Amendment, exceeds AMS's statutory authority, and constitutes arbitrary and capricious agency action, a preliminary injunction is warranted.

## II.    PLAINTIFFS' MEMBERS WILL SUFFER IRREPARABLE HARM IF THE FINAL RULE IS NOT IMMEDIATELY ENJOINED.

Plaintiffs' members will suffer irreparable harm in the absence of a preliminary injunction.   While this case is being litigated, Plaintiffs will have to comply with the Final Rule, speak against their will, and change their businesses at substantial cost with no assurance that a favorable ruling on the merits will remediate their injuries.

### A.    First Amendment Injury Constitutes Irreparable Harm.

 "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373.  Plaintiffs have shown that the Final Rule deprives their members of a valuable First Amendment freedom: the right to choose the information that they convey—and do not convey—about their products.  *See supra*

at 12-25.   This injury began upon publication of the Final Rule.   Although AMS may be conducting "education" and "outreach" until the end of November, the Final Rule states in no uncertain terms that "[t]he effective date of this regulation is May 23, 2013, and the rule is mandatory as of that date."  78 Fed. Reg. 31,370.  Therefore, Plaintiffs' members are required to make new disclosures immediately.   That is irreparable harm under *Elrod*.  *See, e.g.*, *Amestoy*, 92 F.3d at 72 (finding dairy manufacturers would be irreparably harmed by milk-labeling law that "require[d] them to speak when they would rather not"); *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 50-51 (D.D.C. 2011) (finding "more than a sufficient showing of irreparable harm" in tobacco companies' First Amendment challenge to graphic-warning requirement).

**B.**     **Even Apart from Constitutional Harm, Plaintiffs' Member Businesses Will Be Irreparably Injured.**

Plaintiffs' members will also face new financial and operational burdens as a result of the Final Rule that justify preliminary relief because they are "'both certain and great,'" and "'actual and not theoretical.'"    *Sottera, Inc. v. FDA*, 627 F.3d 891, 898 (D.C. Cir. 2010) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)).  *See, e.g.*, *Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388, 394 (CIT 1994) (packager would be irreparably injured by country-of-origin labeling ruling requiring it to, among other things, "re-engineer its inventory management process to track the source of the vegetables from delivery to packaging to ensure that the various labels will correctly reflect the countries of origin for the vegetables").

**1.**     **The Final Rule Will Cause Immediate Irreparable Harm to Packers and Processors Who Rely on Commingling**.

AMS acknowledged in the Final Rule—and cannot now dispute—that the new regulations will impose costs on packers and processors that are "certain," "great," and "actual," *Sottera*, 627 F.3d at 898.  *See* 78 Fed. Reg. 31,382 ("the companies most likely to be affected" include "packers and processors"); *id.* at 31,373 (estimating ban on commingling would cost

packers and processors $19 million to $76.3 million).[11]   AMS predicted that these costs would impose disproportionate burdens on businesses "that currently commingl[e] domestic and foreign-origin cattle or hogs," *id.* at 31,384, and within this subset, the companies likely to bear the highest costs were those "located nearer to sources of imported cattle and hogs," and likely to be "commingling to a greater extent than others," *id.* at 31,382.

Plaintiffs' declarations demonstrate as much.  Dallas City Packing (DCP), a member of Plaintiff AMI, is a small packer in Texas that depends upon cattle imported from Mexico and its ability to commingle those animals with U.S.-born cattle.  *See* Rubin Decl. ¶¶ 1, 4, 7.  As DCP's President explains, "the direct and indirect costs of [the Final Rule] will be impossible for [DCP] to bear financially."  *Id.*  ¶ 7.  About 40-50% of DCP's supply comes from Mexican-born feeder cattle raised in the United States.  *Id.* ¶ 4.  Having to adopt a new segregated production process for these cattle will require the company to build new facilities and operate its plant less efficiently.  *Id.* ¶¶ 9, 12-13.  Staffing for the new lengthened production process could cost over $250,000 each year.  *Id.* ¶ 10.  Because DCP cannot afford to absorb these new costs, and will have to pass them on to customers, DCP expects its customers to begin demanding "Category A" meat only.  *Id.* ¶ 14. However, DCP cannot afford to make the switch to Category A because it does not have a steady year-round supply of U.S.-born cattle.  *Id.* ¶ 15.  Thus, the shift in demand could lead DCP to lose half of its business and perhaps even force it to close.  *See id.* ¶¶ 7-8, 15.

Packers along the Northern border are in a similar predicament.  Agri-Beef, a member of Plaintiff NAMA, is a family-owned company that operates a packing plant in Washington State.

---

[11]      AMS did not break out labeling costs by industry segment.  *See* 78 Fed. Reg. 31,381, table 4.  Nor did it take into account that packers are often responsible for retail labeling.  *See* National Pork Board, Today's Retail Meat Case, available at http://www.pork.org/filelibrary/ Niche/Meatcase%20study.pdf.

MacDowell Decl. ¶ 2.   Because Washington is a "cattle deficit" state, Agri-Beef relies heavily on cattle imported from Canada during particular times of the year.  *Id.* ¶¶ 6-8.  Thus, having the ability to commingle imported cattle with domestic cattle "allows [Agri Beef] to operate efficiently throughout the year."  *Id.* ¶ 7.   The Final Rule's ban on commingling will force Agri-Beef either to adopt a costly new segregated production process requiring more than $2 million in up-front capital costs and recurring annual administrative, recordkeeping, and storage costs of $25 million, *id.* ¶¶ 13-17, or to switch to processing only "Category A" meat, at a cost of $75-100 million in working capital, *id.* ¶¶ 18-19.  Whichever alternative it adopts, Agri Beef will be at a "tremendous disadvantage" relative to its competitors and, even in the event of a favorable ruling in this litigation, "would not be able to regain any of the ground it lost."  *Id.* ¶ 21.

Agri Beef and Dallas City Packing are just two of more than 20 packers and processors in border regions of the United States that will be immediately and irreparably injured by the Final Rule.  AMI Letter, at 6.  Their declarations show that the immediate effect of the Final Rule is not just a question of costs; it is a question of harm to financial and competitive viability that cannot be restored by a favorable ruling.

### 2.      The Final Rule Will Also Irreparably Injure Suppliers That Depend on Imported Feeder Animals.

The burdens on packers and processors will extend to suppliers of imported animals from Mexico and Canada.  These businesses will also be irreparably injured by the Final Rule.  Cattle feedyards in Texas that depend on imports of Mexican feeder cattle are likely to be particularly hard-hit.  *See generally* Declaration of Ed Attebury (Attebury Decl.); Declaration of Andy Rogers (Rogers Decl.); Declaration of Jim Peters (Peters Decl.).

For example, Alpha 3 Cattle Company, a member of Plaintiff NCBA, is a feedyard that imports over 38,000 head of Mexican feeder cattle each year.  Attebury Decl. ¶ 2.  After the 2009

Regulations were adopted, Alpha 3 was forced to accept discounts of $35 per head on its Mexican-origin cattle, which caused it to lose over $1 million.  *Id.*  Now, under the Final Rule, Alpha 3 expects packers to demand even steeper discounts or to stop buying Mexican-origin cattle entirely.  *Id.* ¶ 10.  Some of the packing plants it counts as customers could also close.  *Id.* These losses will affect Alpha 3 immediately because it has existing cattle inventory that it purchased prior to the implementation of the Final Rule.  *Id.* ¶ 12.  And, starting immediately, it will face a competitive disadvantage and new costs that could result in the closure of its business. *Id.*  The declarations submitted for Rogers & Sons, Ltd. and Runnells Peters Feedyard substantiate the same threat of irreparable injury.  *See* Rogers Decl. ¶¶ 2, 12; Peters Decl. ¶ 12.

Pork operations dependent on imports face a similar threat of immediate and irreparable harm.  BK Pork, a member of Plaintiff NPPC's Iowa affiliate, raises pigs at five sites in the Southwestern part of the state.  Karwal Decl. ¶ 3.  BK Pork imports 75% of its livestock from Canada.  *Id.* ¶ 3.  As BK Pork's President explains in his declaration, the company "will almost certainly stop raising Canadian pigs" as a result of the Final Rule and will "have to pay for more expensive U.S.-born pigs" and likely see its output decrease "substantially."  *Id.*  ¶ 9.  The result is that BK Pork will be "in danger of having to close, or if [it is] able to survive, to close particular sites or lay off personnel."  *Id.* ¶ 10.  And, because the Final Rule provides no transition period, "the shock to [BK's] business will be abrupt and drastic." *Id.* ¶ 11.

### 3. The Final Rule Has Had an Immediate Effect on the North American Meat Industry That Will Only Become More Pronounced Absent an Injunction.

AMS will likely argue that a preliminary injunction is not necessary because the "education and outreach program" is just an indirect way of reassuring regulated entities that the government will not be conducting enforcement efforts during that time.  AMS is hard pressed to make that claim, considering that the Final Rule repeatedly emphasizes that the new regulations

are "mandatory" as of May 23, 2013, and that the "education and outreach" period does not "delay the effective date of the rule." 78 Fed. Reg. 31,369.  Regulated entities cannot disregard a mandatory federal regulation that is effective right now based on an agency's representation that the rule will not be enforced for a short period of time—and even if they could, that would not stave off irreparable harm in this case for two reasons.  The first is that the "education and outreach" period does not change what is occurring in the industry *today*.  *See* Declaration of Martin Unrau (Unrau Decl.); Declaration of Jerry Holbrook (Holbrook Decl.)  Animals are born in spring.  Right now, tens of thousands of calves are grazing in Canada, and the Canadian livestock industry is entering into contracts to sell these calves many months down the road, when they are full-grown steers and heifers.  Unrau Decl. ¶¶ 4-6.  The meat from many of these cattle will not reach consumers until next year, perhaps as late as the summer.  *Id.* ¶ 10. And because the Final Rule will unquestionably be in effect and in force at that point, Canadian cattlemen are experiencing reduced demand from their U.S. customers *now*.  *Id.* ¶¶ 6, 10.  This loss of demand, in turn, threatens to take the bottom out of the Canadian cattle market, as it becomes flooded with Canadian-origin cattle that otherwise would have been sold to entities in the United States.  *Id.*  ¶ 6.  Suppliers and purchasers of these cattle are making operational and contractual decisions for the next year, not the next few months, so the "education and outreach" grace period, such as it is, is simply irrelevant.

The second problem with the "education and outreach" assurance is that while AMS may not be enforcing the rule, retailers are: They are demanding compliance with the Final Rule now. *See* Holbrook Decl. ¶ 5.  And that demand makes sense: AMS maintains that the Final Rule is currently in effect and "mandatory."  78 Fed. Reg. 31,370.  The Final Rule does not vanish simply because AMS has decided to conduct "outreach" for a few months as regulated entities

work toward "100% compliance," *id.* at 31,369—which itself requires substantial lead time *before* the outreach period concludes to make the necessary operational changes, such as building new segregation facilities.  Because retailers must be in full compliance after the outreach period, they are demanding compliance from upstream producers right now.

*          *          *

Plaintiffs' declarations demonstrate that the Final Rule will have—and is having—an immediate and devastating effect on packers, processors, and producers.  The declarations also show that even if the Final Rule is later invalidated in this suit, the damage will be lasting. Plaintiffs have therefore satisfied the element of irreparable harm.  *See, e.g.*, *Sottera*, 627 F.3d at 898 (finding of irreparable harm was "entirely reasonable" where "[t]he FDA's refusal to admit [plaintiff's] products into the United States obviously destroyed the firm's ability in the United States to cover its costs for purchase or production"); *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 182 (D.D.C. 2011) (rule imposing new compensation structure on mortgage industry would irreparably injure small mortgage brokerages, who would have to lay off employees and would not be able to afford expenses).

## III.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS.

### A.    The Balance of the Equities Supports An Injunction.

At the third step of the preliminary-injunction test, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted). This balancing favors Plaintiffs because their members' loss of First Amendment freedoms and other irreparable injuries easily outweigh the cost to AMS, which faces only a brief delay in implementing the new requirements and can survive in the meantime with the 2009 Regulations. AMS's potential arguments about the balance of the equities also are undermined by its adoption

44

of measures that appear to (but do not) delay enforcement of the Final Rule, such as the six-month "education and outreach" period and the allowances for meats that are currently in the chain of commerce.  As AMS implicitly acknowledged in adopting these measures, preserving the status quo is a practical solution, and it costs the government nothing.

> **B.      An Injunction Is in the Public Interest.**

"[E]nforcement of a potentially unconstitutional law that would also have severe economic effects is not in the public interest."  *Gordon v. Holder*, 826 F. Supp. 2d 279, 297 (D.D.C. 2011), *aff'd*, 2013 WL 3239742, at *9 (D.C. Cir. June 28, 2013).  In addition, "[t]he public has an interest in federal agency compliance with its governing statute."  *Bayer HealthCare, LLC v. FDA*, 2013 WL 1777481, at *8 (D.D.C. Apr. 17, 2013).   Because the Final Rule violates the First Amendment, exceeds statutory authority, and is arbitrary and capricious, the public interest weighs strongly in favor of an injunction against the Final Rule.  Against all this, AMS has not articulated any justifiable public interest in immediate enforcement.  The public-interest factor therefore weighs in Plaintiffs' favor.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

DATE: July 25, 2013                          Respectfully submitted,

                                                 /s/  Catherine E. Stetson        
                                             Jonathan L. Abram (DC # 389896)
                                             Catherine E. Stetson (DC Bar # 453221)
                                             Judith E. Coleman (DC Bar # 980382)
                                             Elizabeth B. Prelogar (DC Bar #1011890)
                                             **HOGAN LOVELLS US LLP**
                                             555 Thirteenth Street NW
                                             Washington, DC 20004
                                             Telephone: 202-637-5600
                                             Fax: 202-637-5910
                                             jonathan.abram@hoganlovells.com
                                             cate.stetson@hoganlovells.com
                                             judith.coleman@hoganlovells.com
                                             elizabeth.prelogar@hoganlovells.com

                                             *Counsel for Plaintiffs*