**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN MEAT INSTITUTE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-1033 (KBJ) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRIGULTURE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

   I.     The Agricultural Marketing Act of 1946................................................................2

   II.    Regulations Implementing the AMA ....................................................................4

   III.   The World Trade Organization Dispute Brought Against the United States .........5

   IV.   The 2013 Final Rule ............................................................................................6

   V.    This Litigation .....................................................................................................7

ARGUMENT.......................................................................................................................8

   I.     Preliminary Injunction Standard...........................................................................8

   II.    Plaintiffs Will Not Prevail On Any of Their Claims. ............................................8

        A.    The 2013 Final Rule is a proper exercise of the Secretary's
             rulemaking authority under the AMA. ......................................................8

            1.     When it enacted the AMA, Congress did not unambiguously
                  forbid disclosure of information regarding production
                  steps, *i.e.*, where an animal from which covered muscle
                  cut commodities are derived was born, raised,
                  and slaughtered. ...............................................................10

            2.     When Congress enacted the AMA, as amended by the
                  2008 Farm Bill, it did not address commingling and
                  therefore the statute is silent on this issue. ....................................16

        B.    The 2013 Final Rule is a rational and considered approach to
              providing consumers with more accurate information
              regarding the origin of the meat products they purchase..........................19

            1.     Requiring retailers to disclose a covered commodity's
                  production steps will provide consumers with more
                  accurate information about the covered commodity's
                  country of origin. ..........................................................................21

            2.     The 2013 Final Rule directly addresses the concerns
                  raised by the WTO Ruling.............................................................23

             3.     The Secretary's decision to make the 2013 Final Rule
                  effective on May 23, 2013, was not arbitrary and capricious........25

         C.    The 2013 Final Rule does not violate plaintiffs' First
             Amendment rights. ....................................................................................27

             1.     The 2013 Final Rule is subject to reasonableness review
                  under *Zauderer*. ..........................................................................28

                 a.    The 2013 Final Rule disclosures are purely factual and
                     uncontroversial.......................................................29

               b.   The governmental interest is to correct misleading speech and prevent consumer deception..................................32

       2.   The 2013 Final Rule satisfies the Zauderer requirements. ............34

               a.   The 2013 Final Rule disclosures are reasonably related to the governmental interest in correcting misleading speech and preventing consumer deception. ........34

               b.   The 2013 Final Rule disclosures do not unjustly or unduly burden plaintiffs' speech............................................35

III.    Plaintiffs Have Not Shown That They Will Be Irreparably Harmed In the Absence of Preliminary Injunctive Relief. .......................................36

IV.    The Balance of Hardships and the Public Interest Counsel Against Injunctive Relief. ............................................................................................39

CONCLUSION .....................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   38 F. Supp. 2d 114 (D.D.C. 1999) .......................................................................................... 25

*Ass'n of Private Sector Colleges & Univ. v. Duncan.*,
   681 F.3d 427 (D.C. Cir. 2012) ................................................................................................. 27

*Badarcco v. Comm'r of IRS*,
   464 U.S. 386 (1984) ................................................................................................................. 12

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ................................................................................................................... 9

*Barrigton, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ................................................................................................. 13

*Catawba Cnty., N.C. v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) ................................................................................................... 13

*Cent. Hudson Gas & Elec. Co. v. Public Serv. Comm'n of New York*,
   447 U.S. 557 (1980) ........................................................................................................... 28, 36

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ................................................................................................. 37

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................................ 9, 33

*City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013) ........................................................................................................ 9, 15

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) ..................................................................................................... 8

*Comm. in Solidarity with People of El. Sal. (CISPES) v. Sessions*,
   929 F.2d 742 (D.C. Cir. 1991) ................................................................................................. 37

*Common Sense in Gov't Procurements v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) ........................................................................................ 37

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) .......................................................................................... 39

*Davis v. PBGC*,
    571 F.3d 1288 (D.C. Cir. 2009) .......................................................................... 8

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................... 36

*Friends of Gateway v. Slater*,
    257 F.3d 74 (2d Cir. 2001) ................................................................................. 11

*George E. Warren Corp. v. EPA*,
    159 F.3d 616 (D.C. Cir. 1998) .................................................................... 23, 26

*Getty Images News Servs. Corp. v. Dep't of Def.*,
    193 F. Supp. 2d 112 (D.D.C. 2002) ................................................................... 39

*Glickman v. Wileman Bros. & Elliott, Inc.*,
    521 U.S. 457, (1997) .......................................................................................... 29

*In re R.M.J.*,
    455 U.S. 191 (1982) ........................................................................................... 34

*Individual Reference Servs. Grp., Inc. v. FTC*,
    145 F. Supp. 2d 6 (D.D.C.) ................................................................................ 15

*Investment Co. Instit. v. CFTC*,
    891 F. Supp. 2d 162 (D.D.C. 2013) ............................................... 19, 22, 23, 25

*Mail Order Ass'n of Am. v. U.S. Postal Serv.*,
    986 F.2d 509 (D.C. Cir. 1993) ........................................................................... 18

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................................... 22

*Mayo Found. for Med. Educ. & Research v. United States*,
    131 S. Ct. 704 (2011), either issue when it ....................................................... 10

*McNamee v. IRS*,
    488 F.3d 100 (2d Cir. 2007) ............................................................................... 16

*McNeilly v. Land*,
    684 F.3d 611 (6th Cir. 2012) ............................................................................. 36

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) .................................................................................... passim

*Mogul Corp. v. United States,*
   63 F.3d 1572 (Fed. Cir. 1995) ................................................................. 23

*Munaf v. Geren,*
   128 S. Ct. 2207 (2008) ............................................................................. 8

*Murray v. The Schooner Charming Betsy,*
   6 U.S. (2 Cranch.) 64, 2 L.Ed. 208 (1804) ............................................. 40

*Mylan Pharm., Inc. v. Shalala,*
   81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................ 37

*Nat. Res. Def. Council v. SEC,,*
   606 F.3d 1031 (D.C. Cir. 1979) .............................................................. 27

*National Cable & Telecommunications Ass'n v. Brand X Internet Services,*
   545 U.S. 967 .......................................................................................... 33

*Natural Res. Def. Council v. Pena,*
   147 F.3d 1012 (D.C. Cir. 1998) .............................................................. 36

*Natural Res. Def. Council, Inc. v. SEC,*
   606 F.2d 1031 (D.C. Cir. 1979) .............................................................. 27

*Newdow v. Bush,*
   355 F. Supp. 2d 265 (D.D.C. 2005) ........................................................ 36

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................ 39

*R.J. Reynolds Tobacco Co. v. FDA,*
   696 F.3d 1205 (D.C. Cir. 2012) ....................................................... passim

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ................................................................................ 16

*S. African Airlways v. Dole,*
   817 F.2d 119 (D.C. Cir. 1987) ................................................................ 40

*Small Refiner Lead Phase-Down Task Force v. EPA,*
   705 F.2d 506 (D.C. Cir. 1983) ................................................................ 19

*Spirit Airlines Inc. v. U.S. Dep't of Transp.,*
   687 F.3d 403 (D.C. Cir. 2012) ............................................... 28, 30, 34, 35

*Teva Pharm. Indus. Ltd. v. Crawford*,
    410 F.3d 51 (D.C. Cir. 2005) ........................................................................... 12

*United States v. Philip Morris USA, Inc.*,
    907 F. Supp. 2d 1 (D.D.C. 2012) .................................................................... 32

*Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ......................................................................................... 35

*Winters v. Nat. Res. Def. Council, Inc.,*,
    555 U.S. 7 (2008) ............................................................................................... 8

*Wisc. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................................. 37, 39

*WorldCom, Inc. v. FCC*,
    238 F.3d 449 (D.C. Cir. 2001) .................................................................. 19, 21

*Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*,
    471 U.S. 626 (1985) .................................................................................. passim

**Statutes**

7 U.S.C. § 1621, et seq. ............................................................................................. 2

7 U.S.C. §1638 ....................................................................................................... 2, 4

7 U.S.C. § 1638a ............................................................................................... passim

7 U.S.C. § 1638c ........................................................................................... 4, 9, 18

19 U.S.C. § 1304 ...................................................................................................... 14

21 U.S.C. § 601, et seq. .......................................................................................... 14

**Regulations**

7 C.F.R. § 65.300 .............................................................................................. passim

74 Fed. Reg. 2,658 .................................................................................. 4, 21, 30, 32

78 Fed. Reg. 31,367 (May 24, 2013) .............................................................. passim

78 Fed. Reg. at 15,646 ............................................................................................ 17

78 Fed. Reg. at 31,367 ................................................................................................ passim

78 Fed. Reg. at 31,368 ................................................................................................ passim

78 Fed. Reg. at 31,369 ................................................................................................ passim

78 Fed. Reg. at 31,370 ................................................................................................ passim

78 Fed. Reg. at 31,371 ................................................................................................ 14, 22

78 Fed. Reg. at 31,372 ............................................................................................ 19, 20, 26

78 Fed. Reg. at 31,373 ................................................................................................ 36, 38

78 Fed. Reg. at 31,376 ................................................................................................ 19, 27

## INTRODUCTION

Plaintiffs urge this Court to vacate a rule that was promulgated to provide consumers with accurate information about the origin of certain meat products that they purchase and to comply with a ruling by the World Trade Organization that the United States had acted inconsistently with its international trade obligations. But plaintiffs have made this request without demonstrating that they are entitled to the emergency relief they seek.

To start, plaintiffs' claims are without merit.  The Secretary of Agriculture ("the Secretary") promulgated the challenged rule pursuant to the broad rulemaking authority granted by Congress in the Agricultural Marketing Act.  Because the rule is consistent not only with the text of the statute but also Congress's intent "to provide consumers with additional information regarding the origin of" certain meat products they purchase, S. Rep. No. 110-220, at 198 (2007), plaintiffs' claim that the Secretary exceeded his authority under the Act fails.  Nor have plaintiffs shown that the Secretary's decision to promulgate the challenged rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA").  The Secretary carefully considered the issues and crafted a rule that not only provides consumers with accurate information regarding a covered commodity's country of origin (through the disclosure of production steps) but also complies with the United States' international trade obligations.  And the Secretary's decision to make the rule effective on May 23, 2013, but provide regulated entities a six month transition period, more than satisfies the "minimal level of rationality" necessary to withstand APA review.  Finally, because plaintiffs' First Amendment interest "in *not* providing any particular factual information in [their] advertising is minimal," *Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985), and the rule is aimed at correcting potentially misleading country of origin information -- a legitimate

government interest -- plaintiffs' claim that the rule violates their First Amendment rights is baseless.

Moreover, plaintiffs have not shown that they will be irreparably harmed in the absence of preliminary injunctive relief. Plaintiffs cannot rely on their First Amendment claim to justify their request for emergency relief, and their two month delay in filing this motion undercuts their claim of irreparable injury. Plaintiffs' conclusory and speculative allegations of lost profits are likewise insufficient to prove that they will be irreparably harmed if the rule is not enjoined and are undercut by the Secretary's own economic analysis of the impact of the rule. Finally, contrary to plaintiffs' claims, both the balance of harms and public interest counsel against the Court granting preliminary injunctive relief. This is particularly so where, as here, the rule effectuates Congress's intent in providing consumers with more accurate information about the origin of the meat products they purchase. Because plaintiffs have not satisfied their burden of demonstrating that they are entitled to preliminary injunctive relief, the Court should deny their motion.

## **BACKGROUND**

### I.    **The Agricultural Marketing Act of 1946**

In 2002, Congress enacted legislation amending the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621, *et seq.* ("the AMA"), to require retailers to notify their customers of the country of origin of covered commodities.[1] *See* Pub. L. No. 107-171, § 282, 116 Stat. 134 (2002). That legislation directed retailers to designate covered commodities as "United States country of origin" only if the animals from which they were derived were "exclusively born, raised, and

---

[1] The Act defines covered commodities to include muscle cuts of beef, lamb, chicken, goat, and pork as well as ground beef, ground lamb, ground chicken, ground goat, and ground pork. *See* 7 U.S.C. §1638(2)(A).

slaughtered in the United States[,]" *id.*, but was silent with respect to covered commodities derived from animals born, raised, or slaughtered outside of the United States. Six years later, in 2008, Congress enacted the Food, Conservation and Energy Act of 2008, Pub. L. No. 110-234, §1102, 122 Stat. 923 (2008) ("the 2008 Farm Bill"), which further amended the Agricultural Marketing Act of 1946 by adding three additional country of origin designation categories: multiple countries of origin, imported for immediate slaughter, and foreign countries of origin. *See generally* 7 U.S.C. § 1638a(a)(2). Congress added these additional country of origin designations to the AMA "to provide consumers with additional information regarding the origin of certain covered commodities" they purchased. S. Rep. No. 110-220, at 198 (2007). To that end, §1638a(a)(2) sets forth detailed criteria for designating a covered commodity in each of the four country of origin categories.

In order for a retailer to designate a covered commodity as United States country of origin, the covered commodity must derive from an animal that was (i) exclusively born, raised, and slaughtered in the United States; (ii) born and raised in Alaska or Hawaii and transported for a period of not more than 60 days through Canada to the United States and slaughtered in the United States; or (iii) present in the United States on or before July 15, 2008, and then continuously after. *See id.* 7 U.S.C. §1638a(a)(2)(A).

The 2008 Farm Bill requires retailers to use the multiple countries of origin designation if the covered commodity derives from an animal that is (i) not exclusively born, raised, and slaughtered in the United States; (ii) born, raised, or slaughtered in the United States, and (iii) not imported into the United States for immediate slaughter. *Id.* §1638a(a)(2)(B). If a retailer uses this designation, § 1638a(a)(2)(B) instructs that the retailer "may designate . . . all of the countries in which the animal may have been born, raised, or slaughtered." *Id.*

3

For covered commodities that are derived from animals imported into the United States for immediate slaughter, the 2008 Farm Bill directs retailers to designate the country of origin as (i) the country from which the animal was imported, and (ii) the United States.  *See id.* §1638a(a)(2)(C).  And, for covered commodities derived from an animal "that is not born, raised, or slaughtered in the United States[,]" the 2008 Farm Bill states that retailers "shall designate a country other than the United States as the country of origin of such commodity."  *Id.* §1638a(a)(2)(D).

Finally, ground meats such as ground beef, ground lamb, and ground chicken are treated differently under the 2008 Farm Bill.  Section 1638a(a)(2)(E) governs these products and directs retailers to list either (i) "all countries of origin" for such products, or (ii) "all reasonably possible countries of origin."  The statute exempts from the country of origin labeling requirements meat sold at food-service establishments and processed meat products.  *See id.* §§1638(2)(B), 1638a(b).

## II.    Regulations Implementing the AMA

Congress charged the United States Department of Agriculture ("USDA") with implementing the country of origin labeling requirements, among other provisions of the Act.  *See* 7 U.S.C. § 1638c.  In accordance with Congress's instruction to promulgate rules "necessary to implement" the Act, *id.*, the Secretary, through the Agricultural Marketing Service ("AMS"), published a final rule in 2009 addressing country of origin labeling requirements for covered commodities.  *See* 74 Fed. Reg. 2,658 (Jan. 15, 2009).  The 2009 rule set forth four country of origin designations: (A) "Product of the United States," (B) "Product of the United States, Country X, and (as applicable) Country Y", (C) "Product of Country X and the United States," and (D) "Product of Country X."  *Id.* at 2,706.  The Secretary explained that these country of

4

origin designations tracked the four separate origin designations -- United States country of

origin, multiple countries of origin, imported for immediate slaughter, and foreign countries of

origin -- in § 1638a(a)(2).  *See id.*  In addition, in an effort to provide flexibility and minimize

any possible disruption to regulated entities, the 2009 rule provided for a limited allowance for

commingling[2] during a single production day for covered muscle cut commodities designated as

United States country of origin, multiple countries of origin, and imported for immediate

slaughter.  *See id.* at 2,699-70.

### III.    The World Trade Organization Dispute Brought Against the United States

In June 2012, Canada and Mexico both filed actions against the United States in the

World Trade Organization ("WTO"), alleging that the United States' country of origin statutory

and regulatory scheme was inconsistent with the United States' obligations under the WTO

Agreement, including the *Agreement on Technical Barriers to Trade* ("TBT Agreement"). 78

Fed. Reg. 31,367 (May 24, 2013).  Among other claims, both Canada and Mexico argued that the

COOL program was inconsistent with the TBT Agreement's national treatment obligation "to

accord imported products no less favorable treatment than that accorded to domestic products."

*Id.*  The WTO Appellate Body concluded that the United States' COOL program was

inconsistent with the TBT Agreement, reasoning in part that the COOL program "does not

impose labeling requirements for meat that provides consumers with origin information

*commensurate* with the type of origin information that upstream livestock producers and

processors are required to maintain and transmit." Appellate Body Reports, *United States –*

*Certain Country of Origin Labelling (COOL) Requirements*,

WDT/DS384/AB/R/WT/DS386/AB/R (adopted July 23, 2012) ("*US – COOL (AB)*")*,* paras. 343,

---

[2] Commingling is the practice of mixing covered commodities derived from animals from
different countries of origin.

349 (emphasis in the original).  In this regard, the WTO Appellate Body found that the

information "conveyed to consumers is less detailed, and [] often less accurate" under the 2009

rule.  *Id.*  According to the WTO Appellate Body reports, the inaccurate information was a

direct result of the 2009 rule's requirement that labels "list the country or countries of origin"

without "requir[ing] the labels to mention production steps[, *i.e.*, where an animal was born,

raised, and slaughtered]" and the allowance for commingling.  *Id.*  With respect to commingling,

the WTO Appellate Body specifically observed that commingling allowed retailers to label meat

as "mixed origin when in fact it is exclusively U.S. origin, or that it has three countries of origin

when in fact it has only one or two."  *Id.*

On July 23, 2012, the WTO Dispute Settlement Body adopted the Appellate Body's

recommendations and rulings and ordered the United States to comply with its decision by May

23, 2013.  *See* 78 Fed. Reg. at 31,367.   As a result of the WTO ruling, the Secretary "reviewed

the overall regulatory program" and, after notice and comment, promulgated the rule at issue

here ("the 2013 Final Rule").  *See id.*

## IV.    The 2013 Final Rule

Under the 2013 Final Rule, "origin designations for muscle cut covered commodities

derived from animals slaughtered in the United States are required to specify the production

steps of birth, raising, and slaughter of the animal from which the meat is derived that took place

in each country listed on the origin designation."  *Id.*  The 2013 Final Rule also "eliminates the

allowance for commingling of muscle cut covered commodities of different origins."  *Id.*

According to the Secretary, these changes to the country of origin labeling regulations[3] not only

"will provide consumers with more specific information about the origin of muscle cut covered

---

[3] The 2013 Final Rule permits retailers to disclose the production steps through labels, placards, signs, and stickers, among other things.  *See* 78 Fed. Reg. at 31,369.

commodities" they purchase but also bring the COOL program "into compliance with U.S. international trade obligations." *Id.* At the WTO, the United States has also stated that the the 2013 Final Rule constitutes compliance with the WTO rulings.

Although the Secretary made the 2013 Final Rule effective on May 23, 2013 (the deadline set by the WTO for the United States to comply with its rulings), the Secretary authorized a six month education and outreach period. *See id.* at 31,369. During this six month period, the agency "will conduct an industry education and outreach program concerning the provisions and requirements of this rule." *Id.* According to the Secretary, "this allocation of resources will ensure that the industry effectively and rationally implements this final rule." *Id.* Moreover, the six month education and outreach period will allow regulated entities a transition period during which "existing stock of muscle cut covered commodities labeled in accordance with the 2009 COOL regulations" will be able "to clear" the chain of commerce. *Id.* Because the Secretary recognized the need to avoid wasting existing stock and inventory, the 2013 Final Rule does not "apply to muscle cut covered commodities produced or packaged on or before May 23, 2013." *Id.*

## V.     This Litigation

On July 8, 2013,[4] plaintiffs, nine trade associations representing, among other regulated entities, meat packers and processors, filed this action against the United States Department of Agriculture, Tom Vilsack, in his official capacity as Secretary of Department of Agriculture, the Agricultural Marketing Service, and Anne L. Alonzo, in her official capacity as Administrator of the Agricultural Marketing Service. *See* First Am. Compl., ECF No. 15. Plaintiffs claim that the challenged rule violates their First Amendment rights, exceeds the Secretary's authority under

---

[4] On July 23, 2013, plaintiffs filed a First Amended Complaint. *See* First Am. Compl., July 23, 2013, ECF No. 15.

the AMA, and is arbitrary and capricious in violation of the APA.  *See generally id.*  On July 25,

2013, two months after the 2013 Final Rule went into effect, plaintiffs filed their motion for

preliminary injunctive relief.  *See* Pls' Mot. for Prelim. Inj. ("Pls' Mot."), July 25, 2013, ECF

No. 24-1.

<u>**ARGUMENT**</u>

**I.      Preliminary Injunction Standard**

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as

of right."  *Munaf v. Geren*, 128 S. Ct. 2207, 2210 (2008) (internal quotation and citation

omitted).  A party seeking such relief "must establish [1] that [it] is likely to succeed on the

merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3]

that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest."

*Winters v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The D.C. Circuit formerly applied

a "sliding scale" analysis whereby a strong showing on one factor could excuse a weak showing

on another.  *See, e.g.*, *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.

Cir. 1995).  That standard is no longer viable; instead "under the Supreme Court's precedents, a

movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and*

a likelihood of irreparable harm, among other things."  *Davis v. PBGC*, 571 F.3d 1288, 1296

(D.C. Cir. 2009) (Kavanaugh & Henderson, JJ., concurring) (emphasis added).  As shown below,

plaintiffs have not shown that they satisfy *any* of the four preliminary injunction criteria, and

thus are not entitled to preliminary injunctive relief.

## II.      Plaintiffs Will Not Prevail On Any of Their Claims.

### A.  The 2013 Final Rule is a proper exercise of the Secretary's rulemaking authority under the AMA.

When Congress enacted the AMA, as amended by the 2008 Farm Bill, it granted the

Secretary authority to "promulgate such regulations as are necessary to implement" the Act,

including § 1638a, which governs the country of origin labeling requirements for beef, lamb,

pork, chicken, and goat meat at issue in this case.  7 U.S.C. § 1638c.  Acting pursuant to that

express delegation of rulemaking authority, the Secretary promulgated the challenged rule,

which is entitled to deference so long as the Secretary did not exceed the expansive scope of his

rulemaking authority.  *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013).  The parties

agree that the two-step framework established in *Chevron U.S.A. Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837 (1984), governs the Court's resolution of this question.

Under that framework, the Court must first determine "(1) whether the statute unambiguously

forbids the [a]gency's interpretation, and, if not, (2) whether the interpretation, for other reasons,

exceeds the bounds of the permissible."  *Barnhart v. Walton*, 535 U.S. 212, 218 (citing *Chevron*,

467 U.S. at 843).  The answer to both questions is no.

As shown below, nothing in the text or legislative history of the AMA demonstrates that

Congress "unambiguously forbid[s]" the Secretary from requiring retailers to include on retail

labels information about where the animal from which a covered commodity was derived was

born, raised, and slaughtered.  *Id.*  In fact, the 2013 Final Rule's disclosure requirement is

consistent with the purpose, structure, and text of the Act, which necessarily requires retailers to

examine where an animal was born, raised, and slaughtered to determine the appropriate country

of origin label for the covered commodity.  Nor have plaintiffs shown that commingling is

"unambiguously" mandated under the Act.  Because Congress "did not directly address," *Mayo*

*Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011), either issue

when it amended the AMA in 2008, plaintiffs cannot prevail on their claim that the Secretary

exceeded his authority under the Act.

> **1. When it enacted the AMA, Congress did not unambiguously forbid disclosure of information regarding production steps, *i.e.*, where an animal from which covered muscle cut commodities are derived was born, raised, and slaughtered.**

When Congress enacted the AMA, as amended by the 2008 Farm Bill, it expressly

mandated that retailers of certain covered commodities "inform consumers, at the final point of

sale of the covered commodity to consumers, of the country of origin of the covered

commodity." 7 U.S.C. § 1638a(a)(1). Section 1638a(a)(2) of the Act establishes four categories

for designating the country of origin for beef, lamb, pork, chicken, and goat meat: (A) United

States country of origin, (B) multiple countries of origin, (C) imported for immediate slaughter,

and (D) foreign country of origin. *See* 7 U.S.C. § 1638a(2). Congress expressly delineated the

requirements necessary to satisfy each category, and those requirements turn in large part on

where the animal from which the covered meat is derived was born, raised, and slaughtered. *See*

*generally id.*

For example, in order for a retailer to label a covered commodity "as exclusively having a

United States country of origin" the covered commodity must have derived from an animal that

was "(i) exclusively *born, raised, and slaughtered* in the United States." *Id.* at

§1638a(a)(2)(A)(i) (emphasis added). Likewise, for covered commodities for which there are

"[m]ultiple countries of origin[,]" Congress directs retailers to "[list] all of the countries in which

the animal [from which the covered commodity derives] was *born, raised, or slaughtered*." 7

U.S.C. §1638a(a)(2)(B)(II) (emphasis added). For covered commodities that are derived from an

animal that "is not *born, raised, or slaughtered* in the United States," Congress directs retailers

10

to designate a "Foreign country of origin," *i.e.*, a "country other than the United States as the country of origin for such commodity."  *Id.* at § 1638a(a)(2)(D) (emphasis added).

Notwithstanding Congress's explicit instruction in §1638a(a)(2) to determine the country of origin of a covered commodity by ascertaining the country in which the animal from which the covered commodity was derived was born, raised, and/or slaughtered, *see*  7 U.S.C. § 1638a(a)(2), plaintiffs claim that Congress clearly intended to prohibit retailers from disclosing the production step information on their labels.  *See* Pls' Mot. at 26-27.  But plaintiffs have not pointed to any text expressly forbidding the inclusion of such information on covered commodity labels, much less prohibiting the Secretary from requiring that such information be included.  That is because there is no such prohibition in the AMA.  *See, e.g.*, *Friends of Gateway v. Slater*, 257 F.3d 74, 81 (2d Cir. 2001) (observing that Congress knows "how to [] restrict[] [agency discretion] if it so desire[s]" and the absence of any such restriction leaves the decision to the agency's discretion).  Instead, plaintiffs offer a contorted construction of §1638a(a)(2) in an effort to manufacture congressional intent.

For example, plaintiffs' argument that § 1638a(a)(2)(C) demonstrates that Congress clearly intended to foreclose disclosure of production steps, *see* Pls' Mot. at 26, is based on a statute of their own creation, not the one Congress enacted.  In that provision (which governs the labeling of covered commodities derived from animals that were imported into the United States for immediate slaughter), Congress instructed retailers to designate the country of origin as "(i) the country from which the animal was imported; and (ii) the United States," *see* 7 U.S.C. § 1638a(a)(2)(C).  Plaintiffs claim that §1638a(a)(2)(C)'s use of "shall" demonstrates that Congress "unambiguously forbid" the disclosure of production steps on retailers' labels, *see* Pls' Mot. at 26.  Yet this construction of the statute inserts the word "only" into the provision.

11

Contrary to plaintiffs' argument, when Congress enacted § 1638a(a)(2)(C), it did not state that retailers "shall only" designate the country of origin as both the importing country and the United States.  *See Badarcco v. Comm'r of IRS*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.") *see also Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 53 (D.C. Cir. 2005) ("We 'must presume that a legislature says in a statute what it means and means in a statute what it says. . . .'") (internal citation omitted).

And plaintiffs are simply wrong when they argue that the rule "directly contradicts" the text of §1638a(a)(2)(C).  *See* Pls' Mot. at 29.  As noted above, this statutory provision simply requires, for animals imported for immediate slaughter, that retailers identify as countries of origin the country from which the animal was imported and the United States (the country in which it was slaughtered).  The 2013 Final Rule does precisely that, by requiring retailers to inform consumers of the location in which the animal was born, raised, and slaughtered, and directing retailers that, for this category of animals, the country from which the animal was imported shall be designated as the country in which the animal was raised.  *See* 78 Fed. Reg. at 31,369.  If the importing country is also the country of birth (likely to be true in most instances), the label for meat derived from these animals would say "Born and Raise in Country X [with X being the exporting country], Slaughtered in the United States."  *See id.*  If the animal was born in the United States, or in a third country, the label would reflect that information as well.  But the inclusion of that additional information in no way contradicts the statutory requirement that the label list as countries of origin the country from which the animal was imported and the United States.  Those identifications would remain.

Nor have plaintiffs shown that Congress unambiguously intended to forbid disclosure of a covered commodity's production steps when it enacted the grandfather provision in § 1638a(a)(2)(A)(iii) in 2008.  *See Vill. of Barrigton, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011) (explaining that at *Chevron* step one, the court is "tasked with determining Congress's unambiguous intent").  That provision allows retailers to use the "United States country of origin" label for a covered commodity derived from an animal that was "present in the United States on or before July 15, 2008, and once present in the United States, remained continuously in the United States."  7 U.S.C. § 1638a(a)(2)(A)(iii).  Congress enacted this provision, not to forbid disclosure of production steps in all covered commodity retail labeling as plaintiffs argue, *see* Pls' Mot. at 26-27, but rather to "allow producers to transition into compliance in a smooth and cost-effective manner while providing consumers with more information about where their food comes from."[5]  (statement of Rep. Tiahrt) 154 Cong. Rec. E994-01, May 14, 2008.[6]  Congress's decision to enact a grandfather provision simply does not support plaintiffs' argument that Congress unambiguously intended to prevent the Secretary from requiring retailers to disclose production steps in their country of origin labeling for covered commodities.  *See Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 35-38 (D.C. Cir. 2009)

_____

[5] If it had not already done so, plaintiffs' strained interpretation of Congressional intent clearly reaches the breaking point when discussing this grandfathering clause.  According to plaintiffs, "Congress [could not have] intended label content to turn on whether an animal was present in the United States on July 15, 2008, or not until July 16, 2008."  Pls' Mot. at 28.  *But that is exactly the distinction Congress intended to make, and did make, by including this provision.*

[6] The grandfather provision has no practical significance today.  As plaintiffs' own declarations demonstrate, the likelihood that any present-day consumer will purchase a covered commodity that derives from an animal that was "present in the United States on or before July 15, 2008," is slim to none.  *See, e.g.*, Decl. of Runnells Peters Feedyard LLC, ECF No. 24-19, at ¶4 (explaining that feeder calves and background calves reach their "mature weight at the age of 14 to 22 months" at which point "they are purchased by a 'packer' for slaughter and processing"); Decl. of Alpha 3 Cattle Company, ECF No. 24-15, at ¶4 (same).

(concluding that plaintiffs' "torrent" of cherry-picked statutory arguments did not demonstrate that Congress clearly intended to foreclose the Secretary's interpretation).

Similarly flawed is plaintiffs' argument that Congress's use of a singular country of origin in §1638a(a)(2)(D) "indicates" that "point-of-processing labels are impermissible" in their entirety. *See* Pls' Mot. at 27. Section 1638a(a)(2)(D) directs retailers to designate the "country of origin" for covered meat products processed entirely outside of the United States, "that is[, meat from an animal] *not* born, raised, *or* slaughtered in the United States," as "a country other than the United States." 7 U.S.C. § 1638a(a)(2)(D) (emphasis added). As the 2013 Final Rule expressly recognizes, labeling of these particular meat products "follows pre-existing regulations, including those of the U.S. Customs and Border Protection regarding the origin of *imported products*," 78 Fed. Reg. at 31,371 (emphasis added).[7] It is for this exact reason that the Secretary did not subject these particular meat products to the production step disclosure established in the 2013 Final Rule. *Id.* at 31,369 (explaining that "under the current COOL regulations, imported muscle cut covered commodities retain their origin as declared by the U.S. Customs and Border Protection at the time the products entered the United States (*i.e.*, Product of Country X) through retail sale"). Indeed, unlike covered commodities derived from meat designated as "United States country of origin," "Multiple countries of origin," and "Imported for immediate slaughter," which are all slaughtered *in* the United States, *see* 7 U.S.C. §1638a(a)(2)(A)-(C), meat designated as "foreign country of origin" is an entirely separate product because it was derived from an animal slaughtered in a foreign country, *see id.* §1638a(a)(2)(D). Plaintiffs point to this exemption and argue that "[t]here is no reason to think" that Congress intended retailers to disclose production steps for covered commodities, *see* Pls'

---

[7] Both the Tariff Act of 1930, 19 U.S.C. § 1304, and the Federal Meat Inspection Act, 21 U.S.C. § 601, *et seq.*, govern the labeling of all meat products imported into the United States.

Mot. at 27-28.  But plaintiffs' argument ignores the "stable background rule, against which Congress can legislate," that is, that "Congress knows to speak in plain terms when it wishes to circumscribe" agency discretion.  *City of Arlington*, 133 S. Ct. at 1868.   Here, there simply is no textual basis for concluding that Congress intended to preclude the Secretary from requiring retailers to disclose the production steps for meat slaughtered in the United States, *see* 7 U.S.C. §1638a(a)(2)(A)-(C), based on Congress's decision to require an entirely separate labeling scheme for meat slaughtered in a foreign country.

The question this Court must resolve is not what Congress "might have thought" but rather whether the statute "unambiguously forbids" retailers from disclosing the production steps of covered commodities.[8]  Both the purpose and text of the statute show that the answer to that question is no.  Congress enacted the AMA, as amended by the 2008 Farm Bill, "to provide consumers with additional information regarding the country of origin of certain covered commodities," S. Rep. No. 110-220, at 198 (2007), and it delegated broad rulemaking authority to the Secretary to promulgate rules "necessary to" effectuate that purpose.  Because neither the text nor the purpose of the statute demonstrates that Congress directly addressed whether retailers should disclose the production steps for covered commodities, plaintiffs cannot show that the Secretary exceeded his broad rulemaking authority when he promulgated the 2013 Final Rule, which does precisely what Congress intended -- "provide consumers with additional information regarding the origin of covered commodities."  S. Rep. No. 110-220, at 198.

---

[8] Plaintiffs' claim that Congress "rejected" the agency's "point-of-processing labeling system" when it enacted the 2008 Farm Bill, *see* Pls' Mot. at 28-29, is revisionist history.  Plaintiffs fail to identify any legislative history showing that Congress not only was aware of the Secretary's *proposed* rule but expressly rejected it.  Thus, it is far from clear that Congress intended to preclude the Secretary from implementing a "point-of-processing labeling system" when it enacted the 2008 Farm Bill.  *See Individual Reference Servs. Grp., Inc. v. FTC*, 145 F. Supp. 2d 6, 30-34 (D.D.C.) (refusing to find congressional intent based on ambiguous legislative history).

**2.    When Congress enacted the AMA, as amended by the 2008 Farm Bill, it did not address commingling and therefore the statute is silent on this issue.**

Not only have plaintiffs failed to show that Congress unambiguously forbid retailers' disclosure of a covered commodity's production steps, but they similarly have failed to demonstrate that Congress clearly intended to permit commingling when it enacted the AMA. Plaintiffs have not pointed to any, nor is there any, provision in the AMA that mentions commingling. *See generally* 7 U.S.C. § 1638a; *see also* Pls' Mot. at 30-32 (failing to cite any statutory provisions to support their claim that Congress intended to permit commingling). The statute is silent with respect to this issue. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (concluding that statute's reference to "family planning" "does not speak directly to the issues of counseling, referral, advocacy, or program integrity"); *McNamee v. IRS*, 488 F.3d 100, 106-09 (2d Cir. 2007) (concluding that the Internal Revenue Code did not "expressly mention[], much less define[] limited liability companies and thus the statute was "silen[t]" with respect to "the proper[] treatment of such companies" for taxation purposes). Perhaps recognizing that there is no textual support for their argument that Congress clearly intended to permit commingling, plaintiffs argue that the 2013 Final Rule exceeds the scope of the Secretary's authority under the AMA. *See* Pls' Mot. at 31-32. Plaintiffs' argument is incorrect.

Under the Act, Congress directed retailers to "inform consumers . . . of the country of origin of the covered commodity," *see* 7 U.S.C. § 1638a(a)(1), and then expressly delineated four categories of country of origin labels to govern covered commodities: United States country of origin, Multiple countries of origin, Imported for immediate slaughter, and Foreign country of origin, *see id.* § 1638a(a)(2). Congress carefully demarcated the qualifications necessary to satisfy each country of origin labeling requirement. *See id.* §§1638a(a)(2)(A)-(D). Congress

established these four distinct labeling designations to provide consumers with accurate information about the origin of the covered commodities.  *See* S. Rep. No. 110-220, at 198 (2007) (explaining that the purpose of the country of origin labeling statute is "to provide consumers with additional information regarding the origin of certain covered commodities"); *see also* S. Rep. No. 107-117, at 223 (2001) (explaining that the purpose of the AMA is "to notify consumers of the country of origin of beef, pork, lamb," and other covered commodities). But the practice of commingling – which permits the mixing of livestock from different multiple countries of origin during a production day, *see* 78 Fed. Reg. at 15,646 – results in labels that do not accurately reflect the country of origin of the covered commodity.

For example, prior to the promulgation of the 2013 Final Rule, meat derived from an animal that was designated as exclusively a "United States country of origin" product could be mixed with meat derived from an animal designated with a "multiple country of origin" during a single production day.  As a result of this commingling, a retailer of these covered commodities would label all of the meat processed during that production day as a "Product of the United States [*and*] Country X," *see* 78 Fed. Reg. at 15,646 (emphasis added), despite the fact that some portion of that meat was derived from an animal that was exclusively "United States country of origin."  Likewise, under the prior regulations, a retailer could label all of the muscle covered meat produced in a single processing day as "Product of the United States, Country X, and Country Y," despite the fact that the majority of the meat was derived from animals subject to the "imported for immediate slaughter" designation, while the remaining meat derived from animals subject to a "multiple country of origin" designation.  *See id.*

As the foregoing demonstrates, commingling results in potentially misleading labels because these labels do not accurately reflect the actual country of origin of the covered

17

commodity. This problem was compounded because the 2009 rule permitted the retailer to interchange the order of the listed countries in a way that makes it difficult for consumers to determine the origin of the covered commodity they are purchasing. To be more consistent with the purpose of the statute, which is to provide consumers accurate information about the origin of the covered commodities they purchase, and the text of the AMA, which expressly delineates four *distinct* country of origin designations, *see* 7 U.S.C. § 1638a(a)(2), the agency eliminated the allowance for commingling such commodities.

Plaintiffs' argument that the Secretary lacks the authority to promulgate a rule that prevents retailers from inaccurately labeling covered commodities, *see* Pls' Mot. at 31-32, flies in the face of the express delegation of rulemaking authority Congress granted to the Secretary. Congress instructed the Secretary to promulgate rules "necessary to implement" the Act. 7 U.S.C. § 1638c. Congress did not proscribe the manner in which the Secretary implements the Act, as plaintiffs contend. Indeed, such a narrow construction of the Secretary's rulemaking authority to promulgate rules "necessary to implement" the Act would render this provision meaningless. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993) (noting the longstanding principle of statutory interpretation that requires construction "so that no provision is rendered 'inoperative or superfluous, void or insignificant'") (internal citation omitted). Rather, Congress granted the Secretary broad authority to effectuate its goal in enacting the statute, *i.e.*, to provide consumers accurate information about the origin of the covered commodities they purchase. The 2013 Final Rule, which eliminates the practice of commingling in order to prevent potential mislabeling and consumer confusion, *see* 78 Fed. Reg. at 31,369, is entirely consistent with the AMA.

**B. The 2013 Final Rule is a rational and considered approach to providing consumers with more accurate information regarding the origin of the meat products they purchase.**

Similarly unavailing is plaintiffs' claim that the 2013 Final Rule is arbitrary and capricious. The scope of review under the APA's arbitrary and capricious standard "is narrow and a court is not to substitute its judgment for that of the agency." *Investment Co. Instit. v. CFTC*, 891 F. Supp. 2d 162, 186 (D.D.C. 2013). "This is a 'deferential standard' that 'presume[s] the validity of agency action.'" *WorldCom, Inc. v. FCC*, 238 F.3d 449, 457 (D.C. Cir. 2001) (internal citation omitted). In fact, the standard of review is so deferential that this Court must uphold the 2013 Final Rule if "the agency's reasons and policy choices . . . conform to certain minimal levels of rationality." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 520-21 (D.C. Cir. 1983) (internal quotation and citation omitted). The 2013 Final Rule more than satisfies this highly deferential standard.

As explained in the 2013 Final Rule, the Secretary promulgated the challenged rule for two reasons. First, the Secretary sought "to provide consumers with more specific information on which to base their purchasing decisions" by requiring retailers to disclose a covered commodity's specific production steps on retail labels. 78 Fed. Reg. at 31,376; *see also id.* at 31,372 (explaining that the 2013 Final Rule is "necessary" to "ensure label information more accurately reflects the origin of muscle cut covered commodities"). Under the prior COOL regulations, origin designations were often misleading because they lacked specificity as to the details of which production steps occurred in the countries cited on the label. *See id.* at 31,382. The 2013 Final Rule is an effort to cure these potential inaccuracies. *Id.* at 31,370, 31,372. To accomplish that goal, the Secretary decided to require retailers to disclose a covered commodity's production steps through labeling that tracks the text of § 1638a(a)(2). *See id.* at

19

31,370 (explaining that the 2013 Final Rule "preserves the[] four different labeling categories for meat [in the AMA] and is consistent with the labeling criteria set forth in the statutory scheme"). The Secretary also concluded that it was necessary to eliminate commingling in order to prevent retailers from labeling covered commodities with country of origin information that is less informative and potentially misleading. *See id.* at 31,374 ("removing the commingling allowance lets consumers benefit from more specific and detailed labels"). By requiring the disclosure of "specific information concerning the location where production steps occurred" and eliminating commingling, retailers will more accurately "inform consumers about the origin of muscle cuts of meat at retail[,]" thereby enhancing the overall operation of the program. *Id.* at 31,370, 31,372.

Second, the Secretary promulgated the 2013 Final Rule to comply with the United States' international obligations under the WTO Agreement on Technical Barriers to Trade Agreement. *See id.* at 31,367. As explained in the 2013 Final Rule, in the WTO dispute brought by Canada and Mexico against the United States, the WTO Appellate Body concluded that the AMA and the 2009 COOL rule collectively were inconsistent with the United States' obligations under the Trade. *See id.* The WTO Appellate Body reached this conclusion based, in part, on its determination that "the COOL measure does not impose labeling requirements for meat that provide consumers with origin information *commensurate* with the type of origin information that upstream livestock producers and processors are required to maintain and transmit." Appellate Body Reports, *United States – Certain Country of Origin Labelling (COOL) Requirements*, WT/DS384/AB/R/WT/DS386/AB/R (adopted July 23, 2012) (US-COOL (AB)), para. 34. Specifically, the WTO Appellate Body determined that "the origin information that must be conveyed to consumers [under the prior COOL rule] is less detailed, and will often be

20

less accurate." *Id.*  The WTO Appellate Body attributed the misleading labeling to both the fact that "the COOL measure requires the labels to list the country or countries of origin, but does not require the labels to mention production steps at all" and "the additional labeling flexibilities allowed for commingling." *Id.*[9]  In order to comply with the United States' international obligations as set forth in the WTO Trade Agreement, the Secretary promulgated the 2013 Final Rule, which requires retailers to disclose a covered commodity's production steps consistent with the criteria in the AMA and eliminates commingling.  *See* 78 Fed. Reg. at 31,370.

As the 2013 Final Rule demonstrates, the rule is consistent with both Congress's purpose in enacting the legislation and the text of the statute, and provides a reasoned rationale for its promulgation.  *See WorldCom,* 238 F.3d at 457.  Yet despite the Secretary's thoughtful rationale for promulgating the 2013 Final Rule, plaintiffs claim the rule is arbitrary and capricious because (1) the rule will not provide consumers with accurate country of origin information, (2) the rule will not cure the issues raised by the WTO Appellate Body, and (3) the Secretary did not delay implementation of the rule until the WTO has an opportunity to review it.  None of these arguments has any merit.

### 1. Requiring retailers to disclose a covered commodity's production steps will provide consumers with more accurate information about the covered commodity's country of origin.

Plaintiffs' claim that the 2013 Final Rule is more confusing than the prior rule is nonsensical given that the prior rule permitted retailers to list countries of origin in any order and did not reflect the specific criteria for the four country of origin designation categories that Congress established in the AMA.  *See* 74 Fed. Reg. at 2,706.  By contrast, the 2013 Final Rule

---

[9] *See id.* ("Furthermore, due to the additional labeling flexibilities allowed for commingled meat, a retail label may indicate that meat is of mixed origin when in fact it is of exclusively US origin, or that it has three countries of origin when in fact it has only two.").

requires retailers to disclose specific information regarding the covered commodity's production

steps, *i.e.*, where the animal from which the covered commodity was derived was born, raised,

and slaughtered.  Plaintiffs' effort to conjure up hypothetical circumstances in which a label

under the new rule may be inaccurate, *see* Pls' Mot. at 33-34, is a red herring.[10]  Congress

decided that it was necessary to distinguish among countries of origin when labeling certain meat

products for retail and accordingly established four distinct country of origin designations that

turn in large part on where an animal from which the covered commodity was derived was born,

raised, and slaughtered.[11]  *See* 7 U.S.C. § 1638a(a)(2)(A) –(D).  As explained above, the 2013

Final Rule "preserves these four different labeling categories for meat and is consistent with the

---

[10] For example, as discussed above, plaintiffs' argument that Congress intended only to require retailers to list the imported country and the United States for covered commodities that fall under the "imported for immediate slaughter" designation is based on a statute of their own creation, not Congress's.  Section 1638a(a)(2)(C) does not state that retailers shall *only* disclose the country from which the animal is imported and the United States.  The 2013 Final Rule, which requires retailers to disclose the countries in which the production steps occurred, is consistent with this statutory provision and simply requires that retailers disclose specific information regarding where the animal from which the meat was derived was born, raised, and slaughtered.  *See* 78 Fed. Reg. at 31,368-69.  In any event, "in promulgating regulations, agencies may proceed incrementally.  Indeed, '[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop."  *Investment Co. Instit.*, 891 F. Supp. 2d at 187 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007)).  If, at some point in the future, the Secretary decides that there are aspects of the 2013 Final Rule that need revisiting, he may certainly exercise his broad rulemaking authority under the AMA to address those issues.  *See id.*  But that does not serve as a basis for enjoining the 2013 Final Rule.  *See id.*

[11] Plaintiffs' claim that the rule requires retailers to "misleadingly suggest that an animal was born, raised, and slaughtered in a single country outside of the United States even if these production steps occurred in multiple countries" is without merit.  As explained in the rule (and above), Congress determined that muscle cut covered commodities requiring the "Foreign country of origin" designation should be labeled separately from muscle cut covered commodities derived from animals that were born, raised, or slaughtered in the United States.  *See* 78 Fed. Reg. at 31,369, 31,371 (explaining that imported meat products, *i.e.*, meat derived from an animal designated as a "Foreign country of origin," will continue to be labeled "follow[ing] pre-existing regulations including those of the U.S. Customs and Border Protection"); *see also* 7 U.S.C. § 1638a(a)(2)(D).  The rule does not disrupt Congress's determination that imported meat products receive different labeling under an entirely separate statutory and regulatory scheme.

labeling criteria set forth in the statutory scheme," which itself expressly delineates the production steps that the rule requires retailers to disclose.  78 Fed. Reg. at 31,370.

### 2.  The 2013 Final Rule directly addresses the concerns raised by the WTO Ruling.

Plaintiffs, three of which are organizations located in Canada and Mexico, the two countries that brought the WTO dispute against the United States, argue that the 2013 Final Rule does not adequately cure the concerns raised by the WTO Appellate Body and invite this Court to vacate the rule on that basis, *see* Pls' Mot. at 34-35.  But, it is not the role of this Court to determine whether the 2013 Final Rule complies with the WTO ruling.  *See Fed- Mogul Corp. v. United States*, 63 F.3d 1572, 1581, 1582 (Fed. Cir. 1995) ("For the Court of International Trade to read a GATT violation into the statute, over Commerce's objection, may commingle powers best kept separate."); *cf. George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (D.C. Cir. 1998) ("In the particular circumstances of this case our usual reluctance to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute is bolstered by the decision of the WTO lurking in the background.").  Rather, the only question this Court must resolve is whether the Secretary's conclusion that the 2013 Final Rule complies with the United States' WTO obligations was rational.  *See Investment Co. Instit.*, 891 F. Supp. 2d at 186 (explaining that the arbitrary and capricious standard requires the Court to determine "whether [the agency's] action was a 'product of reasoned decisionmaking'") (internal citation omitted).  Because the Secretary's conclusion that the 2013 Final Rule complies with the WTO ruling was "a product of reasoned decisionmaking," the Court should find that plaintiffs' claim fails.  *Id.*

The 2013 Final Rule directly addresses the concerns raised by the WTO Appellate Body. As explained above, the WTO Appellate Body found that the United States' COOL program

"d[id] not impose labeling requirements for meat that provide consumers with origin information *commensurate* with the type of origin information that upstream livestock producers and processors are required to maintain and transmit." *US—COOL (AB)*, para. 343 (emphasis in the original). The WTO Appellate Body's analysis addressed two particular aspects of the prior COOL program – the lack of restriction on the ordering of countries of origin without reference to production steps and the additional labeling flexibilities allowed for commingling – and concluded that these features of the prior COOL regime permitted retailers to convey origin information to consumers that was less detailed and often less accurate than the origin information that upstream livestock producers and processors are required to maintain and transmit. *See id.* In the WTO Appellate Body's view, these "regulatory distinctions" of the prior COOL rule were not "legitimate" and "reflect[ed] discrimination in violation of" Article 2.1 of the [WTO] TBT Agreement. *Id.* at 349.

The 2013 Final Rule addresses the precise problems that the WTO Appellate Body raised in its decision. The rule now requires retailers to disclose production steps on labels for covered commodities and eliminates the allowance of commingling in a single production day. *See* 78 Fed. Reg. at 31,368-69. Thus, contrary to plaintiffs' arguments otherwise, *see* Pls' Mot. at 34-35, as a result of these changes, the 2013 COOL rebalances the program in a way that requires the provision of origin information that is "commensurate" with the records that upstream livestock producers and processors are required to maintain and transmit. And, as demonstrated above, the rule's requirement that retailers disclose production steps coupled with the elimination

of commingling will provide consumers with more accurate information regarding the country of origin of their meat products, a finding supported by the WTO Appellate Body's decision.[12]

### 3. The Secretary's decision to make the 2013 Final Rule effective on May 23, 2013, was not arbitrary and capricious.

The Secretary complied with the procedural requirements of the APA when he made the rule effective on May 23, 2013. *See* Pls' Mot. at 36-38. That is all the APA requires. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 139-40 (D.D.C. 1999) (noting the APA's 30-day time period between publication of the rule and its effectiveness). Yet plaintiffs demand something more: They contend that the Secretary should have delayed the effective date of the rule until the WTO, at some date in the distant future, decides whether it finds that the rule addresses the problems the WTO Appellate Body raised in its decision. *See* Pls' Mot. at 36. The only question this Court must resolve is whether the Secretary's decision not to delay the effective date of the rule was a "product of reasoned decisionmaking." *Investment Co. Instit. v. CFTC*, 891 F. Supp. 2d 162, 186 (D.D.C. 2013) (internal quotation and citation omitted). As shown below, it was.

In the 2013 Final Rule, the Secretary explained that the rule not only enhances the overall operation of the COOL program but directly addresses the concerns raised by the WTO's Appellate Body decision. *See* 78 Fed. Reg. at 31,370. In response to commenters who urged the Secretary to delay the effective date of the rule, he explained that "it would be impracticable and contrary to the public interest to delay the effective date beyond May 23, 2013." *Id.* at 31,369.

---

[12] Plaintiffs' remaining claim that the rule does not cure the concerns raised by the WTO Appellate Body because the Secretary chose to exempt from the scope of the 2013 Final Rule both imported meat products and processed meat, *see* Pls' Mot. at 35, is without merit. As previously explained, both types of products are subject to different statutory and regulatory schemes than muscle cut covered commodities derived from animals slaughtered in the United States, and the United States was under no obligation to alter the requirements as they apply to imported meat or the exemption of processed products under the statute.

Although the Secretary did not delay the effective date of the rule, he expressly acknowledged that regulated entities would need some period of transition time to comply with the rule's requirements.  *See id.* at 31,369-70.  It is for this reason that the Secretary decided to provide regulated entities with a six month education and outreach period, which the Secretary considered "sufficient time for retailers and suppliers to become educated on and fully transition over to the new requirements of the final rule."  *Id.* at 31,370.  During the six month education and outreach period, the "Agency will continue to educate retailers and suppliers on the Agency's compliance and enforcement procedures so that the regulated industries have clear expectations as to how the Agency will enforce this rule."  *Id.*  The Secretary also recognized that, during that time period, regulated entities would have existing packaging inventories and stocks of muscle cut commodities. Therefore, he decided to permit regulated entities to "work[] through existing packaging inventories" and  "allow time for the existing stock of muscle cut covered commodities labeled in accordance with [] [prior] COOL regulations  . . . to clear" the chain of commerce.  *Id.* at 31,369.  To that end, the 2013 Final Rule's disclosure requirements "do not apply to muscle cut covered commodities produced or packaged before May 23, 2013." *Id.*

As the 2013 Final Rule demonstrates, the Secretary was cognizant "that there will be additional costs associated with this final rule" and that those costs "will be incurred by processors and retailers as they adjust to the loss of commingling flexibility and to the new labeling requirements in th[e] final rule."  *Id.* at 31,372.  However, the Secretary concluded that those costs are not a sufficient basis to delay the effective date of a rule that complies with both the APA and the United States' WTO obligations.  *See George E. Warren Corp. v. EPA*, 159

F.3d 616, 624 (D.C. Cir. 1998) (holding that agency's consideration of WTO obligations was not arbitrary and capricious).

In short, as the 2013 Final Rule demonstrates, the Secretary's decision to promulgate the rule was thoughtful and took into consideration the costs incurred as a result of the rule's requirements.[13]  Because the Secretary's decision to promulgate the rule more than satisfies the minimal level of rationality necessary to withstand this Court's highly deferential review of agency action, *see Nat. Res. Def. Council v. SEC*, 606 F.3d 1031, 1048 (D.C. Cir. 1979),  the Court should find that plaintiffs will not succeed on their APA claim.

### C.  The 2013 Final Rule does not violate plaintiffs' First Amendment rights.

The parties agree that the First Amendment protects commercial speech, but plaintiffs dramatically overstate the level of First Amendment protection to which the commercial speech at issue in this case is entitled.  For more than a quarter century, the Supreme Court has recognized that "the First Amendment interests implicated by disclosure requirements are

---

[13] Plaintiffs take issue with the fact that the Secretary acknowledged that it was "difficult to quantify" the "expected benefits from implementing the [2013] COOL requirements, *see* 78 Fed. Reg. at 31,376, and claim that this alone makes the rule arbitrary and capricious.  *See* Pls' Mot. at 36 n.9.  But the inability to quantify the expected benefits of a rule is an insufficient basis on which to vacate the rule.  Indeed, to adopt plaintiffs' reasoning would invalidate many rules that provide unquantifiable benefits while imposing costs on regulated entities.  *See, e.g.*, *Ass'n of Private Sector Colleges & Univ. v. Duncan*. 681 F.3d 427, 447 (D.C. Cir. 2012) (rejecting arbitrary and capricious challenge to agency's regulation based on claim that the agency's statement that the "benefits were difficult to quantify"); *Nat. Res. Def. Council*, 606 F.2d at 1052 (deferring to the agency's judgment and experience and reasoning that the agency "attempted to quantify as nearly as possible the extent of 'ethical investor' interest" but "[b]ecause of the nature of this inquiry, precise quantification is difficult if not impossible").  That is why the D.C. Circuit has rejected such reasoning, explaining that "[p]redictive judgments, like these 'necessarily involve[] deductions based on the expert knowledge of the agency, and, moreover, tend to be infused with policy considerations that are not appropriate subjects of close judicial scrutiny."  *Id.* at 1052 (internal citation omitted).  Although plaintiffs apparently do not find any benefit in a regulation that requires the disclosure of accurate origin information to consumers, the Secretary (and members of the public) do.  *See* 78 Fed. Reg. at 31,376 (explaining that requiring retailers "to disclose the countries of birth, raising, and slaughter[ing] on muscle cut product labels" is a "benefit" to consumers).

substantially weaker than those at stake when speech is actually suppressed." *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 n.14 (1985).  This observation reflects the reality that "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech." *Id.* at 651.  Indeed, "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides . . . [the] constitutionally protected interest in *not* providing any particular factual information in . . .  advertising is minimal." *Id.* at 651.

Accordingly, laws imposing disclosure requirements are subject to more lenient First Amendment review than are flat prohibitions on commercial speech.  Restrictions on non-misleading commercial speech must withstand intermediate scrutiny. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (discussing the standard set forth in *Cent. Hudson Gas & Elec. Co. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980)).  Mere disclosure requirements, on the other hand, must be upheld "as long as [they] are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.  Indeed, the D.C. Circuit has expressly drawn this critical distinction, concluding that for laws that "'impose a disclosure requirement rather than an affirmative limitation on speech,' *Zauderer*, not *Central Hudson*, applies." *Spirit Airlines Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 412 (D.C. Cir. 2012) (quoting *Milavetz,* 559 U.S. at 249-50).  The *Zauderer* standard "is akin to rational-basis review." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012).

### 1.   The 2013 Final Rule is subject to reasonableness review under *Zauderer*.

This well-established difference between a law prohibiting commercial speech and a law imposing a disclosure requirement is entirely lost on plaintiffs, who focus exclusively on the *Central Hudson* intermediate scrutiny standard.  As even plaintiffs implicitly acknowledge, *see* Pls' Mot. at 13, however, the 2013 Final Rule does not prohibit regulated entities from saying anything; rather, it imposes an affirmative disclosure requirement.  As such, the 2013 Final Rule must be evaluated under *Zauderer*, not under *Central Hudson*.

As the courts have explained, *Zauderer* governs if (1) the governmental restriction requires a disclosure rather than a prohibition on speech, *Milavetz*, 559 U.S. at 249; (2) the required disclosures are "purely factual and uncontroversial," *Zauderer*, 471 U.S. at 651; and (3) the disclosures are aimed at misleading or incomplete commercial speech and at preventing such speech from deceiving consumers. *Milavetz*, 559 U.S. at 249-50; *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.,* 696 F.3d 1205, 1213 (D.C. Cir. 2012) (quoting *Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 491, (1997)).  Plaintiffs concede that the 2013 Final Rule is, in their words, a "compelled disclosure," Pl. Mot. at 12-13, rather than a ban on speech. As discussed below, the remaining two elements are also satisfied here.

### a.   The 2013 Final Rule disclosures are purely factual and uncontroversial.

*Zauderer* review is appropriate if the regulation in question constitutes "purely factual and uncontroversial" information. *Zauderer*, 471 U.S. at 651. The approved disclosures in *Zauderer*, *Milavetz*, and *Spirit Airlines* involved factual statements that were not subject to misinterpretation by consumers. For example, the *Zauderer* court upheld a rule of professional conduct that required attorneys who advertised contingency-fee services to disclose in their advertisements that a losing client might still be responsible for certain litigation fees and costs.

*Zauderer*, 471 U.S. at 633. The *Milavetz* court upheld a disclosure requirement, which mandated that persons designated under the statute as "debt relief agencies" identify themselves as such in their advertising. *Milavetz*, 559 U.S. at 233. *See, also*, *Spirit Airlines*, 687 F.3d at 413-15 (upholding a regulation mandating that airlines disclose the total price consumers must pay).

The 2013 Final Rule's labeling requirement is similarly factual and uncontroversial. The regulation simply mandates that all covered muscle cuts of meat include labeling (or other signage) identifying the country where the source animal was born, the country where it was raised, and the country where it was slaughtered. *See* 78 Fed. Reg. at 31,367, 31,369. Each production step is either self-explanatory, as with the term born, or clearly defined, as with the terms raised and slaughtered.[14] Despite these clear-cut definitions, plaintiffs insist that these labels will "lead to misleading and confusing results," because they are internally inconsistent and they do not apply to ground beef. *See* Pls' Mot. at 19. Plaintiffs are wrong on both points.

Plaintiffs claim that the 2013 Final Rule is littered with "exemptions and definitional loopholes" that undermine the integrity of the labels. *See id.* at 21. Plaintiffs' examples, however, undercut their argument as they are both factually accurate and uncontroversial. *See id.* at 20. For example, plaintiffs' first illustration involves an animal born and raised in a foreign country and then subsequently further raised in the United States. *See id*. By listing the animal's country of birth, as the regulation requires, it is understood that the animal was raised at least a part of its life in that same country. *See* 78 Fed. Reg. at 31,368. In order to keep the labeling manageable, the Secretary is not requiring signage to list both countries where the animal was

---

[14] The terms raise and slaughtered are defined in 7 CFR Part 65 and included in the 2009 rule. Raised means "the period of time from birth until slaughter or in the case of animals imported for immediate slaughter . . . the period of time from birth until date of entry into the United States." 74 Fed. Reg. at 2,705. Slaughter means "the point in which a livestock animal . . . is prepared into meat products (covered commodities) for human consumption. *Id*.

raised.  *See* 78 Fed. Reg. at 31,368.  Instead of "Born and Raised in Country X, Raised and Slaughtered in the United States," the regulation permits "Born in Country X, Raised and Slaughtered in the United States." *Id*.  Both statements are true and uncontroversial.  Of course, if retailers wish to use the lengthier label nothing in the regulation prevents them from doing so.[15]

In addition, plaintiffs argue that regulating ground beef and muscle cuts of meat separately undermines the informational value of the labels. *See* Pls' Mot. at 19.  This argument is irrelevant.  Even if the challenged regulation were underinclusive – and as explained momentarily, it is not – under *Zauderer*, it would not run afoul of the First Amendment.  *See* 471 U.S. at 651 n.14 ("[W]e are unpersuaded by appellant's argument that a disclosure requirement is subject to attack if it is 'under-inclusive' – that is, if it does not get at all facets of the problem it is designed to ameliorate.  As a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied. . . . The right of a commercial speaker not to divulge accurate information regarding his services is not such a fundamental right." (internal citation omitted)).

Furthermore, although it is not relevant to this Court's inquiry, the 2013 Final Rule is *not* underinclusive.  As plaintiffs fail to note, Congress legislated separate rules for each commodity

---

[15] Plaintiffs' additional examples are similarly unconvincing.  Example 2 involves Category C meat from animals imported into the United States for immediate slaughter.  Under the 2013 Final Rule, the animals' country of raising shall be designated as "the country from which they were imported," even if the animals were born in another country. 78 Fed. Reg. at 31,369.  Examples 3 and 4 involve Category D foreign meat imported into the United States, which is labeled as "Product of Country X," the country from which the meat is imported, even if the animal was born or raised in another country. Plaintiffs' contend that these labels are misleading because they do not require a listing of *all* countries in which an animal was raised.  As mentioned previously, the Secretary rejected this approach in order to minimize the burden on regulated entities.  If plaintiffs want to include this additional information voluntarily they may do so provided that they maintain proper records to substantiate their claims. *Id*.

because the production of ground beef differs substantially from that of muscles cut of meat.  *See* 7 U.S.C. § 1638a(a)(2)(E).  Ground beef producers often purchase lean beef trimmings from foreign countries and mix them with domestic beef trimmings before grinding them into a final product.  *See* 74 Fed. Reg. at 2,671.  A muscle cut of meat is different.  A slaughterhouse cannot create one sirloin steak by combining sections from two sirloin steaks.  Requiring each ground beef product to include the "Born, Raised, and Slaughtered" labeling is impracticable given that one product might contain ground beef from a calf from several different countries.  The nature of the products necessitates different regulatory schemes.[16]

> **b.    The governmental interest is to correct misleading speech and prevent consumer deception.**

In order for *Zauderer* to apply to a commercial speech regulation, the regulation must be aimed at correcting misleading speech and preventing deception of consumers.  *Milavetz*, 559 U.S. 249-50.  Under the 2009 rule, retailers were using potentially misleading labels, which could confuse consumers as to the muscle cut meat's country of origin.  The Secretary promulgated the 2013 Final Rule to address these deficiencies, thereby providing consumers with more complete information about the origin of the meat products they purchased.  *See* 78 Fed. Reg. at 31,367.

To that point, the 2009 rule included four separate categories for muscle cuts of meat.  Category A referred to meat from animals born, raised, and slaughtered in the United States, or from animals present in the United States on or prior to July 15, 2008.  7 C.F.R. § 65.300(d)

---

[16] Plaintiffs' citation to *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), is misplaced.  The 2013 Final Rules does not contain pictures nor does it raise concerns about misrepresentation as was the case in *R.J. Reynolds.  Id.* (holding that the regulations at issue were not factual and uncontroversial because they contained graphic images "not meant to be interpreted literally").  The "Born, Raised, and Slaughtered" requirements are clearly factual and uncontroversial as they consist of "simple declarative sentences" using "basic, uncomplicated language."  *United States v. Philip Morris USA, Inc.*, 907 F. Supp. 2d 1, 18 (D.D.C. 2012).

(2009).  Category B referred to meat from animals born in another country and raised and

slaughtered in the United States. 7 C.F.R. § 65.300(e)(1) (2009).  Category C referred to meat

from animals imported into the United States for immediate slaughter. 7 C.F.R. § 65.300(e)(3)

(2009).  Category D referred to foreign meat imported into the United States. 7 C.F.R. §

65.300(f) (2009).  As explained above, the commingling of the various categories of muscle cuts

of meat led to labels that were potentially misleading to consumers.  For example, if a

slaughterhouse commingled ninety-nine Category A cows with one Category B cow on a single

production day, all the resulting meat would be labeled Category B.  The commingling of

Category B and C cows was similarly confusing.  Under the 2009 rule, Category B meat was

labeled "Product of the U.S., Country X" while Category C meat was labeled "Product of

Country X, U.S." § 65.300(e)(1); § 65.300(e)(3).  When commingling Category B and C cows

on the same production day, however, the resulting meat could be labeled either B or C because

the order of the countries on the label was interchangeable.  7 C.F.R. § 65.300(e)(4) (2009).[17]

The 2013 Final Rule resolves these irregularities by eliminating the practice of commingling.  78

Fed. Reg. 31,367.  Now all meat that is labeled Category A, B, C, or D will actually be Category

A, B, C, or D meat.

    In conclusion, the Secretary promulgated the 2013 Final Rule to correct discrepancies

under the prior regulation that led to potentially misleading labels.  "An initial agency

interpretation is not instantly carved in stone.  On the contrary, the agency . . . must consider

varying interpretations and the wisdom of its policy on a continuing basis." *National Cable &*

*Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (quoting *Chevron,*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863-864).  In

---

[17] The WTO Appellate Body reached a similar conclusion. *See, e.g.*, *US-COOL (AB)*, para. 343.

promulgating the 2013 Final Rule, the Secretary engaged in just such a reflective and reiterative

process aimed at eliminating the misleading labels.

> **2.      The 2013 Final Rule satisfies the *Zauderer* requirements.**

> **a.      The 2013 Final Rule disclosures are reasonably related to the governmental interest in correcting misleading speech and preventing consumer deception.**

As the D.C. Circuit has observed, the *Zauderer* standard "is akin to rational-basis

review." *R.J. Reynolds Tobacco Co.*, 696 F.3d at 1212.  It does not require a "least restrictive

means" analysis, is significantly more lenient than the intermediary scrutiny applied in *Central*

*Hudson*, and is easily met in this case.  *Zauderer*, 471 U.S. at 651 n.14; *Milavetz*, 559 U.S. at

249.  To satisfy *Zauderer*, a regulation first has to be "'reasonably related to the [Government's]

interest in preventing deception of consumers.'"  *Milavetz* 559 U.S. at 253, (quoting *Zauderer*,

471 U.S. at 651); s*ee also Milavetz*, 559 U.S. at 251-252 (holding that a regulation requiring

professionals who offer bankruptcy-related services to identify themselves as a "debt relief

agency" was reasonably related to preventing consumer confusion regarding the potential fees

involved in obtaining debt relief); *Spirit Airlines*, 687 F.3d at 415 (upholding against a First

Amendment challenge a Department of Transportation final rule requiring airlines to list the total

price was reasonably related to "prevent[ing] consumer confusion about the total price"

consumers have to pay).

The 2013 Final Rule easily meets that requirement.  It eliminates the practice of

commingling "in order to dissipate the possibility of consumer confusion or deception" regarding

the various categories of muscle cuts of meat. *Zauderer*, 471 U.S. at 650 (quoting *In re R.M.J.*,

455 U.S. 191, 201 (1982)).  Moreover, the labels it requires "entail only an accurate statement"

identifying where the animal from which the meat originated was born, raised, and slaughtered.

*Milavetz*, 559 U.S. at 250.  The 2013 Final Rule is directly related to the Secretary's goal of more accurately reflecting the origin of muscle cut covered commodities in accordance with the intent of the statute and is in line with society's "strong interest in the free flow of commercial information."  *Va. Pharm. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 764 (1976).

### b.  The 2013 Final Rule disclosures do not unjustly or unduly burden plaintiffs' speech.

Under *Zauderer*, commercial disclosures also must not unjustly or unduly burden the regulated entities' commercial speech.  *Zauderer*, 471 U.S. at 651 (noting such requirements "might offend the First Amendment by chilling protected commercial speech.").  Plaintiffs fail to point to any "burden" or "chill" that these labels would actually have on their speech.  The only burden this regulation places on the plaintiffs' speech is the desired one—the labeling of all muscle cut meat with the "Born, Raised, and Slaughtered," signifiers, which, are, as explained previously, simple and straightforward concepts.  *See Spirit Airlines*, 687 F.3d at 415 (concluding, while conducting more stringent *Central Hudson* review, that Department of Transportation rule did not impose any burden on speech other than requiring disclosure of the final price).  Plaintiffs may dislike the 2013 Final Rule but their "constitutionally protected interest in *not* providing any particular factual information" related to an animal's production steps is "minimal[,]" *Zauderer*, 471 U.S. at 651.

For these reasons, the 2013 Final Rule clearly satisfies the *Zauderer* requirements and does not violate plaintiffs' First Amendment right.[18]

---

[18] Even assuming *arguendo* that *Central Hudson*, not *Zauderer*, provides the standard of review, plaintiffs are unlikely to prevail on their First Amendment claim.  Under *Central Hudson*, a regulation survives First Amendment scrutiny if (1) there is a substantial government interest, (2) the rule directly advances that interest, and (3) the rule is not more extensive than necessary to

### III.    Plaintiffs Have Not Shown That They Will Be Irreparably Harmed In the Absence of Preliminary Injunctive Relief.

Plaintiffs have not shown that they will be irreparably harmed absent the extraordinary relief they have requested.  Although plaintiffs are correct in noting that "[t]he loss of First Amendment freedoms for even a minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), plaintiffs have not demonstrated that the 2013 Final Rule violates their First Amendment rights, so there has been no loss of freedom for any period of time.  In this respect, the merits and the irreparable injury prongs of the analysis merge together, and plaintiffs cannot show irreparable injury without also showing a likelihood of success on the merits, which they cannot do.  *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012).

Plaintiffs' inexplicable delay in filing this suit is yet another reason to deny their request for emergency relief.  The Secretary issued the 2013 Final Rule on May 23, 2013.  Yet plaintiffs waited two months – until July 25, 2013 – to seek a preliminary injunction.  Plaintiffs' failure to seek preliminary injunctive relief promptly, with no reasonable explanation for their delay, counsels against the Court awarding them the relief they seek.  *See, e.g.*, *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan*

---

serve that interest.  *See Cent. Hudson*, 447 U.S. at 566; *R.J. Reynolds Tobacco Co.*, 696 F.3d at 1217.  Here, the government has a substantial interest in providing consumers with additional, more accurate information about the origins of their food, and in complying with the WTO ruling.  The 2013 Final Rule directly advances those interests by requiring labels to identify where the animals from which covered commodities derived were born, raised, and slaughtered.  Finally, the rule's requirements are no more extensive than necessary to carry out Congress's intent to provide consumers with accurate information about the origin of the meat products they purchase and the government's interest in fulfilling its international trade obligations.

*Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm").

Even if plaintiffs had not unduly delayed seeking emergency relief, they have not shown that they meet the high burden of proof necessary to demonstrate irreparable injury.  The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006).  In addition to showing that the injury complained of is of such imminence that there is clear and present need for equitable relief to prevent it, "plaintiff[s] [also] must show that [they] will suffer harm that is more than simply irretrievable; it must also be serious in terms of its effect on [] plaintiff[s]."  *Coal. for Common Sense in Gov't Procurements v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  "[H]arm that is 'merely economic' in character is not sufficiently grave under this standard."  *Id.* (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Indeed, "[t]o successfully shoehorn potential economic loss into a showing of irreparable harm, [] plaintiff[s] must establish that the economic harm is so severe as to 'cause extreme hardship to the[ir] business[es]' or threaten [] [their] very existence."  *Id.*  Plaintiffs do not begin to meet this burden.

"Bare allegations of what is likely to occur are of no value" to the Court in determining whether plaintiffs will be irreparably harmed absent an injunction.  *Wisc. Gas. Co.*, 758 F.2d at 674; *see also Comm. in Solidarity with People of El. Sal. (CISPES) v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991) ("Injunctions [] will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.") (citation omitted).  But "bare allegations" and fears about what *may* happen in the future are all plaintiffs have offered to support their claim of irreparable injury.  *See, e.g.*, Decl. of Martin D. Unrau, ECF No. 24-22, at ¶8 (speculating that

"[w]ithout the ability to commingle" cattle, "processors will either cut back on their purchases of our cattle or demand steep discounts to make up for their costs"); Decl. of  Runnells Peters Feedyard LLC, ECF No. 24-19, at  ¶¶10, 12 (speculating that the 2013 Final Rule "could result in the closure of my feedlot" and "may also result in the closure of some smaller packing plants that depend on Mexican cattle"); Decl. of Bryan Karwal, ECF No. 24-17, at ¶¶7, 8, 10 (stating his "serious concerns that . . . packers will stop purchasing finished Canadian-born pigs in the future[,]" that "changes flowing from the regulations will impose extreme hard financial burdens" that will affect his business, and the rule will "plac[e] [his business] in danger of having to close . . . or close particular sites"); Decl. of Alan Rubin, ECF No. 24-21, at ¶8 (alleging that the rule "could force our business to close").

        Plaintiffs' speculation about the potential for lost profits rings particularly hollow in this context, given that they failed to provide the Secretary with anything other than anecdotal evidence when the Secretary sought comment on the proposed rule.  *See* 78 Fed. Reg. at 31,373. The Secretary expressly solicited comments on the prevalence of commingling in the industry and the costs associated with the practice, but in response received comments that suggested that only "some packers" engaged in commingling.  *Id.*  As a result, the Secretary had a difficult time assessing the prevalence of the practice in the industry.  *Id.* at 31,368 (explaining that "it is not possible to specify the extent to which packers are making use of the [commingling] flexibility" given the "anecdotal information" the agency received).   In any event, the Secretary's own economic analysis suggests that plaintiffs' claims of irreparable injury are overstated.  The Secretary estimated the cost of compliance as between $19.0 million and $76.3 million in the processing sector and between $17.1 million and $68.5 million in the retail sector. *See* 78 Fed. Reg. at 31,373.  While these costs are not insignificant, the Secretary determined that they would

not "fundamentally alter the way [the meat industry] does business," as Plaintiffs' claim, *see* Pls'

Mot. at 22, when compared to the multibillion dollar meat industry.

The law in this Circuit is clear that plaintiffs' burden is to "provide proof that the harm

has occurred in the past and is likely to occur again, or proof indicating that the harm is *certain*

*to occur in the near future.*" *Wisc. Gas Co.*, 758 F.2d at 674 (emphasis added).  Plaintiffs'

conclusory predictions of lost profits and an inability to compete in the industry, devoid of

factual support, fall well short of that burden, and are reason enough to deny plaintiffs' motion.

**IV.    The Balance of Hardships and the Public Interest Counsel Against Injunctive Relief.[19]**

Where, as here, plaintiffs have failed to show that they will even be harmed in the

absence of emergency relief, the balance of harms weighs against a preliminary injunction.  *See*,

*Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 124 (D.D.C. 2002)

("[T]he balance of harms clearly weighs against granting a preliminary injunction at this time . . .

given the speculative nature of any actual harm to [plaintiff].").  Moreover, preliminary

injunctive relief would harm the government and the public.  "[T]here is inherent harm to an

agency in preventing it from enforcing regulations that Congress found it in the public interest to

direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C.

2008).  Enjoining the Secretary's 2013 Final Rule governing the labeling of muscle cuts of meat

would undermine the government's ability to achieve Congress's goal of providing consumers

with more accurate information regarding the country of origin of these products.  An injunction

may also allow Canada and Mexico, the two WTO members challenging COOL program the

WTO, to contend that the United States has not brought its country of origin labeling regime into

---

[19] These factors "merge when the Government is the opposing party" and are appropriately considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

compliance with its obligations under the WTO.  *See S. African Airways v. Dole*, 817 F.2d 119,

125 (D.C. Cir. 1987) (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64,

118, 2 L.Ed. 208 (1804) (noting that "since the days of Chief Justice Marshall, the Supreme

Court has consistently held that" congressional statutes and regulations "must be construed

wherever possible in a manner that will not require the United States 'to violate the law of

nations.' ")).  The Court should be loath to disregard Secretary's and Congress's judgment, even

if plaintiffs had offered any comparable harm at the other end of the balance.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for preliminary

injunction.


Dated:  August 9, 2013                        Respectfully submitted,

                                              STUART F. DELERY
                                              Assistant Attorney General

                                              JOHN R. GRIFFITHS
                                              Assistant Director

                                              */s/ Tamra T. Moore*
                                              TAMRA T. MOORE
                                              District of Columbia Bar No. 488392
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              20 Massachusetts Avenue, Room 6134
                                              Washington, DC 20001
                                              Tel: (202) 514-8095
                                              Fax: (202) 616-8460
                                              E-mail: tamra.moore@usdoj.gov

                                              Attorneys for Defendants