# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                         )

AMERICAN MEAT INSTITUTE, *et al.*  )
                Plaintiffs,       )
                                           )

               v.                        )      Civil Action No. 13-CV-1033 (KBJ)
                                           )

UNITED STATES DEPARTMENT    )
OF AGRICULTURE, *et al.*             )
                Defendants.      )
                                           )
_____ )

## MEMORANDUM OPINION

## I.   INTRODUCTION

Before this Court is a motion for a preliminary injunction challenging a regulation that the Agricultural Marketing Service ("the AMS" or "the agency") promulgated in May of 2013, pursuant to a statute Congress first passed in 2002. The regulation implements a statutory scheme regarding "country-of-origin labeling" ("COOL") for certain commodities. *See* 78 Fed. Reg. 31,367 (May 24, 2013) ("Final Rule—Mandatory Country of Origin Labeling of Beef, Pork, Lamb, Chicken, Goat Meat, Wild and Farm-Raised Fish and Shellfish, Perishable Agricultural Commodities, Peanuts, Pecans, Ginseng, and Macadamia Nuts,") [hereinafter, "Final Rule"]. Plaintiffs are a group of meat industry trade associations who implore the Court to enjoin the Final Rule preliminarily, claiming that it violates their First Amendment rights, exceeds the agency's authority under the implementing statute, and violates the Administrative Procedure Act, 5 U.S.C. § 706 (2012) *et seq.* (the "APA"), and that their members will be irreparably harmed absent a preliminary injunction. Defendants are the United States Department of Agriculture ("USDA"), its Secretary Tom Vilsack in

his official capacity, the AMS—a division of the USDA with responsibility for promulgating the Final Rule and administering the COOL program—and AMS Administrator Anne Alonzo in her official capacity (collectively, "Defendants" or the "Government").  The Court has also permitted a group of intervenors ("Defendant-Intervenors") to join the case on the side of Defendants.  The Defendant-Intervenors are several meat industry trade groups and a consumer advocacy group that support the Final Rule.

## II.    STATUTORY AND REGULATORY FRAMEWORK

### A.  The Agricultural Marketing Act

The legislation underlying the Final Rule was enacted initially in 2002 as an amendment to the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621 *et seq.* (the "AMA").  *See* Pub. L. No. 110-171, 121 Stat. 2467 (2002).  As originally written, the 2002 country-of-origin statute required retailers of "covered commodities" to inform consumers of the country of origin of such commodities.  *Id.* at sec. 282(a)(1).[1]  In addition, the statute provided criteria establishing when a retailer was permitted to designate a covered commodity as having a United States country of origin.  *Id.* at sec. 282(a)(2).  In the case of beef, lamb, and pork, the 2002 statute provided that retailers could use a U.S. designation only for meat derived from "an animal that is exclusively born, raised, and slaughtered in the United States."  *Id.*  The statute further instructed

---

[1] The statutory definition of "covered commodity" includes, among other products not relevant here, muscle cuts of beef, lamb, and pork, as well as ground beef, ground lamb, and ground pork, but excludes such items if they are ingredients in a "processed food item."  *See* 7 U.S.C. § 1638(2)(B) (2008).  The term "processed food item" is not defined in the statute, but is defined in the implementing regulations as (in relevant part) "a retail item derived from a covered commodity that has undergone specific processing resulting in a change in the character of the covered commodity, or that has been combined with at least one other covered commodity or other substantive food component."  7 C.F.R. § 65.220 (2009).

the Secretary of Agriculture (the "Secretary") to "promulgate such regulations as are necessary to implement" the statute no later than September 30, 2004. *Id.* sec. 284(b). After enacting the statute, however, Congress twice delayed its regulatory implementation, first until 2006 (Consolidated Appropriations Act, Pub. L. No. 108-199, 118 Stat. 3, sec. 749 (2004)), and then until 2008 (Agricultural & Related Agencies Appropriations Act, 2006, Pub. L. No. 109-97, 119 Stat. 2120 sec. 792 (2005)).

In 2008, the relevant provisions of the statute were amended as a part of The Food, Conservation, and Energy Act of 2008 (also known as "the 2008 Farm Bill"), Pub. L. No. 110-234, 122 Stat. 923, sec. 11002, and codified at 7 U.S.C. § 1638a (2008) (the "COOL statute"). As amended in 2008 (and as it exists today), the COOL statute requires retailers to provide consumers with country-of-origin information and also sets forth a detailed categorization system that pertains to the manner in which covered commodities derived from certain livestock are to be designated for COOL purposes. *See* 7 U.S.C. § 1638a (2010) (reprinted in the Appendix to this opinion) [hereinafter "Appendix"]. The statute first instructs that "a retailer of a covered commodity shall inform consumers, at the final point of sale of the covered commodity to consumers, of the country of origin of the covered commodity." *Id.* § 1638a(a)(1).[2] The statute then articulates different requirements for the designation of muscle cut meats that largely depend upon an animal's geographic history relative to its processing stages. *See id.* § 1638a(a)(2)(A)-(E). The first four designations relate to (A) an animal that has a

---

[2] This provision applies to all covered commodities except those that are sold or served in food service establishments. *See* 7 U.S.C. § 1638a(b). A "food service establishment" is defined in the statute as "a restaurant, cafeteria, lunch room, food stand, saloon, tavern, bar, lounge, or other similar facility operated as an enterprise engaged in the business of selling food to the public." 7 U.S.C. § 1638(4).

United States country of origin (*e.g.*, an animal that was "born, raised, and slaughtered" in the U.S.); (B) an animal that has multiple countries of origin; (C) an animal that is imported into the United States for immediate slaughter; and (D) an animal that has a foreign country of origin.[3]  As used in industry parlance and in this litigation, these four classifications for animals from which "muscle cut" meats are derived are referred to as Categories A, B, C, and D, corresponding to the subheadings under which they appear in 7 U.S.C. § 1638a(a)(2).  *See* Appendix at A-1-2.[4]

B.  Regulations Implementing the COOL Statute

The 2002 amendments to the AMA directed the Secretary to promulgate "such regulations as are necessary to implement" the provisions of the COOL statute.  Pub. L. No. 107-171 sec. 284(b).  In 2009, after Congress enacted the 2008 version of the statute, the Secretary, acting through the AMS, published a final rule setting forth four possible COOL designations for retailers to use when marketing muscle cut meats.  *See* 74 Fed. Reg. 2658-01 (Jan. 15, 2009) (the "2009 COOL Rule").  The 2009 COOL Rule provided examples of approved labels that corresponded to the four designation categories laid out in the statute: for Category A, "Product of the United States"; for Category B, "Product of the United States, Country X, and (as applicable) Country Y";

---

[3] Ground meat products are governed by a fifth designation that is not directly at issue in these proceedings.  *See* 7 U.S.C. § 1638a(2)(E) ("The notice of country of origin for ground beef, ground pork, ground lamb, ground chicken, or ground goat shall include— **(i)** a list of all countries of origin of such ground beef, ground pork, ground lamb, ground chicken, or ground goat; or **(ii)** a list of all reasonably possible countries of origin of such ground beef, ground pork, ground lamb, ground chicken, or ground goat.").

[4] The COOL statute's Categories A through D specifically relate to what is referred to in the statute as "muscle cut" meat products.  *See* 7 U.S.C. § 1638(2)(A) (categorizing beef, pork, and lamb as either "muscle cut" or "ground").  As noted, the statute treats ground meats differently.  *See supra* n.3.  In addition, the statute provides an express exemption from the COOL requirements for covered commodities sold at food service establishments, *see supra* n.2, and for covered commodities that are an ingredient in processed food items, *see supra* n.1.

for Category C, "Product of Country X and the United States"; and for Category D, "Product of Country X." *Id.* The 2009 COOL Rule also explicitly acknowledged that meat processors sometimes engage in "commingling"—the practice of processing multiple animals with varying countries of origin together during a single production day for slaughter and packaging—and directed that muscle cuts produced through this process should be labeled in the same way as Category B covered commodities, regardless of whether the commingled animals would each otherwise fall into Category A, B, or C. *Id.*[5] Finally, the 2009 Rule permitted muscle cuts produced through commingling to list in any order the various countries of origin present in the commingled products. *Id.*

C. The WTO Proceedings

In October of 2009, Canada (later joined by Mexico) requested the formation of a panel of the World Trade Organization's ("WTO") Dispute Settlement Body ("DSB") to consider Canada's claims that the 2009 COOL Rule discriminated against foreign livestock in violation of the United States's obligations under the WTO Agreement on Technical Barriers to Trade ("TBT").[6] The DSB panel, which issued findings in December of 2011, concluded that the 2009 COOL Rule accorded less favorable treatment to foreign livestock and therefore violated the TBT agreement. *See* Panel Report, *United States – Certain Country of Origin Labeling (COOL) Requirements*, WT/DS386/R (Nov. 18, 2011) ¶ 7.546 [hereinafter WTO Panel Report]. Both sides

---

[5] Commingling would never involve Category D animals because Category D refers only to finished muscle cut meat products imported from other countries.

[6] TBT was one of the agreements entered into by WTO members upon the official establishment of the WTO in 1994.

appealed certain aspects of the decision, and in June of 2012, the WTO Appellate Body issued a decision substantially confirming the panel's findings. *See* Appellate Body Report, *United States – Certain Country of Origin Labeling (COOL) Requirements*, WDT/AB/R/WT/DS386/R (June 29, 2012) [hereinafter Appellate Body Report]. The case was then transferred to a WTO arbitrator to determine the amount of time that the United States would be given to comply with the findings in the Appellate Body Report. The arbitrator issued a separate 58-page opinion ordering the United States to bring its COOL program into compliance with TBT by May 23, 2013. *See* Award of the Arbitrator, *United States – Certain Country of Origin Labeling (COOL) Requirements*, WDT/AB/R/WT/DS386/23 (Dec. 4, 2012) [hereinafter WTO Arbitrator's Report].

D. The 2013 Proposed And Final Rules

As a result of the Appellate Body Report, the AMS undertook a comprehensive review of the then-existing COOL program. On March 12, 2013, the agency issued a notice of proposed rulemaking outlining changes to the COOL program. *See* Proposed COOL Rule, 78 Fed. Reg. 15,645 (Mar. 12, 2013). This notice explained that the proposed changes were designed both to provide consumers with additional country-of-origin information and also to bring the United States into compliance with the Appellate Body Report. *Id.* The notice also provided for a 30-day public comment period. *Id.* At the end of the comment period, the AMS published the Final Rule. *See* Final Rule, 78 Fed. Reg. 31,367 (May 24, 2013).

The Final Rule generally modifies the 2009 COOL Rule in two respects. First, the Final Rule requires COOL labels for muscle cut meats to specify where the "production steps" for each such product took place—that is, where the animal from

which the commodity was derived was born, raised, and slaughtered.[7]  As with the 2009 COOL Rule, the Final Rule provides examples of acceptable labels: for Category A, "Born, raised, and slaughtered in the United States"; for Category B, "Born in Country X, raised and slaughtered in the United States"; for Category C, "Born and raised in Country X, slaughtered in the United States"; and for Category D, "Product of Country X."  *Id.* at 31,385.  Second, the Final Rule states that "this final rule eliminates the allowance for commingling of muscle cut covered commodities of different origins" in order to "let[] consumers benefit from more specific labels."  *Id.* at 31,369.

The Final Rule also recognizes that, because of the new labeling requirements and the commingling ban, "it may not be possible for all of the affected entities to achieve 100% compliance immediately."  *Id.*  The Final Rule therefore provides that, during a six-month period following the effective date of the Rule, the agency will "conduct an industry outreach and education program concerning the provisions and requirements of this rule."  *Id.*  That grace period remains ongoing as of the writing of this opinion.

E.  The Instant Litigation

Plaintiffs filed the original complaint in this action on July 8, 2013.  (ECF No. 1.)  On July 23, 2013, an amended complaint followed.  ("Compl.," ECF No. 15.)  The complaint contains three separate counts that challenge the Final Rule as violating the First Amendment (Count I), the AMA (Count II), and the APA (Count III).  On July 25,

---

[7] This new labeling system applies to covered commodities from each Category A-C.  Category D, which applies to muscle cuts from an animal slaughtered outside of the United States, requires a label that only identifies the country from which the meat was imported.

2013, Plaintiff filed a motion for a preliminary injunction along with a memorandum of law in support of the motion. ("Pl. Br.," ECF No. 24.)

On August 9, 2013, pursuant to a Court-ordered briefing schedule, the agency filed an opposition to Plaintiffs' preliminary injunction motion. ("Def. Br.," ECF No. 30.) On that same day, Defendant-Intervenors filed a motion to intervene (ECF No. 28), along with a brief in opposition to Plaintiffs' Motion ("Int. Br.," ECF No. 28-12).[8] Plaintiffs filed their reply to the agency's opposition on August 19, 2013 ("Pl. Reply," ECF No. 33), and a supplemental reply responding to Defendant-Intervenors on August 22, 2013 ("Pl. Supp. Reply," ECF No. 42). The Court held oral argument on the preliminary injunction motion on August 27, 2013.

Upon consideration of the arguments presented in the briefs and at oral argument, and for the reasons explained below, the Court concludes that Plaintiffs' motion for a preliminary injunction must be DENIED. A separate order consistent with this memorandum opinion will issue.

## III. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id.* at 20. In conducting an inquiry into these factors, "[a] district court must 'balance the

---

[8] The Court granted the Defendant-Intervenors' motion to intervene on August 19, 2013.

strengths of the requesting party's arguments in each of the four required areas.' . . . If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Chaplaincy of Full Gospel Churches v. England* ("*CFGC*"), 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  However, "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue."  *Id.* (citation omitted).[9]

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Plaintiffs' First Amendment Claim

Count I of Plaintiffs' Complaint alleges that the Final Rule violates Plaintiffs' First Amendment rights by compelling them to speak when they would rather not. (Compl. ¶¶ 72-80; *see also* Pl. Br. at 12.)  It is "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327

---

[9] This approach to analyzing the preliminary injunction factors, which is traditionally used in this circuit, is often referred to as a "sliding scale."  The D.C. Circuit has recently suggested that the sliding scale approach may no longer be applicable after the Supreme Court's decision in *Winter*.  *See Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C. Cir. 2011) (likelihood of success on the merits and irreparable harm may be "independent, free-standing requirement[s] for a preliminary injunction" (internal quotations marks and citation omitted)); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and* a likelihood of irreparable harm, among other things." (emphasis in original)) (Kavanaugh & Henderson, JJ., concurring).  However, the D.C. Circuit has not yet held that the sliding scale analysis is no longer applicable; therefore, this Court will apply that standard to the injunction at issue here.  This Court need not delve into the question of whether the sliding scale analysis retains its viability in this circuit, because Plaintiffs have failed to demonstrate that a preliminary injunction should issue even under the more lenient sliding scale analysis.  *Cf. Kingman Park Civic Ass'n v. Gray*, 13-cv-990(CKK), 2013 WL 3871444, at *3 (D.D.C. July 29, 2013) ("[A]bsent . . . clear guidance from the Court of Appeals, the Court considers the most prudent course to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the 'sliding scale' framework. If a plaintiff cannot meet the less demanding 'sliding scale' standard, then it cannot satisfy the more stringent standard alluded to by the Court of Appeals.").

(2013) (internal quotation marks and citations omitted); *see also Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 957 (D.C. Cir. 2013) ("[T]he First Amendment freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." (internal quotation marks and citation omitted)).  Compelled speech, no less than restricted speech, is subject to strict scrutiny in most circumstances.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of No. Carolina, Inc.*, 487 U.S. 781, 798 (1988) (applying "exacting First Amendment scrutiny" to a state-law disclosure requirement applicable to professional fundraisers); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 11 (D.C. Cir. 2009) (applying strict scrutiny to a disclosure provision that applied to professional lobbyists).[10]  The focus in this case, however, is on compelled *commercial* speech, which all parties agree is subject to less exacting constitutional standards.

Compelled commercial speech is generally evaluated under the intermediate scrutiny test that the Supreme Court first articulated in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980).  To withstand scrutiny under *Central Hudson*, the government regulation of speech must "directly advance" a "substantial" government interest "and be 'n[o] more extensive than is necessary to serve that interest.'"  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (alteration in original) (citation omitted).  Accordingly, the D.C. Circuit has explained that, for a government restriction on commercial speech to pass constitutional muster under *Central Hudson*, "the

---

[10] In the *Taylor* case, the D.C. Circuit considered a 2007 law that required registered lobbyists to make certain disclosures about their financial backers.  The court explained that strict scrutiny applied, and that "[t]o satisfy strict scrutiny, the government must establish three elements: (1) the interests the government proffers in support of the statute must be . . . compelling; (2) the statute must effectively advance those interests; and (3) the statute must be narrowly tailored to advance the compelling interests asserted."  582 F.3d at 11 (internal quotation marks and citations omitted).

governmental interest must be substantial; the regulation must directly advance the governmental interest asserted; and the regulation must not be more extensive than is necessary to serve that interest." *Nat'l Cable & Telecommc'ns Ass'n v. FCC*, 555 F.3d 996, 1000 (D.C. Cir. 2009) (internal quotation marks and citations omitted).

There is, however, an exception to the prevailing *Central Hudson* rule. In *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, the Supreme Court held that, where a law compels disclosure of "purely factual and uncontroversial information," the law need only be "reasonably related to the [government's] interest in preventing deception of consumers" to pass muster under the First Amendment. 471 U.S. 626, 651 (1985).[11]

The parties in the instant case differ sharply as to whether the *Central Hudson* (intermediate scrutiny) or the *Zauderer* (reasonableness) standard applies to the Final Rule's compelled disclosure of production step information, and they largely rely on two recent decisions from the D.C. Circuit that illuminate the question of which test should be applied here. In *R.J. Reynolds Tobacco Co. v. Food and Drug Administration* ("*RJR*"), several tobacco companies challenged on First Amendment grounds an FDA regulation requiring graphic images to be displayed along with warnings on cigarette packs. 696 F.3d 1205 (D.C. Cir. 2012). A divided panel of the D.C. Circuit ruled that intermediate scrutiny, not the *Zauderer* standard, applied for two main reasons: first,

---

[11] *Zauderer* involved a rule that required attorneys who sought to advertise that they worked for contingency fees to disclose in their advertisements that their clients might be responsible for some litigation fees and costs regardless of the outcome of their case. 471 U.S. at 631-34. In these circumstances, as noted, the Supreme Court held that a reasonableness test applied, rather than the intermediate scrutiny of *Central Hudson*. *Zauderer*, 471 U.S. at 651. In so holding, the Court reasoned that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, [a party's] constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." *Id.*

because the government had not shown that there is a "danger" that the tobacco companies' advertisements "mislead consumers" without a warning that includes graphic images, *id.* at 1214; and second, because "the graphic warnings d[id] not constitute the type of purely factual and uncontroversial information or accurate statements to which the *Zauderer* standard applied." *Id.* at 1216 (citing *Zauderer*, 471 U.S. at 651, and *Milavetz*, 559 U.S. at 250). Applying intermediate scrutiny per *Central Hudson*, the panel majority struck down the regulation on the second prong of the *Central Hudson* test, finding that the FDA had not provided enough evidence that the rule requiring graphic images along with warning labels would directly and materially further the government's substantial interest in reducing smoking. *RJR*, 696 F.3d at 1221-22.

Conversely, in *Spirit Airlines, Inc. v. United States Department of Transportation*, the D.C. Circuit considered a First Amendment challenge to a Department of Transportation ("DOT") rule requiring that the total cost of airfare, inclusive of tax, be the most prominent price displayed on airline advertisements and travel websites. 687 F.3d 403 (D.C. Cir. 2012). The panel majority in *Spirit Airlines* determined that *Zauderer*'s reasonableness standard, not *Central Hudson*'s intermediate scrutiny, governed the compelled commercial speech regulation at issue. *Id.* at 412-14. Specifically, the *Spirit Airlines* court noted that, where the rule in question is "directed at *misleading* commercial speech, and where [it] impose[s] a disclosure requirement rather than an affirmative limitation on speech, *Zauderer*, not *Central Hudson*, applies." *Id.* at 412 (internal quotation marks omitted). The panel in *Spirit Airlines* also noted that the *Zauderer* standard could be applied even where an agency had not made an

affirmative showing that the public had previously been deceived and thus the compelled disclosure was necessary, as long as "'the *possibility* of deception . . . was self-evident.'" *Id.* at 413 (quoting *Zauderer*, 471 U.S. at 651). The *Spirit Airlines* majority found that these conditions were easily satisfied under the circumstance presented because the DOT rule required disclosure of factual information, and "based on common sense and . . . experience," the disclosure of such facts would likely address consumer confusion in the marketplace. *Id.* at 413. Accordingly, the panel applied *Zauderer* and ultimately held that the DOT rule did not violate the First Amendment. *Id.* at 413-14.

The First Amendment arguments that the parties seek to advance in this case are largely based on the D.C. Circuit's analyses in *RJR* and *Spirit Airlines*. Plaintiffs urge the Court to rely on language from *RJR*, and accordingly, they maintain that *Central Hudson*'s intermediate scrutiny applies. While Plaintiffs apparently do not dispute that the Final Rule's production step labeling requirement is purely factual and non-controversial, Plaintiffs vigorously assert that the Final Rule does not target "deceptive speech" and that, therefore, *Zauderer* does not apply. (Pl. Reply at 3-9.) To this end, Plaintiffs argue that the agency never said anything about prevention of consumer deception during the rule-making process, so its attempt to do so now qualifies as the type of classic "post hoc rationalization" that the Court should not accept. (*Id.* at 4.) In addition, Plaintiffs maintain that *RJR*'s statement that "the government [cannot] seek review under the lenient *Zauderer* standard absent a showing that the advertisement at issue would likely mislead consumers," *RJR*, 696 F.3d at 1214, must be taken at face

value, and that the agency has not made the requisite "showing" of deception. (Pl. Reply at 7; *see also* Hr'g Tr. at 8:1-20, Aug 27, 2013, ECF No. 46.)

Defendants, on the other hand, rely largely on *Spirit Airlines* to argue that the ambit of the "consumer deception" required to invoke *Zauderer* is not nearly as narrow as Plaintiffs claim. The agency essentially maintains that common sense demonstrates that compelled disclosure of production steps targets misleading speech and consumer confusion insofar as it corrects aspects of the 2009 COOL Rule that led retailers to use misleading labels, such as the allowance for commingling. (*See* Def. Br. at 32-34 (noting that "the Secretary promulgated the 2013 Final Rule to correct discrepancies under the prior regulation that led to potentially misleading labels").) Similarly, Defendant-Intervenors contend that "[l]ike the DOT rule [at issue in *Spirit Airlines*], the Final Rule was targeted at preventing consumer confusion in the marketplace," and that "the legislative history of the COOL statute and the voluminous public comments on the 2003 and 2009 rulemaking demonstrate that consumers were being confused." (Int. Br. at 11.)

Against the backdrop of *RJR* and *Spirit Airlines*, the Court concludes that the production step labeling mandated by the Final Rule is the type of disclosure requirement subject to review under *Zauderer*'s "reasonableness" standard. As a preliminary matter, it is undisputed, and the Court agrees, that the Final Rule mandates "purely factual and uncontroversial" disclosures about where an animal was born, raised, and slaughtered, *Zauderer*, 471 U.S. at 651, and thus satisfies this prerequisite to *Zauderer*'s application.[12] Furthermore, with respect to the "consumer deception" aspect

---

[12] The Second Circuit has cogently described one (persuasive though not binding) rationale for the less exacting level of scrutiny applicable to factual and uncontroversial compelled disclosures per *Zauderer*.

of *Zauderer*'s applicability, *Spirit Airlines* clearly indicates that Plaintiffs are wrong to

insist that the agency was required to articulate specifically that the Final Rule was

targeting consumer deception in order to invoke review under the *Zauderer* standard.

Rather, under *Spirit Airlines*, the likelihood of deception need only be based on

"experience" and "common sense."[13] And here, just as in *Spirit Airlines*, the

"likelihood of deception is hardly . . . speculative." *See id.* at 413 (internal quotation

marks and citation omitted). Prior to the enactment of the Final Rule, the allowance for

commingling all but ensured that certain muscle cut commodities would carry

misleading labels. As the agency points out, under the 2009 COOL program, if ninety-

nine cows that were born, raised, and slaughtered in the U.S. were commingled with

one cow that was born in Mexico and raised and slaughtered in the U.S., all resulting

muscle cuts would be labeled "Product of the United States and Mexico." (Def. Br. at

---

In *National Electrical Manufacturers Association v. Sorrell*, the court explained that "[c]ommercial speech is subject to less stringent constitutional requirements than are other forms of speech[;] [f]urthermore, within the class of regulations affecting commercial speech, there are material differences between [purely factual and uncontroversial] disclosure requirements and outright prohibitions on speech." 272 F.3d 104, 113 (2d Cir. 2001) (quoting *Zauderer* (internal quotation marks omitted)). The court continued:

> Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the marketplace of ideas. Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal. In such a case, then, less exacting scrutiny is required than where truthful, nonmisleading commercial speech is restricted.

*Id.* at 113-14 (citations, internal quotation marks, and footnote omitted).

[13] Even *RJR* suggests that *Zauderer's* "deception" requirement is not as stringent as Plaintiffs maintain. The *RJR* court cited regulations targeting "incomplete commercial messages" as an example of the type of regulations subject to review under *Zauderer*, and also recognized that a "self-evident—or at least potentially real" risk of misleading consumers is sufficient to warrant scrutiny under *Zauderer*. 696 F.3d at 1214 (internal quotes and citations omitted).

33.)  Moreover, retailers had no obligation to provide any of the details regarding which steps of the production process happened where, and for muscle cuts from animals with multiple countries of origin, retailers were permitted to list the countries in any order. (*Id.* at 17-18.)  Under these circumstances, the Court has no trouble concluding that experience and common sense dictates that there was a likelihood of consumer confusion under the prior COOL program.

Moreover, even if Plaintiffs are correct that *Zauderer* requires an affirmative showing of consumer confusion as the basis for the disclosure requirement, the agency appears likely to be able to satisfy that burden here.  When it issued the Final Rule, the agency explicitly stated that it was requiring the disclosure of production step information to provide consumers with "more specific information on which to base their purchasing decisions," and also to "ensure [that] label information more accurately reflects the origin of muscle cut covered commodities."  *See* Final Rule, 78 Fed. Reg. at 31,375.  Public comments that the agency relied on in crafting the Final Rule indicated that the disclosure requirement "makes labels more informative for consumers," *id.* at 31,369, and the Final Rule also specifically dictates how production step information is to be presented to consumers using language that indicates that consumer confusion was the major driver behind the rule's promulgation.  *See, e.g.*, *id.* ("Therefore, under this final rule, abbreviations for the production steps are permitted as long as the information can be clearly understood by consumers.").[14]  Thus, although the agency may not have used the specific words "deceive" or "mislead" when explaining the

_____

[14] Notably, the United States also specifically argued that the country-of-origin labeling program was implemented to "help prevent consumers from being misled about the origin of meat" during the WTO proceedings surrounding the 2009 COOL Final Rule.  WTO Panel Report ¶ 7.665.

purpose of the production step disclosure requirement, the Final Rule sufficiently establishes that the regulation was intended to address the possibility of consumer confusion regarding the origin of covered commodities. Consequently, this Court concludes that the Final Rule should be reviewed under the *Zauderer* standard.

Having concluded that *Zauderer*, and not *Central Hudson*, applies, the Court now turns to an assessment of Plaintiffs' likelihood of success on the merits of their First Amendment claim. Under *Zauderer*, the government need only show that the compelled disclosure at issue is "reasonably related to the [government's] interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. This standard of review is unquestionably lenient; indeed, the D.C. Circuit has explained that the *Zauderer* standard is "akin to rational-basis review." *RJR*, 696 F.3d at 1212.

Not surprisingly, the parties differ as to whether the Final Rule passes muster even under the *Zauderer* standard. While Defendants maintain that the Final Rule easily satisfies *Zauderer* (Def. Br. at 34-35), Plaintiffs argue that the Final Rule's production step disclosure requirement fails this lenient test primarily because, in Plaintiffs' view, compelled disclosure of production step information imposes burdens far in excess of any marginal possibility of consumer confusion that is alleviated by the rule. (Pl. Reply. at 11-12.) In other words, from Plaintiffs' perspective, the harm (*i.e.*, the confusion that the rule is supposedly designed to address) is not adequately defined (*id.* at 11), and the production step disclosure requirement is not only too costly relative to that ill-defined problem, it purportedly *causes* as many labeling inaccuracies as it cures (*id.* at 11-12).

Plaintiffs' arguments in this regard are not likely to be persuasive. First, to the extent that Plaintiffs' argument rests on the proposition that the production step disclosure requirement is too "burdensome" to be reasonably related to the government's interest in preventing consumer confusion, Plaintiffs appear to conflate the burden that they claim the Final Rule places on their *finances* with the burden it places on their speech. (*See id.*; *see also* Pl. Br. at 2 (asserting that the agency's interest in compelling disclosure of production step information "is far outweighed by the onerous burdens imposed by the Final Rule").) In the First Amendment context, it is the burden on speech, not pocketbook, that matters. *See Milavetz*, 559 U.S. at 250 ("Unjustified or unduly burdensome disclosure requirements offend the First Amendment by chilling protected speech."). Moreover, it is well established that, when the compelled speech is commercial and purely factual in nature, the speaker's First Amendment rights are not unduly burdened "'as long as [the] disclosure requirements are reasonably related to the [government's] interest in preventing deception of consumers.'" *Milavetz*, 559 U.S. at 250 (quoting *Zauderer*, 471 U.S. at 651); *see also supra* n.14.

Second, Plaintiffs' excess-burden argument essentially attempts to graft a "tailoring" requirement onto the reasonableness standard the Supreme Court has articulated. But *Zauderer*'s reasonableness inquiry contains no tailoring requirement; rather, it requires only that a regulation such as the one at issue here be reasonably related to the government's interest in preventing consumer deception. *See RJR*, 696 F.3d at 1212. Here, there is clearly a reasonable relationship between the government's interest in preventing consumer confusion about the origins of muscle cut meat, on the

one hand, and the required disclosure of specific production step information, on the other.  Accordingly, the Final Rule satisfies the reasonableness standard articulated in *Zauderer*, and the Court finds that Plaintiffs' First Amendment challenge is unlikely to be successful.

B.  Plaintiffs' AMA Claim

As a second basis for challenging the Final Rule, Plaintiffs argue that the rule contravenes the will of Congress in two respects.  First, Plaintiffs maintain that the Final Rule exceeds the authority that the COOL statute grants to the AMS with respect to the country-of-origin labeling program because it requires retailers to specify where an animal was "born, raised, and slaughtered," which, according to Plaintiffs, "the COOL statute does not permit."  (Compl. ¶ 82.)  Second, Plaintiffs argue that the Final Rule impermissibly bans commingling practices—a ban that, according to Plaintiffs, clearly exceeds the bounds of the agency's limited statutory authority to regulate labels. (*See* Pl. Br. at 32 ("Congress did not give AMS authority to dictate how to produce and package meat.").)  In defense of the Final Rule, the AMS and Defendant-Intervenors argue that the agency's action is entitled to deference because the COOL statute does not clearly prohibit regulations that require the more detailed label information required under the Final Rule.  (Def. Br. at 10-15; Int. Br. at 13-17.)  Moreover, Defendants maintain that Congress specifically authorized the agency to promulgate regulations that are consistent with the legislature's intent to provide consumers with more specific country-of-origin information, and in the absence of any express prohibition, the commingling ban permissibly furthers that intention.  (Def. Br. at 18.)

Plaintiffs' statutory authority arguments implicate the familiar two-step *Chevron* standard. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). The Supreme Court has long held that "if the statute speaks clearly 'to the precise question at issue,' we 'must give effect to the unambiguously expressed intent of Congress.'" *Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002) (quoting *Chevron,* 467 U.S. at 842–43). If, however, "the statute 'is silent or ambiguous with respect to the specific issue,' we must sustain the Agency's interpretation if it is 'based on a permissible construction' of the [statute]." *Id.* at 218 (citations omitted). The Court's task here, then, is to examine the COOL statute for indicia of congressional intent in light of Plaintiffs' contentions and to determine whether Plaintiffs are likely to succeed in claiming that the agency lacked statutory authority to promulgate the Final Rule.

1. *Point-of-Processing Labeling*

The first aspect of Plaintiffs' statutory challenge is their assertion that the COOL statute unambiguously prevents the AMS from requiring muscle cut retailers to affix what Plaintiffs call "point-of-processing" labels (Pl. Br. at 25-30)—*i.e.*, labels that identify the specific geographic locations where the animal that was the source of the muscle cuts was "born, raised, and slaughtered." (*Id.*)[15] Although Plaintiffs struggle valiantly to persuade the Court that they will be able to surmount the first *Chevron* hurdle with respect to this statutory contention, the text and structure of the COOL statute present obstacles that appear to be too great for Plaintiffs to overcome.

---

[15] The parties use the terms "point-of-processing" information and "production step" information interchangeably when referring to the Final Rule's requirement that a retailer disclose to consumers the places where the animal from which muscle cut commodities are derived was born, raised, and slaughtered. This opinion uses these phrases interchangeably as well.

First and foremost, Plaintiffs can point to no statutory provision that expressly prohibits the AMS from enacting regulations that mandate the disclosure of "born, raised, and slaughtered" information.  This omission is significant because the COOL statute does expressly require the Secretary of Agriculture, who heads the AMS, to "promulgate such regulations as are necessary to implement" the law.  7 U.S.C. § 1638c(b).  (*See also* Def. Br. at 18 (arguing that the Secretary has broad discretion to promulgate rules "necessary to implement" the COOL statute).)

In the absence of any statutory prohibition limiting the agency's power to dictate the disclosure of production step information, Plaintiffs maintain that the statute's text nevertheless clearly establishes Congress's intent to leave no room for the agency to do so.  Plaintiffs' argument in this regard focuses on the statute's prescriptions regarding which country constitutes the "country of origin" for certain covered commodities under specified circumstances.  For example, Plaintiffs read the language of 7 U.S.C. § 1638a(a)(2)(C) to mandate that the country of origin for meats that fit into Category C will be "two places only—the country from which it was imported and the United States" (Pl. Br. at 26), and thus, Plaintiffs argue that Congress could not have intended for the production steps to be revealed because, in the Category C instance, "the animal's 'country of origin' has nothing to do with where it was born or raised."  (*Id.*) Plaintiffs perceive a similar disconnect between what the statute says about the country of origin and a point-of-processing label requirement when they interpret the statutory provision pertaining to Category A muscle cuts.  Plaintiffs argue that the fact that Congress permits the Category A designation to be made with respect to muscle cuts derived from animals "present in the United States on or before July 15, 2008"—

without regard for where such animals were born, raised, or slaughtered—means that Congress "could not have intended origin information to be conveyed through production-step details." (*Id.* at 26-27 (analyzing § 1638a(a)(2)(A)).) And Plaintiffs make the same point-of-processing prohibition point with respect to Category D muscle cuts, because § 1638a(a)(2)(D) states that the country of origin is "a" country that is "other than the United States," and, in Plaintiffs' view, this prescription is "incompatible with a point-of-processing scheme, since an animal may not be born, raised, and slaughtered all in one place." (Pl. Br. at 27.)

Plaintiffs' statutory arguments are likely to be unavailing for several reasons. First of all, Plaintiffs rely heavily on, and seek to advance, the notion that when Congress speaks to a matter in any respect, an agency is thereby prohibited from building upon what the statute requires even in the absence of an express prohibition. In this regard, Plaintiffs ardently maintain that Congress's decision to determine the acceptable "country of origin" designation for animals of different backgrounds unambiguously evidences its intent to prevent the AMS from requiring that retailers inform consumers of any additional origin-related information. (*See* Pl. Br. at 29 (reasoning that "COOL labels must not specify each point of processing, from birth to raising to slaughter, because not every animal's statutorily defined 'country of origin' includes those production steps"); *see also id.* at 28 ("[W]hile Congress defined 'country of origin' differently for separate categories of meat, with some categories encompassing an animal's country of birth or raising . . . the statute's language and structure make clear that labels must not list this information by detailing each production step.").) But such extrapolation—*i.e.*, that because Congress mandated that

the country of origin be disclosed, and went further to define the country of origin in particular (and sometimes inconsistent) circumstances, such information is obviously the *only* permissible disclosure—is rarely successful. *See, e.g.*, *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 219 (2009) (finding that, where Congress mandated the exact level of discharge of pollutants in one provision of a regulatory scheme, the agency retained discretion to determine discharge amounts in other contexts); *see also Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) ("When interpreting statutes that govern agency action, we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) (emphasis omitted))).

Moreover, and perhaps even more to the point, in each textual instance that Plaintiffs point to, rather than indicating that the statutorily-defined country of origin is the sole bit of information that may properly appear on the labels of muscle cut commodities, Congress appears to be engaged in the more fundamental task of developing a uniform system for determining which geographic location qualifies as the "country of origin" for designation purposes in any given case. For example, Congress tells retailers that in order to designate a muscle cut commodity as a United States product exclusively (Category A), the retailer must ensure that the animal from which the cuts were derived was "exclusively born, raised, and slaughtered in the United States." 7 U.S.C. § 1638a(a)(2)(A)(i).[16] This says nothing about the *content* of the

_____

[16] The statute establishes only two other circumstances in which it is permissible for the country of origin to be designated as the U.S. exclusively: where the animal at issue was "born and raised in

required disclosure with respect to such an animal.[17]  And it certainly does not preclude the AMS from determining that, in order to best inform consumers about the origins of a Category A muscle cut commodity pursuant to the statute, the label affixed to any such muscle cuts package must convey something to the effect of "Born, Raised, and Slaughtered in the USA."

The same is true of Categories C and D, and Plaintiffs' reading of those provisions is similarly unpersuasive.  Plaintiffs insist that Congress intended its requirements about country-of-origin designations in these circumstances to serve as a prohibition against point-of-processing labeling.  (*See* Pl. Br. at 27.)  But nowhere in those statutory provisions does Congress purport to address the content of the disclosure that a retailer is required to make to consumers with respect to the muscle cut categories that the statute creates.  Instead, just as with Congress's clearly stated intention to establish which types of animals are properly designated as Category A, the language of subparagraphs (C) and (D) reads much more like Congress is sorting livestock—explaining which animals fall into which categories based on factors such as where they were born, raised, or slaughtered; whether they have been imported into the U.S. for immediate slaughter; or whether they were processed before they were

---

Alaska or Hawaii and transported for a period of not more than 60 days through Canada to the United States and slaughtered in the United States," and where the animal was "present in the United States on or before July 15, 2008, and once present in the United States, remained continuously in the United States."  7 U.S.C. § 1638a(a)(A)(ii)-(iii).

[17] Indeed, the farthest that the statute goes in addressing the form or appearance of the mandatory notice to consumers is to state that "[t]he information required . . . may be provided to consumers by means of a label, stamp, mark, placard, or other clear and visible sign on the covered commodity or on the package, display, holding unit, or bin containing the commodity at the final point of sale to consumers."  7 U.S.C. § 1638a(c)(1).

imported—and *not* like Congress is making pronouncements about what information

retailers can be required to disclose to consumers, as Plaintiffs strenuously maintain.[18]

In pressing for the likely viability of their interpretation of the COOL statute,

Plaintiffs also cannot escape the fact that the North Star of any exercise of statutory

interpretation is the intent of Congress, as expressed in the words it uses. *Cf. Am.*

*Fed'n of Labor & Congress of Indus. Orgs. v. FEC*, 333 F.3d 168, 180 (D.C. Cir. 2003)

("[I]nquiry into . . . Congress's intent proceeds, as it must, from 'the fundamental canon

that statutory interpretation begins with the language of the statute itself.'" (quoting

*Butler v. West*, 164 F.3d 634, 639 (D.C. Cir. 1999))).  In this respect, too, Plaintiffs

textual argument withers when exposed to the guiding light of standard legislative

drafting experience.  That is, if Congress truly had intended that a retailer with muscle

cuts from an animal properly designated as Category A, B, C, or D could *only* be

required to inform consumers of the covered commodity's statutorily-established

country of origin designation—and nothing more—surely it would have found a clearer

way to express that intention.  Indeed, Congress does precisely that elsewhere in this

same statute, by inserting specific provisions that speak directly to the information that

a retailer can, and cannot, be required to gather and to disclose.  *See, e.g.*, § 1638a(c)(2)

(stating, in regard to covered commodities "already individually labeled for retail sale

---

[18] In this regard, Plaintiffs' assertion that "Congress could not have wanted the specificity of COOL labels to vary based on the happenstance of whether an animal was imported for immediate slaughter or imported and then raised briefly in the United States" (Pl. Br. at 28) is probably true, but the conclusion that the Plaintiffs draw from that contention—that AMS is thereby prohibited from requiring point-of-processing labels—does not follow.  Congress clearly considered criteria *other than* where an animal was born, raised, and slaughtered to be important to the determination of the country-of-origin designation, such as, for example, when an animal is imported into the United States for immediate slaughter.  *See* 7 U.S.C. § 1638a(a)(2)(C).  The fact that a rational legislature probably would not have wanted the content of the required labels to turn on such matters as whether an animal was imported for immediate slaughter or "whether an animal was present in the United States on July 15, 2008" (Pl. Br. at 28) merely underscores the likelihood that subsection (a)(2), which relies on such distinctions, is not really addressing the content of COOL labels at all.

regarding country of origin," that "the retailer *shall not be required to provide any additional information* to comply with this section" (emphasis added)); *id.* § 1638a(d)(2)(B) ("The Secretary *may not require* a person that prepares, stores, handles, or distributes a covered commodity to maintain a record of the country of origin of a covered commodity other than those maintained in the course of the normal conduct of the business of such person." (emphasis added)). These textual reminders that Congress typically says what it means when it seeks to limit an agency's regulatory authority undermine Plaintiffs' argument that Congress intended to—but somehow neglected to—include like language regarding the disclosure obligation at issue here.[19]

The best Plaintiffs can do to support their contention that the statute prohibits the AMS from requiring point-of-processing labels is to maintain that Congress's selective use of the word "shall" in the COOL statute evidences its intention that the prescribed country-of-origin designations be the only information that is disclosed to consumers pursuant to the statute. (Pl. Br. at 29-30.) This argument homes in on the statutory text as follows. In subparagraph (C), Congress says that a retailer whose muscle cuts will be derived from an animal that has been imported into the United States for immediate slaughter "*shall* designate the origin of such covered commodity as— (i) the country from which the animal was imported; and (ii) the United States," 7 U.S.C.

---

[19] Plaintiffs' argument that Congress considered and affirmatively rejected the agency's point-of-processing label scheme when COOL regulations were first proposed in 2003 (Pl. Br. at 28-29) is not convincing. As Defendant-Intervenors point out (Int. Br. at 16), the COOL statute adopts the point-of-processing framework in many respects; therefore, it is not at all clear that Congress actually rejected the agency's proposed focus on production steps. In any event, it is well-established that the text of a statute, and not the legislative process that engendered it, is conclusive of Congress's intent. *See United States v. Barnes*, 295 F.3d 1354, 1365 (D.C. Cir. 2002) ("We do not resort to legislative history to cloud a statutory text that is clear." (internal quotation marks and citation omitted)); *see also United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (noting that statutory construction begins with the plain language of the statute, and where the text is clear, the inquiry ends without proceeding into legislative history).

§ 1638a(a)(2)(C)(emphasis added), so who is the AMS to require retailers of Category C meats to inform consumers of the places where the animal was born, raised, and slaughtered?  (*See* Pl. Br. at 26.)  Of course, this reading assumes, without good reason, that a retailer's duty to "inform consumers . . . of the country of origin" in subsection (a)(1) of the statute is equivalent to subsection (a)(2)'s duty to "designate" the country of origin; and, indeed, Plaintiffs' entire argument appears to be based on conflating what Congress permits (or requires) in regard to designating the country of origin, on the one hand, with the particular statement that a retailer can (or must) make when informing consumers about the origin of the muscle cuts package, on the other.  (*See, e.g.*, Pl. Br. at 26 (asserting that the requirement to "inform" consumers of the country of origin cannot mean "the 'countries of birth, raising, and slaughter'" because, in regard to Category C meat, for example, Congress mandated that "the retailer 'shall designate the origin . . . as (i) the country from which the animal was imported; and (ii) the United States'—period").)  It is perfectly reasonable, however, to interpret the COOL statute as creating a retailer obligation that has two different aspects:  the duty to *inform* consumers of the covered commodity's country of origin, which is preceded by the distinct, threshold responsibility of *designating* (*i.e.*, determining) which country qualifies as the country of origin with respect to a given commodity.

There are plenty of hints in the statutory language that this may be precisely how Congress intended for its subsection (a)(2) provisions to be read.  The most prominent textual clue that the statute's instructions regarding designation in subsection (a)(2) do not necessarily limit the scope of the information that retailers are required to give consumers pursuant to subsection (a)(1) is, of course, the fact that Congress used two

different terms—"inform" and "designate"—in these consecutive subsections of the statute. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (noting that the use of different words in a single statute presumably means that Congress intended that the different words had different meanings and effects); *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) ("[W]e have repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." (internal quotation marks and citations omitted)). And these two words can have very different meanings. Merriam-Webster's collegiate dictionary explains that to "inform" is to "impart information or knowledge," whereas to "designate" means to "to distinguish" or "to indicate and set apart for a specific purpose." Merriam-Webster's Collegiate Dictionary 313, 599 (10th ed. 1999). That Congress used two terms that can mean different things in subsections (a)(1) and (2) is indicative of a lack of congressional intent that "inform" and "designate" be construed as one-and-the-same, as Plaintiffs suggest. Also seemingly relevant to a determination of what Congress intended when it used "inform" in subsection (a)(1) and "designate" in subsection (a)(2) is the fact that the concept of designating the country of origin of a commodity apart from labeling that commodity is employed elsewhere with respect to a similar regulatory and statutory framework.[20] Thus, it would be

---

[20] *See Easterday Ranches Inc. v. Dep't of Ag.*, No. CV-08-5067-RHW, 2010 WL 457432, at \*2-3 (E.D. Wash. Feb. 5, 2010) (explaining that the Treasury Department permits retailers that import livestock for immediate slaughter to represent that the animals are exclusively a product of the United States "in a customs setting, for the purposes of tariff designation," and differentiating such designation from the act of affixing a label to inform consumers of the country of origin). The *Easterday* court examined a series of regulations that the Department of the Treasury promulgated, 19 C.F.R. § 102, *et seq.*, to deal with country of origin designation and labeling in the context of a customs scheme governing tariffs on imported goods. *See* 19 U.S.C. § 1, *et seq.* (2012). This regulatory scheme—which, like 7 U.S.C. § 1638a(a)(2)(C), pertains to imported animals—creates a two-pronged approach that could be the functional equivalent of COOL's "designate" and "inform" structure. One section of the Treasury Department's rules pertains to "Rules of Origin," and establishes rules for determining the imported

reasonable to conclude that, when Congress laid out in the COOL statute all of the circumstances under which retailers can properly "designate" the country of origin of an animal that will be processed for sale as a muscle cut commodity, it intended to make a statement about how to distinguish between countries for the purpose of determining which country constitutes the animal's country of origin under the specified circumstances, which says nothing at all about what information the retailer may be required to convey pursuant to the statutory obligation to inform consumers about the animal that originated from that country or countries.[21]

To be sure, it is also possible to construe the term "designate" to mean "specify" or "stipulate"—an alternative interpretation that would permit an inference that subsection (a)(1)'s duty to inform consumers is, in fact, the equivalent of a retailer's obligation to designate the country of origin for the purpose of subsection (a)(2). Indeed, if by "designate" Congress meant "specify," then the statutory terms "inform" and "designate" overlap, giving some credence to Plaintiffs' argument that Congress's

_____

good's country of origin. 19 C.F.R. § 102.22; *see also id.* § 102.20 (identifying situations in which country of origin for the purposes of tariff classifications can be changed). Apart from this initial determination, the regulatory scheme has separate instructions that instruct when imported goods must be "marked"—*i.e.*, labeled—with the appropriate country of origin in order to inform the "ultimate purchaser" of the goods. *Id.* § 134.11 (referring to "labeling and marking" of imported goods). While certain goods are exempt from marking, their country of origin must still be determined. *See id.* § 134.35(b). Thus, these regulations clearly contemplate a process whereby determining the country of origin is different from putting that country on the label of the product itself.

[21] The text and structure of subparagraph (B) illustrate this very point. Subdivision (i) of that subparagraph establishes the designation rule for muscle cuts derived from an animal in which the production steps have taken place both in the United States and another country, so long as the animal has not been imported into the United States for immediate slaughter. With respect to such an animal, Congress states that "[a] retailer . . . may designate the country of origin of such covered commodity as all of the countries in which the animal may have been born, raised, or slaughtered." 7 U.S.C. § 1638a(a)(2)(B). But the very next subdivision takes care to dispel any notion that this designation requirement has any impact on the retailer's duty to *inform* consumers of the country of origin pursuant to section (a)(1). *See id.* § 1638a(a)(2)(B)(ii) ("Nothing in this subparagraph alters the mandatory requirement to inform consumers of the country of origin of covered commodities."). The language of subdivision (ii) could reasonably be read to clarify Congress's intent that designation and information are distinct statutory obligations, and that the former in no way restricts the latter, as Plaintiffs argue.

pronouncements about what a retailer can (or must) do when designating the country of origin governs the scope of the information that can be provided to consumers under the terms of the COOL statute. Nevertheless, the reasonable possibility that Congress meant the two terms to be construed differently as explained above remains, so, at most, any conceivable overlap only manages to render the statute ambiguous. *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (finding a statute ambiguous because it was subject to different interpretations); *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999) (finding a statute ambiguous because it was "reasonably susceptible to more than one meaning"). This is not good news for Plaintiffs: ambiguity in such a critical statutory term would require this Court to proceed to evaluate the permissibility of the agency's interpretation under *Chevron*'s step two, and the arduousness of the second step of the well-worn *Chevron* trek is so well established that Plaintiffs are hard-pressed here to provide the necessary assurances of their likely success on the merits if such analysis is required. *Cf. Sherley v. Sebelius*, 644 F.3d 388, 389, 395-98 (D.C. Cir. 2011) (vacating the district court's imposition of a preliminary injunction because plaintiffs were unlikely to prevail given the ambiguity of the statute and the agency's reasonable interpretation); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 226-28, 230 (D.D.C. 2012) (denying a preliminary injunction where plaintiff was unlikely to succeed on the merits in part because the statute was ambiguous and the agency's interpretation was not plainly erroneous).

*Chevron*'s step two requires the Court to defer to an agency's interpretation of a statute unless that interpretation is impermissible. *Chevron*, 467 U.S. at 843; *see also Coalition for Common Sense in Government Procurement v. United States*, 707 F.3d

311, 317 (D.C. Cir. 2013) (noting that "[t]he *Chevron* step two question" is "whether the [agency's] rule reflects a reasonable interpretation of" the relevant statute). Here, the AMS stated in the Final Rule itself, and reiterated in its briefs, that it considers the changes that the rule makes to the previous labeling requirements to be "consistent with the provisions of the statute." Final Rule, 78 Fed. Reg. at 31,368. Pointing out that the COOL statute expressly "provides authority for the Secretary to promulgate regulations necessary to implement the COOL program," *id.* at 31,370, the agency also explained the basis for this interpretation:

> [t]he statute contemplates four different labeling categories for meat, based on where the animal was born, raised, and/or slaughtered. This final rule preserves these four different labeling categories for meat and is consistent with the labeling criteria set forth in the statutory scheme.

*Id.* There is nothing plainly wrong or impermissible about this statutory interpretation; indeed, based on the analysis above, the agency's view of the statute as permitting the point-of-processing labeling structure set out in the Final Rule is entirely reasonable. In any event, on summary judgment or at trial, the Court would be required to give the agency's interpretation great deference at this point in the *Chevron* analysis, *see Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011), which means that Plaintiffs' contention that the COOL statute prohibits production step labeling would likely fail.

2. *Commingling*

Plaintiffs' second statutory challenge is their assertion that the AMS exceeded its statutory authority when it issued a Final Rule that prohibits the longstanding practice of commingling. (Compl. ¶ 84; *see also* Pl. Br. at 25 (arguing that "the Final Rule's bar on commingling extends beyond the limited authority Congress granted the AMS to

regulate product labels by instead dictating how meat is processed and packaged in the first instance").) As noted in Section II.B above, commingling involves processing animals from different countries of origin together during a single production day and labeling the resulting muscle cuts commodity with all of the various countries where the animals originated. Plaintiffs maintain that the COOL statute expressly authorizes commingling (Pl. Reply at 17), and also that the AMS, which is an agency that regulates labeling and advertisements, went far beyond its mission when it promulgated a rule that brings commingling to an end and thereby forces regulated entities to "restructure the[ir] production, distribution, and packaging systems" (Compl. ¶ 83; *see also* Pl. Br. at 30-32). For the following reasons, this argument lacks merit, and is therefore unlikely to succeed.

First, the term "commingling" does not appear anywhere in the text of the COOL statute. This omission in and of itself renders doubtful Plaintiffs' assertion that Congress clearly intended to address, and to protect, the practice. *Cf. Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . ."). Certainly, if Congress was as supportive of commingling as Plaintiffs insist, one would have expected the COOL statute's drafters to have inserted language to that effect.

Nor is even the *concept* of commingling unambiguously present in the statutory text, despite Plaintiff's arguments to the contrary. (*See* Pl. Reply at 16-17.) A straightforward reading of the statutory provision related to Category B muscle cut commodities makes this evident. That provision, which is entitled "Multiple Countries

of Origin" (and is thus the most logical place to look for evidence that Congress intended to preserve commingling) states:

> **(B) Multiple countries of origin**
>
> > **(i) In general**
>
> A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat that is derived from an animal that is—
>
> > **(I)** not exclusively born, raised, and slaughtered in the United States,
> > **(II)** born, raised, or slaughtered in the United States, and
> > **(III)** not imported into the United States for immediate slaughter,
>
> may designate the country of origin of such covered commodity as all of the countries in which the animal may have been born, raised, or slaughtered.

7 U.S.C. § 1638a(a)(2)(B)(i). Plaintiffs argue that this provision indicates Congress's intent to make allowances for the kind of multiple-country labels that result from the commingling practice (Pl. Reply at 17), but close examination reveals that this statutory provision expressly refers to the proper designation of "*an*" animal or "*the* animal," making clear that it relates solely to the threshold question of how to designate muscle cuts that derive from "an" animal that, itself, is of mixed origin.[22] And Congress's guidance on *that* point says nothing about the separate and entirely different question of which country-of-origin applies if a retailer wants to market a muscle cuts package that contains a mix of cuts derived from multiple animals, where the animals have different

---

[22] In this regard, the language of subparagraph (B) plainly suggests that Congress is addressing what might otherwise be a difficult application issue for retailers, given the principal statutory duty to inform consumers of "*the* country of origin of a covered commodity." 7 U.S.C. § 1638a(a)(1) (emphasis added). One can imagine a retailer asking how to designate the country of origin of an animal that was, say, born in Argentina, raised in Mexico, and slaughtered in the United States—*which* country qualifies as "the" country-of-origin for the purpose of the statute? In subparagraph (B), Congress provides a reasonable answer: the retailer "may designate the country of origin of such covered commodity as *all* of the countries in which the animal may have been born, raised, or slaughtered." *Id.* § 1638a(a)(2)(B)(i) (emphasis added).

country-of-origin designations—*i.e.*, the commingling question.  In other words, the statute's text plainly focuses on the appropriate designation for "an" animal that has multiple potential countries of origin; it does not, and presumably never intended to, address the different issue of how to discern the country of origin of a mixed muscle cut commodity; that is, a package of muscle cuts that are derived from more than one properly-designated animal, when the relevant animals have different countries of origin.

In the absence of any clear congressional guidance on the mixed muscle cuts situation, the AMS previously permitted retailers who had commingled animals with different country-of-origin designations into a mixed muscle cuts package to list all of the relevant countries on the label of that commodity, and to list those countries in any order.  *See* 2009 COOL Rule, 74 Fed. Reg. at 2659; *see also id.* at 2670 (recognizing that "[c]ommingling like products is a commercially viable practice that has been historically utilized by retailers").  This means, of course, that the much-heralded practice of commingling animals for slaughter and then affixing a multiple-country label to identify all of the applicable countries of origin is likely a creature of *regulation* from its inception, not a product of the statute, as Plaintiffs maintain.  And what the agency once giveth, it can surely taketh away without running afoul of the authorizing statute.  *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156-57 (2000) (noting that "an agency's initial interpretation of a statute that it is charged with administering is not "carved in stone" and that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances." (internal quotation marks and citations omitted)).

Undaunted, Plaintiffs insist that Congress's use of the word "may" in subparagraphs (A) and (B)—when contrasted with its use of the term "shall" in subparagraphs (C) and (D)—is the key to discerning a congressional intent to "preserve commingling flexibility." (Pl. Reply at 17; *see also* Hr'g Tr. at 14:7-10.) To this end, Plaintiffs assert that "may" means that Congress clearly intended to provide meat packers and retailers with a commingling-related *choice* in regard to making country-of-origin designations, and with respect to subparagraph (B) in particular, Plaintiffs highlight a Senate report that appears on first blush to confirm this conclusion. (*See* Pl. Reply at 17 (quoting S. Rep. No. 110-220, at 198 (2007) as stating that "the 'may' used in subsection (B) is to provide flexibility to packers when working with livestock from multiple countries of origin")).) Plaintiffs are correct that the text of subsection (B) *does* appear to provide a choice, just not the one for which Plaintiffs advocate.

Focusing again on the statutory language quoted above, subparagraph (B) authorizes a retailer who has "an" animal that has multiple countries of origin—*e.g.*, born in Argentina, raised in Mexico, and slaughtered in the United States—to choose to designate "all of the countries of origin in which the animal may have been born, raised, or slaughtered." 7 U.S.C. § 1638a(2)(B)(i)(III). In the alternative (hence, the "may"), a retailer can presumably opt to designate just *one* country of origin with respect to such an animal (so long as that one country is not the United States per § 1638a(a)(2)(A)). Given that the COOL statute authorizes the Secretary to conduct audits and also requires detailed recordkeeping to permit "verification of the country of origin of covered commodities," *see id.* § 1638a(d)(2), the choice to designate a single country of origin for an animal pursuant to subparagraph (B) is a meaningful one. But

it is a choice that Plaintiffs' commingling arguments completely obscure. Indeed, contrary to Plaintiffs' assertions, subparagraph (B) refers to a *single* animal—it says nothing about the designation of "source animal*s*" (plural) (Pl. Reply at 17)—nor does it come anywhere near to conveying that "retailers 'may' use a multiple-country-of-origin label that designates all of the countries in which the source animals for commingled meat 'may have been born, raised, or slaughtered,'" as Plaintiffs maintain. (*Id.* (quoting 7 U.S.C. § 1638a(a)(2)(B)).) Yet the provision nevertheless provides "flexibility to packers when working with livestock from multiple countries of origin," S. Rep. No. 110-220 at 198, because a packer who is working with "an" animal from multiple countries of origin "may" choose to designate all of that animal's applicable countries as the country of origin or, presumably, may opt to designate only one of them.

The bottom line is this: even if Plaintiffs are correct that Congress secretly wished to preserve commingling and infused subparagraph (B) with that intention, the most plausible reading of what Congress actually wrote is that the statute gives retailers a choice when designating an animal that has mixed countries of origin—either designate all of the countries or select one of the non-U.S. jurisdictions as the country of origin. The provision neither expressly addresses commingling nor does it necessarily preserve any commingling related choice.

Plaintiffs' other commingling arguments relate to subparagraph (A) and are based on the same type of loose textual analysis. Here, Plaintiffs maintain that Congress deliberately uses "may" rather than "shall" in subparagraph (A) in order to convey that retailers who have livestock that would otherwise be entitled to be labeled

"product of the USA" *may* choose to affix a mixed-country label to the muscle cuts of

such livestock instead.  (*See* Pl. Br. at 32; *see also* Hr'g Tr. at 14:7-15:8.)  This labeling

choice would occur, Plaintiffs argue, when a retailer opts to commingle muscle cuts

from pure U.S. animals (or animals born in Alaska or Hawaii, or animals present in the

U.S. before July 15, 2008) with the cuts of animals that have a different country of

origin.  But to reach the conclusion that Congress intended to preserve commingling in

this manner, Plaintiffs have to both construe the "may" in subparagraph (A) entirely out

of context and also ignore the equally important statutory terms "only" and

"exclusively."  When the entire statutory framework and all of the words that Congress

employed are taken into account, however, it seems far more likely that, rather than

crafting such a convoluted bulwark to guard against the destruction of commingling,

Congress was not addressing commingling in the text of the COOL statute at all.

     To understand why this is so, one must begin at the beginning of section 1638a,

with the general rule that Congress adopted in 2002, and that remained unchanged when

Congress revisited the COOL statute in 2008.  That provision reads:

### § 1638a.  Notice of Country of Origin

**(a) In general**

   **(1) Requirement**

   Except as provided in subsection (b) of this section, a retailer of a
   covered commodity shall inform consumers, at the final point of sale
   of the covered commodity to consumers, of the country of origin of the
   covered commodity.

7 U.S.C. § 1638a(a)(1).  Subsection (a)(2) then proceeds to lay out a series of rules for

retailers to follow when "[d]esignat[ing]" the country of origin if the covered

commodity is muscle cuts of beef, lamb, pork, chicken or goat. *See id.* § 1638a(a)(2).

Significantly, the first part of subsection (a)(2)—subparagraph (A)—states:

**(A)     United States country of origin**

A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat may designate the covered commodity as exclusively having a United States country of origin only if the covered commodity is derived from an animal that was—

**(i)**     exclusively born, raised, and slaughtered in the United States;
**(ii)**    born and raised in Alaska or Hawaii and transported for a period of not more than 60 days through Canada to the United States and slaughtered in the United States; or
**(iii)**   present in the United States on or before July 15, 2008, and once present in the United States, remained continuously in the United States.

*Id.* § 1638a(a)(2)(A). When subparagraph (A) is construed in light of the general rule at subsection (a)(1), a retailer who has muscle cuts that are derived from an animal that fits the first of the subparagraph (A) scenarios—born, raised, and slaughtered in the U.S.—has no choice at all: such retailer "*shall* inform consumers" of the country of origin (*id.* § 1638a(a)(1)(emphasis added)), and the only conceivable country of origin for an animal that is born, raised, and slaughtered in the United States is the United States. Consequently, Plaintiffs' insistence that the term "may" in subparagraph (A) must mean that Congress intended to provide a choice related to such livestock contravenes the clear mandate of subsection (a)(1) and for that reason alone is extremely doubtful. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (internal quotation marks and

citations omitted)); 2A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 46:06, 230-44 (6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.").

But Plaintiffs go even further, doing serious damage to the statute's text, when they read "may" as standing alone in subparagraph (A), when that term is clearly working in conjunction with "only" and "exclusively" to establish the sole circumstances in which a retailer "may" (meaning can or is permitted to) designate a muscle cut commodity as a product of the U.S. exclusively. In other words, Plaintiffs are wrong to suggest that the question that Congress is answering with the text of subparagraph (A) is which country a retailer "may" choose when designating the country of origin of an animal that is born, raised, and slaughtered in the United States,[23] when, in reality, Congress appears to have crafted subparagraph (A) to address the propriety of an exclusive U.S. country-of-origin designation for *other* types of muscle cuts—*i.e.,* to address the question, "when a retailer is selecting the country of origin for an animal that does *not* have such a clear pedigree, can the retailer designate the animal as exclusively 'made in the USA'?"

Subparagraph (A) makes crystal clear that the answer to this question is "no." By its terms, "[a] retailer . . . may designate the covered commodity as exclusively having a United States country of origin *only*" under the three listed circumstances. *See* 7 U.S.C. § 1638a(a)(2)(A) (emphasis added). Congress's use of the word "only"—

_____

[23] As explained above, this is a nonsensical question because the only country of origin that is at all applicable to such an animal is the United States.

which Plaintiffs ignore—means that the term "may" as it is used in subparagraph (A) does not convey any choice whatsoever; to the contrary, the provision effectively *restricts*, rather than augments, retailer discretion. In short, Plaintiffs are unlikely to prevail on this interpretation of the statute because they interpret subparagraph (A) as prescribing what a retailer "may" do when designating the muscle cuts of an animal that fits within one of the three listed types, when, with Congress's use of "may" "only" and "exclusively," the text actually states what a retailer *cannot* do in making a designation regarding the muscle cuts of all other types of animals.

Mindful that a statute must be construed as a whole, *see Brown & Williamson Tobacco Corp.*, 529 U.S. at 133, this Court notes that the remainder of subsection (a)(2) is entirely consistent with the view that the COOL statute's designation rules are not conveying commingling choice as Plaintiffs assert, but are most likely aimed at limiting what a retailer can claim about the origins of its meat products so far as U.S. designations are concerned. In section (a)(2)(A), Congress sets out the "only" circumstances in which an exclusive U.S. designation is appropriate, as explained above. In section (a)(2)(B), Congress appears to permit (but does not require) the muscle cuts of an animal that was born raised "or" slaughtered in the United States to be designated as a product of "all of the countries in which the animal may have been born raised or slaughtered," including the United States.[24] Section (a)(2)(C) establishes that animals that are imported into the United States for immediate slaughter are to be designated as originating from the importing country "and" the United States, regardless of their backgrounds in foreign lands. Finally, with respect to an animal

---

[24] As explained earlier, such a retailer presumably "may" also choose to designate one country of origin for such animal, so long as that one country is not the United States exclusively per subparagraph (A).

"that is not born, raised, or slaughtered in the United States," Congress states that it is sufficient for retailer to designate "a country other than the United States as the country of origin." *Id.* § 1638a(a)(2)(D). Taken together, these statutory provisions make two things clear: that the animal's relationship to the United States is the crux of the country-of-origin designation as far as Congress is concerned, and that the thrust of subsection (a)(2) is Congress's effort to define and establish the boundaries of that relationship. In other words, contrary to Plaintiffs' contentions, Congress's focus in enacting subsection (a)(2) appears to have been on delineating the circumstances under which a retailer could properly designate the U.S. as the country of origin for muscle cut covered commodities, and Congress neither directly mentions, nor even necessarily contemplates, the effect of its prescriptions in this regard on commingling practices.

Notably, the legislative history of the COOL statute amply supports this reading of the statutory text. Members of Congress made numerous statements in 2002 when the COOL statute was initially enacted, and again when the statute was amended in 2008, that strongly suggest that Congress's primary intention was to direct retailers regarding the particular circumstances under which it is appropriate to designate meat as being a 'product of the U.S.A.' *See, e.g.*, 153 Cong. Rec. S15,116 (daily ed. Dec. 11, 2007) (statement of Sen. John Barasso) ("We raise exceptional beef and exceptional lamb in this country. Our producers deserve the opportunity to label their product 'born and raised in the USA.' Consumers demand it, and they will buy it."); *see also* 153 Cong. Rec. S4229 (daily ed. May 24, 2007) (statement of Sen. Mike Enzi) ("COOL provides customers with important information about the source of food and allows our livestock producers, who hands down produce the highest quality meats in the world, to

remain competitive in a growing global market."); 148 Cong. Rec. H1538 (daily ed. Apr. 24, 2002) (statement of Rep. John Thune) ("It is important . . . that we put in place a mandatory country-of-origin labeling requirement so that the people in this country know where their food is coming from and so that producers in this country have an opportunity to have their product clearly identified as the finest and best in the world.").

Against this backdrop, Plaintiffs' primary counter-reference from the legislative history of the statute is a letter sent on May 9, 2008, from then-General Counsel of the USDA Marc L. Kesselman to Representative Robert Goodlatte, who was, at that time, the Ranking Member of the House Committee on Agriculture (the "Kesselman Letter"). (*See* Pl. Br., Ex. 12, ECF No. 24-14 (the Kesselman Ltr.); *see also* Hr'g Tr. at 14:25-15:2.) Plaintiffs tout the Kesselman Letter because it provides an opinion on the question of whether "products eligible for the U.S. Country of Origin label *must* bear that label, and consequently cannot bear a Multiple Countries of Origin label." (Kesselman Ltr. at 3.) Relying (as Plaintiffs do here) on the distinction between the "may" of Category A and the "shall" of Categories C and D, Mr. Kesselman concluded that the statute cannot be read to mandate a U.S. designation for animals born, raised, and slaughtered in the U.S., and accordingly did not bar commingling. (*Id.* at 3-4.)

For a number of reasons, the Kesselman Letter does not provide convincing proof that Congress intended commingling to be preserved under the COOL statute. First, the letter was not drafted or adopted by the legislature itself, and as an opinion offered *to* Congress, rather than something that originated with Congress, it does not necessarily evidence Congress's intent. Furthermore, all that is reflected in the letter is

the general counsel of USDA's statement regarding the Secretary's best guess as to what the statute might allow in regards to commingling at the time that the letter was written; it says nothing about what the statute *requires*. And this is even setting aside the fact that the letter indulges in the same mistakes of statutory interpretation that Plaintiffs' arguments here rely upon and that are detailed above. It is also significant that the Kesselman Letter represents an interpretation of the Secretary from 2008 that, whatever its merits, is unquestionably inconsistent with the interpretation that the Secretary holds today. That an agency may reevaluate its interpretation of a statute and come to a different conclusion is well established. *See Chevron*, 467 U.S. at 863-64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."). It is odd that Plaintiffs have proffered as the lynchpin of their statutory argument an interpretation previously held by the very agency that they are now accusing of having misinterpreted the extent of its statutory authority, and, in any event, surely the agency's now-disavowed former interpretation of the statute should not be given any more weight than the interpretation that the Secretary now advances.

At the end of the day, the fact that the COOL statute can reasonably be construed as being silent on the commingling question, and that it certainly does not speak unambiguously to the issue, as explained above, means that this Court's analysis of Plaintiffs' statutory argument in regard to commingling would likely proceed to the second step of the *Chevron* test. As mentioned earlier, at *Chevron*'s step two, the deferential question at issue is whether the agency's interpretation is based on a

permissible construction of the statute—an inquiry that is often fatal to regulatory challenges—and there is nothing in the instant case that suggests that the Plaintiffs will be any more successful on the merits of that inquiry here. The agency argues that its commingling ban is permissible because the statute gives the Secretary wide latitude to promulgate regulations to implement the statute. (Def. Br. at 18.) The agency also maintains that the commingling ban is consistent with the statutory purpose because the practice of commingling flies in the face of the express intent of the COOL statute to "provide consumers with additional information regarding the origin of certain covered commodities," given that in most cases commingling results in "potentially misleading labels that do not accurately reflect the actual country of origin" of a covered commodity. (Def. Br. at 17.) Also, the record clearly establishes that there was no other way for the agency to implement a production-step labeling scheme without banning commingling; indeed, at oral argument Plaintiffs all but conceded this point. (Hr'g Tr. at 19:3-14.)

Affording the required deference to the agency's interpretation under *Chevron*'s step two, this Court would most likely conclude that the commingling ban was a permissible way to further the statute's intent for the reasons the agency provides. All that *Chevron* requires is that an agency action reasonably fills a gap in the statutory framework in a manner that is consistent with Congress's overall goals. *See Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1449 (D.C. Cir. 1988) (noting that "[r]easonableness in this context means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives of Congress" (internal quotation marks and citations omitted)). By pursuing a course of action that

unquestionably furthers Congress's intent to require retailers to provide accurate origin information about the covered commodities, the AMS is likely to be able to demonstrate that the commingling ban satisfies this standard.

Finally, the Court notes generally that Plaintiffs' statutory arguments are unlikely to succeed on the merits in the overall scheme of things largely because they demand a narrow focus on specific words and phrases in the COOL statute and do not account for the broader context of the statute and what Congress apparently intended to achieve when it authorized the agency to promulgate rules to implement the statutory purpose. (In other words, Plaintiffs' statutory arguments cherry-pick the trees and miss the forest.) For example, Plaintiffs latch on to Congress's use of the word "may," as noted above, and argue that this term connotes a desire to maintain flexibility within the labeling program (*see, e.g.*, Hr'g Tr. at 14:25-15:2), all while persistently undervaluing the significance of Congress's entirely inflexible original mandate—that retailers "*shall* inform consumers, at the final point of sale . . . of the country of origin of the covered commodity." 7 U.S.C. § 1638a(a)(1) (emphasis added). Similarly, Plaintiffs highlight portions of the statute in which the country-of-origin designation is not made to turn on the production steps (*e.g.*, Pl. Br. at 26-27), but give short shrift to the fact that, at least with respect to three of the four designation categories, the COOL statute itself evaluates the country of origin in terms of the geographical location where the animal was "born, raised, or slaughtered," *see* 7 U.S.C. § 1638a(a)(2)(A), (B) and (D), making it hardly untoward for the AMS to have incorporated those same categories into its labeling standards.

Moreover, and perhaps most important, if there is anything that is clear about Congress's intent in regard to the COOL statute's disclosure requirement, it is this: that Congress meant to provide consumers with *more* information about the origins of their meat, not less. Plaintiffs' text-based arguments regarding congressional intent rely on the *opposite* assumption, *i.e.*, that Congress intended for retailers to provide consumers with some, but not all, of the known information about the history of marketed muscle cuts. This reading of the statute is flatly inconsistent with nearly every statement that members of Congress made about COOL when the law was enacted and amended.[25] And given that the statutory language does not unambiguously limit the amount of information that retailers can be required to disclose about the origins of the covered commodities, the AMS could reasonably assume that subsections (a)(1) and (2) merely establish the *floor*—that meat retailers must, at a minimum, disclose the country of origin as statutorily defined—and that the agency had Congress's blessing to ensure that all origin-related information that the industry maintains is accurately provided to consumers in the marketplace. What is more, if Congress's clear intent to provide consumers with more accurate information about the origins of their meat could not be achieved without requiring that packers and retailers segregate animals in order to track such information up to the point of sale, then, despite Plaintiffs' protestations, the AMS

---

[25] *See, e.g.*, 148 Cong. Rec. H1538 (daily ed. Apr. 24, 2002) (statement of Rep. John Thune) ("[C]onsumers have the right to know the origin of the meat that they buy."); 148 Cong. Rec. H1539 (daily ed. Apr. 24, 2002) (statement of Rep. David Wu) ("Country of origin is [a] way to help American consumers to make an informed choice at the supermarket."); 148 Cong. Rec. H1539 (daily ed. Apr. 24, 2002) (statement of Rep. Earl Pomeroy) ("Country of origin labeling is necessary to give U.S. consumers important information"); 148 Cong. Rec. S3909 (daily ed. May 7, 2002) (statement of Sen. Tom Harkin) ("A country of origin label will provide crucial information [for consumers]."); 148 Cong. Rec. S3918 (daily ed. May 7, 2002) (statement of Sen. Paul Wellstone) ("[C]onsumers have a right to know what they are eating and where it is from."); *see also* S. Rep. No. 110-220 (COOL program enacted "in order to provide consumers with additional information regarding the origin of certain covered commodities").

could also comfortably conclude that a regulation that prohibits commingling (a practice that appears nowhere in the statute) makes eminent sense as the only way to implement the labeling standards effectively.

Consequently, and for all of these reasons, Plaintiffs are unlikely to succeed on the merits of their statutory authority challenges to the Final Rule.

## C. Plaintiffs' APA Claim

Plaintiffs' final claim on the merits is that the Final Rule is arbitrary and capricious in violation of the APA. (*See* Compl. ¶¶ 86-91 (citing 5 U.S.C. § 706(a)(2)).) In considering this claim, the Court must decide whether "'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 329 (D.C. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court is mindful that "the 'scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency,'" but the Court "must nonetheless be sure the [agency] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (second and third alterations added) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Plaintiffs advance several arguments as to why the Final Rule violates the APA. First, Plaintiffs argue that the Final Rule is arbitrary and capricious because "[the agency's] justifications for the Final Rule contradict the evidence before [it]." (Pl. Br. at 33.) In this vein, Plaintiffs contend that the Final Rule fails to achieve its stated goal of providing accurate country-of-origin information to consumers because the Final Rule will not necessarily lead to more accurate labeling. (*Id.* at 33-34.) Likewise, Plaintiffs maintain that the agency's goal of bringing the U.S. into compliance with its international trade obligations remains elusive because the Final Rule exacerbates, rather than solves, the problems the Appellate Body Report identified with the prior COOL regime. (*Id.* at 34-36.) Plaintiffs also insist that the AMS acted arbitrarily and capriciously in not delaying the effective date of the Final Rule until after the WTO had a chance to evaluate the rule. (*Id.* at 36-38.)

For their part, Defendants acknowledge that providing more accurate information to consumers and complying with the Appellate Body Report were the primary justifications for promulgating the Final Rule, but contest Plaintiffs' assertions that there is no rational connection between these aims and the specifics of the Final Rule. (Def. Br. at 19-24.) Moreover, Defendants argue that the AMS had good reasons for its decision to make the Final Rule effective as of May 23, 2013. (*Id.* at 25-27.)

For reasons explained below, the Court concludes that Plaintiffs have not shown that they have a likelihood of success on the merits of their APA claims.

1. *Accurate Labeling*

Plaintiffs argue that, in certain circumstances, the Final Rule might require labels that are inaccurate or misleading, and therefore the Final Rule is arbitrary and

capricious.  (Pl. Br. at 33-34.)  For example, Plaintiffs point out that, under the Final

Rule, any animal imported into the United States more than two weeks before slaughter

will be designated "raised in the United States" even if it spent the vast majority of its

life elsewhere.  (*Id.* at 20; Final Rule, 78 Fed. Reg. at 31,368.)[26]  Plaintiffs' recitation

of various possible factual scenarios in which the Final Rule purportedly mandates

inaccurate or misleading labels is offered apparently to press the point that a regulation

that may in some circumstances enable the exact outcome an agency is attempting to

avoid (in this case, consumer confusion) must be arbitrary and capricious.  But this is

not the law.  *See, e.g.*, *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 955 (D.C. Cir.

2007) ("Under the arbitrary and capricious test, our standard of review is 'only

reasonableness, not perfection.'" (quoting *Kennecott Greens Creek Min. Co. v. MSHA*,

476 F.3d 946, 954 (D.C. Cir. 2007))); *Flynn v. Comm'r*, 269 F.3d 1064, 1071 (D.C. Cir.

2001) ("The Secretary's regulations need not perfectly accommodate all anomalous

situations in order to be reasonable under the statute.").  In fact, it is of no moment that

Plaintiffs can dream up scenarios in which, under the Final Rule, "labels will in many

cases be inaccurate" or will "sometimes omit" relevant production step information (Pl.

Br. at 33-34), because the relevant APA question is not whether such scenarios exist,

but whether the Final Rule is generally designed to achieve its stated purpose and

---

[26] Similarly, Plaintiffs note that when an animal is imported for immediate slaughter under Category C, the Final Rule provides that the country of "raising" must be the country from which the animal was imported, even if it was actually "raised" elsewhere.  (Pl. Br. at 20.)  Plaintiffs also argue that, because the Final Rule requires production step labeling for covered commodities in Categories A, B, and C, but only labeling based on the country from which the covered commodity was imported for Category D, consumers will assume that all the production steps for Category D covered commodities took place in the country from which the covered commodity was imported, and will accordingly be "misinformed" any time that is not actually the case.  (*Id.*)  Finally, Plaintiffs maintain that the lack of clarity with respect to Category D covered commodities will be especially acute where one of the production steps for Category D meat occurred in the U.S., because that part of the animal's life will not be reflected in the country of origin label.  (*Id.* at 20-21.)

therefore has some rational connection to the agency's goal.  *See, e.g.*, *Investment Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 376-77 (D.C. Cir. 2013) ("So long as [the agency] provided a reasoned explanation for its regulation, and the reviewing court can reasonably discern the agency's path, we must uphold the regulation." (internal quotation marks and citations omitted)).

Plaintiffs have done little to show that the Final Rule is irrational in this regard. The Final Rule requires retailers to provide consumers with details regarding the geographical location of each production step for a given covered commodity, which is more information than was provided under the 2009 COOL Rule.  And providing this additional information is exactly what the Final Rule purports to do.  *See, e.g.*, Final Rule, 78 Fed. Reg. at 31,367 (stating that "[t]he [a]gency is issuing this rule . . . to provide consumers with more specific information" regarding the country of origin of muscle cut covered commodities).  Plaintiffs provide no reason to believe that the Final Rule was really aimed at something other than this stated goal.  Nor do Plaintiffs argue that the Final Rule will provide less accurate information *in comparison* to the 2009 COOL Rule, which is the relevant benchmark given that the justification for the Final Rule is that it improves the accuracy of the COOL labeling system over what was in place under the prior program.  In light of the agency's explanation of how production-step labeling requirements address meat labeling that was misleading under the prior regulations, Plaintiffs' argument that the Final Rule is arbitrary and capricious because it does not go so far as to require production-step labeling in every case has little force. Plaintiffs do not and cannot dispute that the new "born, raised, and slaughtered" requirement will likely generate more specific labels to a greater degree than the

previous system and thus moves the COOL program in the direction of providing consumers with more specific, more accurate information, as it purports to do.

Significantly, Plaintiffs also fail to acknowledge that the potential inaccuracies they have identified are, by and large, a product of the COOL statute itself. For example, Plaintiffs complain that, for Category C muscle cuts, the Final Rule makes retailers equate the country from which an animal was imported with the country in which the animal was "raised" for labeling purposes, even if it spent most of its life elsewhere. (Pl. Br. at 20, 34.) Although Plaintiffs may be correct that a Category C label could, in certain circumstances, mislead a customer who is searching for muscle cuts derived from an animal that was imported into the U.S. for immediate slaughter after being raised in a particular foreign locale other than the importing country, this is not a reason to condemn the Final Rule because it is *Congress*, not the AMS, that determined that the importing country was the relevant foreign country of origin when an animal is imported into the United States for immediate slaughter. *See* 7 U.S.C. § 1638a(a)(2)(C). Far from acting arbitrarily, the agency appears to have carefully patterned its labeling rule for a Category C muscle cut commodity after the statutory parameters that Congress enacted to govern country-of-origin designations in this situation.

Similarly, Plaintiffs argue that the Final Rule contradicts its stated purpose of providing more specific information because the rule allows an animal that is imported into the U.S. more than two weeks before slaughter to be designated as "raised in" the U.S., even if most of the animal's life was spent elsewhere. (Pl. Br. at 20, 34.) Again, however, setting aside the particular timeframe, it is the COOL statute itself that draws

51

a distinction between muscle cuts derived from animals imported for "immediate slaughter" (Category C) and muscle cuts derived from animals with a mixed heritage that includes the United States, where such animals were *not* imported for immediate slaughter (Category B)—the Final Rule merely maintains this statutory distinction. *See* Final Rule, 78 Fed. Reg. at 31,368.[27] Thus, rather than accusing the AMS of acting arbitrarily, it seems that Plaintiffs' "real grievance lies with Congress for having directed" the agency to implement Congress's intent, "rather than with [the agency] for having adopted [a particular] method . . . to comply with that congressional directive." *Associated Metals & Minerals Corp. v. Carmen*, 704 F.2d 629, 636 (D.C. Cir. 1983).[28]

### 2. *The WTO Decision*

Plaintiffs' second APA line of attack is to argue that the Final Rule is arbitrary and capricious because it "exacerbates, rather than cures" the issues with the prior COOL regime that the WTO panel and Appellate Body identified. (Pl. Br. at 34-36.) The WTO Panel found, and the Appellate Body Report confirmed, that the COOL regime in place under the 2009 COOL Rule discriminated against foreign livestock by

---

[27] With respect to the allotted two-week period, Congress specifically delegated to the regulators the determination of what period of time qualified as "immediate," and the regulators set the period at two weeks. 7 C.F.R. § 65.180. Agencies are entitled to rely on their own expertise regarding matters that Congress leaves to their discretion. *See, e.g.*, *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) ("[A]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential* review, as long as they are reasonable." (internal citations omitted) (alteration in original)).

[28] As an aside, it is at least mildly ironic that Plaintiffs assert that the agency has acted arbitrarily in violation of the APA insofar as the Final Rule incorporates the designation limitations that apparently Congress included in the statute to address industry concerns regarding otherwise potentially onerous record-keeping requirements. *Cf.* 154 Cong. Rec. H3819 (daily ed. May 14, 2008) (statement of Rep. Ike Skelton) ("[T]he legislation would require that all meat sold to American consumers have a country-of-origin label. But, importantly, this labeling agreement represents a compromise that would simplify record keeping and other requirements associated with the law."). One would not ordinarily expect industry representatives to fault an agency for adopting regulations that make it *easier* for industry participants to satisfy the regulatory requirements while still addressing Congress's primary concerns.

creating incentives for U.S. retailers to favor domestic livestock, and that such discrimination violated the United States's international trade obligations. In so holding, the WTO Panel and Appellate body considered the totality of the prior COOL program, including both the 2009 COOL Rule and the COOL statute.[29] There is no doubt that the WTO determination provided an impetus for promulgating the Final Rule. *See* Final Rule, 78 Fed. Reg. at 31,367-68.

Plaintiffs argue that the WTO decided that the prior COOL program (and in particular the record-keeping requirements for upstream producers) provided an incentive for retailers to favor domestic livestock and that the Final Rule does nothing to alleviate this discrimination. (Pl. Br. at 34-35.) In fact, according to Plaintiffs, by increasing the labeling requirements further downstream in the chain of production, the agency has made the problems the Appellate Body identified even worse. (*Id.*) Plaintiffs note that Canada and Mexico apparently share Plaintiffs' view, and have already filed paperwork with the WTO challenging the Final Rule. (Pl. Supp. Reply at 9.) Plaintiffs also contend that the Final Rule does nothing to address two additional problems identified in the Appellate Body Report as sources of discrimination: the possibility that, despite COOL, meat labels will not necessarily be accurate, and the carve-outs under the COOL program for processed food items and food service establishments. (Pl. Br. at 35.) *See also* 7 U.S.C. § 1638(2)(B); *id.* § 1638a(b).

---

[29] The Panel and the Appellate Body also considered two regulatory directives not relevant here: an "Interim Final Rule" that preceded the 2009 COOL Rule, and a letter from Secretary of Agriculture Tom Vilsack encouraging industry participants to voluntarily adopt practices to "ensure that consumers are adequately informed about the source of food products," such as "voluntarily includ[ing] information about what production steps occurred in each country when multiple countries appear on each label." WTO Panel Report ¶ 7.123.

Defendants respond that Plaintiffs have misconstrued the gravamen of the WTO decision. In Defendants' view, the WTO Appellate Body found fault mainly with the fact that the labeling requirements for retailers under the old COOL regime were not *commensurate* with the recordkeeping requirements for upstream producers, because the upstream firms were required to catalogue far more, and to pass along more detailed information, than retailers were required to convey on labels. (Def. Br. at 23-24.) The agency argues that it has corrected the imbalance the Appellate Body identified by ratcheting up the disclosure requirements for retailers, and thereby creating the equilibrium that was lacking under the previous regime. (*Id.*)

At the outset, the Court emphasizes that its role in evaluating the instant motion for a preliminary injunction is *not* to determine whether the Final Rule actually complies with the Appellate Body's ruling. Compliance with adverse WTO dispute resolution proceedings is delegated by law to the Executive and Legislative branches, *see* 19 U.S.C. § 3533(g), and whether measures that the Executive and Legislative Branches take to comply with the WTO obligations are sufficient can be addressed only through the WTO dispute resolution system. Moreover, "if U.S. statutory [or regulatory] provisions are inconsistent with [the WTO treaties], it is strictly a matter for Congress." *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1348 (Fed. Cir. 2005); *see also Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1291 (Fed. Cir. 2008) ("The determination whether, when, and how to comply with [a] WTO[] decision . . . involves delicate and subtle political judgments that are within the authority of the Executive and not the Judicial Branch."). Consequently, the Court's only purpose in considering the Appellate Body Report here is to determine whether Plaintiffs have a

shown a likelihood of successfully proving that the agency had no reasonable basis for its statement that one of its goals in promulgating the Final Rule was to bring the United States into compliance with that decision. *See* Final Rule, 78 Fed. Reg. at 31,367 (the Final Rule will "bring the current mandatory COOL requirements into compliance with U.S. international trade obligations").

On that limited question, the Court finds that Defendants have the better argument. The WTO Appellate Body's conclusion that the COOL scheme unfairly discriminated against foreign goods primarily turned on its view that "the COOL measure does not impose labelling requirements for meat that provide consumers with origin information *commensurate* with the type of origin information that upstream livestock producers and processors are required to maintain and transmit." Appellate Body Report ¶ 343; *see also id.* ¶ 349 ("In sum, our examination of the COOL measure . . . reveals that its recordkeeping and verification requirements impose a disproportionate burden on upstream producers and processors, because the level of information conveyed to consumers through the mandatory labelling requirements is far less detailed and accurate than the information required to be tracked and transmitted by these processors and producers."). Reading the plain language of the Report and comparing it to the Final Rule, it is clear that the agency increased the labeling requirements for retailers to generally approximate the recordkeeping requirements imposed on upstream producers and processors in an attempt to address the inequity that the Appellate Body identified. While it is conceivable that these measures might not ultimately pass muster in front of the WTO, this Court is satisfied that the

production step labeling requirement bears a rational relationship to the agency's stated goal of bringing the United States into compliance with the Appellate Body Report.

It is true, as Plaintiffs point out, that the Appellate Body identified other issues with the previous COOL program that the Final Rule did not address. Specifically, Plaintiffs note that the Final Rule does not address the Appellate Body's skepticism over the fact that Category D muscle cuts are not subject to production step labeling, nor its contention that the carve-outs for food service establishments and processed food items contribute to the discrimination against foreign livestock. (Pl. Br. at 35 (citing Appellate Body Report ¶¶ 343-44).) But these alleged shortcomings can hardly form the basis for an argument that the Final Rule was arbitrary and capricious because both the Category D designation and the carve-outs are *required by COOL statute itself*. *See* 7 U.S.C. § 1638(4); *id.* § 1638a(a)(2)(D); *id.* § 1638a(b).[30] The AMS was not free to disregard the statute in favor of a rule that conformed to every aspect of the WTO decision. *See* 19 U.S.C. § 3533(g); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). And to the extent that Plaintiffs' arguments are based on the assertion that the statute itself is inconsistent with the Appellate Body Report, such arguments do not support a claim brought under the APA. *See, e.g.*, *Associated Metals & Minerals Corp.*, 704 F.2d at 636.

---

[30] The same is true of Plaintiffs' argument that the Final Rule fails to correct potential inaccuracies in the previous COOL program identified by the Appellate Body. (*See* Pl. Br. at 35.) As explained in Section 4.C.1, *supra*, these inaccuracies are largely a product of the statute, not the regulations.

The Appellate Body Report and the record in this case demonstrate, essentially, that the AMS was stuck between a rock and a hard place after the WTO ruled. In the absence of a legislative solution to what the WTO had identified as problematic, the agency had to attempt to bring the COOL regulations into compliance with the international tribunal's decision without running afoul of the COOL statute. Given these constraints, it is evident to the Court that the agency did the best it could, and responded in a manner that was neither arbitrary nor capricious. Plaintiffs are unlikely to be able to demonstrate otherwise in a challenge to the Final Rule brought under the APA.

3. *Effective Date Of the Final Rule*

Plaintiffs' final argument that the Final Rule is arbitrary and capricious in violation of the APA stems from the fact that the agency made the Final Rule effective on the day that it was published, May 23, 2013. (Pl. Br. at 36-37.) Plaintiffs argue that the AMS should have heeded commenters who warned that the Final Rule would impose severe costs for no reason because the Rule would be unlikely to satisfy the WTO, and thus should have obediently delayed implementation of the Rule until after the WTO had had a chance to review it. (*Id.*) Plaintiffs also assert that, in the face of calls for suspended implementation, the agency provided no reasonable response or meaningful justification for immediate implementation of the Final Rule. (*Id.*)

Plaintiffs' contentions in this regard are faulty and are likely to fail primarily because they all but ignore the significance of the date on which the Final Rule was published and made effective. May 23, 2013, is the exact deadline that the WTO arbitrator gave the United States to bring its COOL rules into compliance with the

Appellate Body Report. And this date was hardly selected at random—it was the product of a separate arbitration proceeding within the WTO dispute resolution framework that generated a lengthy opinion holding that May 23, 2013, was the appropriate compliance deadline. WTO Arbitrator's Report ¶ 123. Defendant-Intervenors also point out that, per the WTO Dispute Settlement Understanding, failure to comply in a timely manner with a decision of the Appellate Body would give Canada and Mexico the right to pursue retaliatory sanctions against the U.S. *See* Understanding on Rules and Procedures Governing the Settlement of Disputes, art. 22.2, Apr. 15, 1994, Marrakesh Agreement, Annex 2, 1869 U.N.T.S. 401.[31] The Court concludes that the directive from the WTO arbitrator in and of itself establishes a sufficiently reasoned basis for the agency to have made May 23, 2013, the Final Rule's effective date; the potential that the U.S. might face retaliatory sanctions as a result of any delay in compliance only strengthens that conclusion.

Plaintiffs nevertheless point out that, during the briefing for the instant motion, Canada and Mexico both filed paperwork with the WTO requesting formation of a panel to examine whether the Final Rule complies with international trade obligations. (Pl. Supp. Reply at 9; *id.* Ex. 1, ECF No. 42-1; *id.* Ex. 2, ECF No. 42-2.) Plaintiffs argue that these actions show that there is no chance that the feared consequences of delayed implementation (retaliation for non-compliance by Canada or Mexico) would have occurred, and thus that the agency could not reasonably have invoked the threat of

---

[31] The Dispute Settlement Understanding ("DSU") is the document which governs the procedures by which WTO disputes are adjudicated, and binds signatories to those procedures. *See* Understanding on Rules and Procedures Governing the Settlement of Disputes, arts. 1.1-1.2, Apr. 15, 1994, Marrakesh Agreement, Annex 2, 1869 U.N.T.S. 401. These WTO documents are available at http://www.wto.org/english/tratop_e/dispu_e/dsu_e.htm.

sanctions as a justification for making the Final Rule effective immediately. (Pl. Supp. Reply at 9.) But Plaintiffs' logic is flawed. First of all, the fact that Canada and Mexico may not like the solution that the agency implemented to address the WTO decision does not mean those countries would have withheld retaliation if the United States had not implemented any changes at all. In this same vein, while it may be true that Canada and Mexico have now initiated a challenge to the rule the AMS implemented to respond to the Appellate Body Report (presumably because they believe that the Final Rule is even less in their interest than the 2009 COOL Rule was), the fact remains that Canada and Mexico had already challenged the COOL program once—and won. Based on this prior experience, the agency's belief that those countries might seek retaliatory sanctions in the absence of any changes to the COOL program by the given deadline was well founded. In other words, the risk that retaliatory sanctions would follow breach of the duty to respond to the WTO decision in a timely fashion loomed large given the prior WTO litigation, and that well-founded fear provided a sufficient reason for the agency to believe that it needed to act.[32]

Because the AMS patterned the Final Rule after the statute, and attempted to address the Appellate Body's concerns in a timely manner, Plaintiffs have failed to show a likelihood of success on their APA claim.

---

[32] At oral argument, Plaintiffs' counsel additionally represented that Canada and Mexico have recently agreed not to seek sanctions based on the Appellate Body Report's decision regarding the 2009 COOL program until their current challenge to the Final Rule is resolved by the WTO. (Hr'g Tr. at 68:11-18.) That may be all well and good, but this fact has no bearing on the question of whether the agency acted arbitrarily in selecting the Final Rule's effective date. Plaintiffs must demonstrate a likelihood of success in proving that the AMS lacked a reasoned basis for its decision to make the Final Rule effective as of May 23, 2013, and this new willingness on Canada and Mexico's part to forbear from seeking retaliatory sanctions based on the prior COOL program has happened months after the agency made its decision to implement the Final Rule.

## V.    IRREPARABLE HARM

To be entitled to a preliminary injunction, even under the sliding scale approach that applies in this circuit, Plaintiffs must make a showing that they will suffer "irreparable harm" absent the extraordinary remedy of injunctive relief.  *See CFGC*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." (citation and quotation marks omitted)); 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (2d ed. 2013) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").  Although the concept of "irreparable harm" is not easily defined, there is no doubt that "[t]he irreparable injury requirement erects a very high bar for a movant."  *Coalition for Common Sense in Gov't Procurement v. United States* ("*Common Sense*"), 576 F. Supp. 2d 162, 168 (D.D.C. 2008).

"[S]everal well-known and indisputable principles" guide the inquiry regarding irreparable injury.  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The party seeking injunctive relief must demonstrate that the claimed injury is "both certain and great" and that the alleged harm is "actual and not theoretical."  *Id.* Because "the court must decide whether the harm will *in fact* occur," a party seeking injunctive relief must "substantiate the claim [of] irreparable injury" and "must show

that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.* (emphasis in original). In addition, "[i]njunctive relief will not be granted against something merely feared as liable to occur at some indefinite time"; therefore, the movant "must show that [t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted) (second alteration in original).

Significantly for present purposes, the certain and immediate harm that a Plaintiff alleges must also be truly irreparable in the sense that it is "beyond remediation." *CFGC*, 454 F.3d at 297. This means that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.* (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also Wisconsin Gas Co.*, 758 F.2d at 674 ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."). Consequently, bearing the irreparable harm burden is an especially heavy lift for movants who claim injury based on potential economic losses; indeed, "[t]o successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business or threaten its very existence." *Common Sense*, 576 F. Supp. 2d at 168 (D.D.C. 2008) (internal quotation marks and citations omitted).

In the instant case, Plaintiffs offer two lines of argument in an attempt to demonstrate that implementation of the Final Rule will cause irreparable harm. First, Plaintiffs argue that if compelled production-step labeling constitutes a violation of the

First Amendment, then they have established irreparable harm *per se,* which Defendants

do not dispute.  (Pl. Br. at 38-39; Def. Br. at 36; Int. Br. at 30.)  Second, Plaintiffs

maintain that meat industry participants at all stages of the production process will face

crippling "new financial and operational burdens as a result of the Final Rule."  (Pl. Br.

at 39 (citation and internal quotations omitted).)  The Court has considered each of

these contentions and finds that neither establishes the harm that is required to warrant

a preliminary injunction.

A. <u>First Amendment Violation As Irreparable Harm</u>

There is no doubt that "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976).  Here, however, the Court has already determined that

Plaintiffs do not have a likelihood of success on the merits of their First Amendment

claim.  *See, supra*, Section IV.A.  Accordingly, the Court concludes that Plaintiffs are

unable to base their irreparable harm arguments on this basis.  *See Edwards v. District*

*of Columbia*, 765 F. Supp. 2d 3, 19 (D.D.C. 2011) (noting that where "[p]laintiffs'

irreparable harm argument rests entirely on their First Amendment claim," and

"plaintiffs have not shown that the [regulation at issue] violates their rights under the

First Amendment," plaintiffs "are 'not faced with irreparable harm absent the issuance

of an injunction'" (quoting *Enten v. District of Columbia*, 675 F. Supp. 2d 42, 54

(D.D.C. 2009))); *cf. CFGC*, 454 F.3d at 301 (noting that the D.C. Circuit "has construed

*Elrod* to require movants to do more than merely allege a violation of freedom of

expression in order to satisfy the irreparable injury prong of the preliminary injunction

frame-work").

B. <u>Economic Irreparable Harm</u>

Plaintiffs second irreparable harm argument is that the Final Rule will impose devastating "new financial and operational burdens" on industry participants. (Pl. Br. at 39 (citation and internal quotations omitted).) Plaintiffs assert this claim with respect to both packers and processors, who are at the downstream end of the production process, and also upstream livestock suppliers, and have offered a number of declarations from individuals involved in both of these aspects of the meat production industry.

1. *Packers and Processors*

With respect to packers and processors, Plaintiffs argue that many packing and processing firms rely on commingling, and the Final Rule's commingling ban will impose "disproportionate burdens on businesses 'that currently commingl[e] domestic and foreign-origin cattle or hogs.'" (*Id.* at 40 (quoting Final Rule, 78 Fed. Reg. at 31,384).)[33] In this regard, Plaintiffs point out that the agency itself predicted its rule would impose significant costs on the meat packers and processors who are "'located nearer to sources of imported cattle and hogs'" (*id.* (quoting Final Rule, 78 Fed. Reg. at 31,382)), and in Plaintiffs' view, the agency "cannot now dispute" that the new regulations would impose costs that are "certain," "great," and "actual." (*Id.* at 39.)[34] Additionally, Plaintiffs offer declarations from various meat packers and processers who testify that compliance with the Final Rule's commingling ban will force them to, among other things, build out separate facilities for handling and storing segregated

---

[33] The current record is not clear regarding the number of packing companies that commingle livestock.

[34] In the Final Rule, the agency estimated the total cost of industry compliance with the rule at between $53.1 and $137.8 million. Final Rule, 78 Fed. Reg. at 31,368.

cattle (Pl. Br., Decl. of Alan Rubin, ECF No. 24-21, ¶ 9; *id.*, Decl. of Brad McDowell, ECF No. 24-18, ¶ 14); incur significant annual administrative and recordkeeping costs (Decl. of Brad McDowell ¶ 16); and/or, in some cases, forgo buying foreign livestock entirely and thereby cede a competitive advantage to competitors who already buy only domestic cattle (*id.* ¶¶ 18-21.) Plaintiffs also assert that their declarations demonstrate that new segregated production processes will require packers to incur costs that pose "harm to [their] financial and competitive viability that cannot be restored by a favorable ruling." (Pl. Br. at 41.) Based on these declarations, Plaintiffs maintain that they have shown irreparable harm.[35]

The Court is not persuaded. As Defendants rightly argue, "bare allegations and fears about what *may* happen in the future" (Def. Br. at 37 (internal quotation marks and citation omitted)) are not sufficient to support a claim of irreparable injury. To be sure, Plaintiffs have gathered a number of declarants who are willing to speculate about the potential impact of the Final Rule on their business operations and profits, but without more than such blanket, unsubstantiated allegations of harm, there is no strength in these numbers. For example, declarant Alan Rubin, president of Dallas City Packing, states that adopting new segregated production procedures for the cattle that

---

[35] The Court notes in passing that, in addition to declarations submitted with their opening brief, Plaintiffs also submitted several supplemental declarations with their reply brief. Pursuant to Local Civil Rule 65.1(c), applications for a preliminary injunction "shall be supported by *all* affidavits on which the plaintiff intends to rely" and "[s]upplemental affidavits either to the application or the opposition may be filed only with permission of the court." LCvR 65.1(c) (emphasis added). Plaintiffs did not seek leave of court to file the supplemental declarations submitted with the reply. Nevertheless, the Court has reviewed those declarations, and it finds Plaintiffs' lack of compliance to be of no moment because, for the reasons stated herein, the declarations have not influenced the Court to rule in Plaintiffs' favor regarding the irreparable harm factor. *Cf. Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 1, 9 n.11 (D.D.C. 2010) (noting that the plaintiff did not seek leave of the Court to file supplemental materials with her reply as required under Local Civil Rule 65.1, but reviewing the declarations notwithstanding, and finding that consideration of the declarations did not alter the Court's decision in the matter).

his company processes will increase costs "beyond the point where we would be able to recover those costs," as it will require his company to "build out separate facilities," add employees, and lengthen the workday, which he contends would lead to increased staffing costs, added "warehousing costs," and overall inefficiencies in the production process. (Decl. of Alan Rubin ¶¶ 4, 9, 10, 12, 13, 16.) Rubin even avers that "implementing these new rules could force [his] business to close." (*Id.* ¶ 8.) But he provides few if any facts that would permit the Court to evaluate the context in which these claims are made—*e.g.*, although declarant Rubin provides estimates for the number of cattle his company processes per day, and states the percentage of these cattle that are foreign, without any information about the overall size and scope of the business, the Court is left in the dark about the economic effect of the segregation rule on the company's bottom line.

Another Plaintiffs' declarant, Brad McDowell, who is the President of a wholly-owned subsidiary of meat-processing giant Agri Beef, similarly provides some "approximate" costs of implementing segregated production processes, and estimates that the change in the way that his company processes meat "will require Agri Beef to commit an additional $75-$100 million in working capital." (Decl. of Brad McDowell ¶¶ 13-19.) Again, however, what declarant McDowell does *not* say is that such additional expenditures will so severely impact the company's bottom line that the increased costs that the Final Rule imposes threaten the company's very existence. Indeed, none of the Plaintiffs' declarations adequately alleges and substantiates the kind of immediate and irreparable monetary injury that is required to sustain Plaintiffs' assertions regarding the Final Rule's dire financial effects or the lack of recoverability

of the added expenditures. *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51

(D.D.C. 2011) (finding that plaintiff failed to demonstrate irreparable harm where

declarant mentioned his company's lost revenues and predicted that he "will be out of

business within eighteen months" because the declaration failed to "offer a projection

of anticipated future losses, tie that to an accounting of the company's current assets, or

explain with any specificity how he arrived at the conclusion that he would be forced

out of business in eighteen months"); *see also Wisconsin Gas Co.*, 758 F.2d at 674

("[M]ovant must provide *proof* that the harm has occurred in the past and is likely to

occur again, or *proof* indicating that the harm is certain to occur in the near future."

(emphasis added)).[36]

Notably, it appears that Plaintiffs' failure to substantiate the harms they assert is

not for lack of trying. The packer declarants speak earnestly about what they truly

"expect" to happen in the marketplace; what their customers are "likely" to demand;

and what "could" happen to their businesses if they are made to follow the Final Rule.

(*See, e.g.*, Decl. of Alan Rubin ¶¶ 8, 14, 18; Decl. of Brad McDowell ¶¶ 18, 21, 23; Pl.

---

[36] Defendant-Intervenors argue that Plaintiffs' packer declarants fail to provide substantiation for their claims of irreparable harm because none exists. Specifically, Defendant-Intervenors proffer their own declarants who attest that, given the structure of the industry and the way in which suppliers are paid, the packers (who are alleged to be relatively few in number) enjoy great market power and thus any additional costs borne by packers will be insignificant. (*See, e.g.*, Int. Br., Ex. 2.a, Decl. of Robert Taylor ¶ 6 ("[T]here are relativity few [meat packing] establishments . . . resulting in an oligopolistic structure with power concentrated among a few participants."); *id.*, Ex. 2.b, Decl. of Charles McVean ¶¶ 4, 5 ("[T]here is no likelihood that any additional costs will not be passed back upstream to cattle producers."); *id.*, Ex. 2.c, Decl. of Bob Sears ¶ 7 ("[A]ny increased segregation of cattle [caused by the Final Rule] would almost certainly be addressed through actions taken by feedlots" and "would not be a significant cost for feedlots that already typically segregate by seller . . . ."). *See also id.*, Ex. 2.d, Decl. of John Sumption ¶ 8 ("[T]he origin of each cow is already tracked through production [by the packer] . . . ."); *id.*, Ex. 2.e, Decl. of Paul Symens ¶ 9 (because packers already track each individual animal in order to pay their suppliers, "[t]he only extra step a plant would have to [take] to comply with the [Final Rule] is to add the label where the animal was from").) Moreover, Defendant-Intervenors argue that, based on public materials such as press reports about some of the businesses that employ Plaintiffs' declarants, the purported costs of compliance will not actually put these businesses at risk because they are of such a size and structure that the companies can absorb any added costs, particularly in light of their high revenues. (*See* Int. Br. 32-42.)

Reply, Supp. Decl. of Brad McDowell, ECF No. 33-2, ¶¶ 27-32.)  But the Court cannot find "certain" or "actual" harm based on such speculation, let alone find the kind of extreme economic injury necessary to support a claim of irreparable harm.  *See, e.g.*, *GEO Specialty Chems., Inc. v. Husisian*, 923 F. Supp. 2d 143, 150 (D.D.C. 2013) (finding no irreparable harm where, "aside from speculative allegations of loss of revenue and other market advantages, all of which are merely economic, [Plaintiff] has completely failed to demonstrate the certainty or imminence of its financial deficits"); *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (concluding that, while the declarant "raise[d] legitimate concerns about the current and future health of his company," to be entitled to preliminary injunctive relief, it was necessary to provide "more than [his] conclusory projection . . . to show that any of the plaintiff's small business members currently face certain, imminent business closings").

2. *Suppliers*

In addition to highlighting the alleged irreparable harm that packers will purportedly suffer under the Final Rule, Plaintiffs also argue that the Final Rule will irreparably injure firms that supply livestock to packers—that is, livestock producers and feeders—especially those that rely on imported animals in the ordinary course of business.  (Pl. Br. at 41.)  To advance this argument, Plaintiffs rely on history.  They provide declarations to the effect that, after the 2009 COOL Rule was adopted, certain suppliers were forced to accept significant discounts on foreign origin cattle.  (*See, e.g.*, *id.*, Decl. of Ed Attebury, ECF No. 24-15, ¶ 2 ("The current []COOL regulations have cost my business approximately $1,347,500 due to discounts on Mexican cattle from packers of $35 per head."); *id.*, Decl. of Jim Peters, ECF No. 24-19, ¶ 2 ("The [2009

COOL Rule] ha[s] cost my business $1,237,415 due to discounts on Mexican cattle from packers ranging from $25-45 per head."); Pl. Reply, Decl. of Ricardo Pena Hinojosa, ECF No. 33-7, ¶ 4 ("When [the 2009 COOL Rule] went into effect . . . the American stockyards, feedlots, and packing plants, began discounting [Mexican] cattle because of COOL-compliance costs.").)

Furthermore, Plaintiffs' supplier declarants predict that what happened before will likely happen again; that is, once the Final Rule goes into effect, the suppliers' customers will demand even steeper discounts or stop buying Mexican-origin cattle entirely. (*See, e.g.*, Decl. of Ricardo Pena Hinojosa ¶ 5 ("Based on my experience with the 2009 version of the COOL Rule, I expect the new COOL regulations will make the discounts even greater . . . ."); Pl. Br., Decl. of Andy Rogers, ECF No. 24-20, ¶ 3 ("Recent conversations with a cattle buyer from my packer customer indicated that the 2013 rule could see discounts paid on cattle of Mexican origin increase . . . ."); Decl. of Jim Peters ¶ 10 ("Since we have received discounts due to the existing []COOL regulations, we expect deeper discounts with the new []COOL regulation."); Decl. of Ed Attebury ¶ 10 (same).)

Some of Plaintiffs' supplier declarants even further extrapolate these expected additional discounts into dire consequences for their businesses, asserting that packers may no longer buy foreign livestock at all and that the viability of declarants businesses' may be seriously threatened. (*See, e.g.*, Decl. of Ed Attebury ¶ 10 ("[B]oth packer [sic] and retailers will no longer be willing to process and sell beef from Mexican-origin cattle. This will lead to major changes to my business model and could result in the closure of my cattle business."); Decl. of Andy Rogers ¶ 3 ("[The increased

discount in Mexican-origin cattle] would devastate my business."); Pl. Reply, Supp. Decl. of Jim Peters, ECF No. 33-3, ¶ 5 (noting that the possibility his business's main packer customer would stop accepting Mexican cattle due to retailer demands "could force my feedlot to close").)

Defendant-Intervenors, who also represent industry professionals, zealously contest the causal relationship that Plaintiffs have attempted to draw between the 2009 COOL regulations and the deep discounts for, and rejection of, foreign-born livestock, noting that average beef prices and total beef imports have risen since 2009 (*see* Int. Br., Ex. 5.a (USDA data indicating average beef prices and spreads have risen since 2009); *id.*, Ex. 5.b (USDA data indicating that beef imports have risen since 2009)). Defendant-Intervenors also offer their own declarations disputing Plaintiffs' supplier declarants' claims that any discounts for foreign cattle were due to the 2009 COOL Rule. (*See* Decl. of John Sumption ¶ 9 (lower prices for Mexican cattle "is not a new phenomenon in the last five years" and is "due to the breed of cattle, how the cattle tend to grade (amount of choice), and quality of feed supply in different stages of growth"); Decl. of Paul Symens ¶ 11 ("It has been my experience that cattle from Mexico are known to give a lower yield and lower quality of beef, which results in packinghouses offering a lower price for these cattle.").)

Even without wading into the debate over the effect of the 2009 COOL Rule, what the Court finds most significant about Plaintiffs' supplier declarants' dire predictions for the future based on the purported impact of the 2009 COOL Rule is what they do *not* say—that any of the declarants (or anyone else for that matter) suffered the kind of extreme hardship as a result of the 2009 COOL Rule that could provide a

factual basis for a finding that the Final Rule is likely to cause irreparable harm if it is not enjoined. By using the 2009 COOL Rule as a model for what will happen under the Final Rule but failing to provide any evidence of the extreme consequences of the old rule, Plaintiffs are essentially asking the Court to conclude that, while the Final Rule is the same as the 2009 COOL Rule *in kind*, the difference between the two is so great *in degree* that the Final Rule will result in "severe [and] extreme hardship" that "threaten[s] [the] very existence" of the supplier declarants' businesses, *Common Sense*, 576 F. Supp. 2d at 168, even though the 2009 COOL Rule apparently did not. Plaintiffs have not provided any basis for any such finding, however; and without it, the declarations of Plaintiffs' suppliers in regard to the expected impact of the Final Rule are mere speculation, which, as stated above, is not the stuff of which successful irreparable injury claims are ordinarily made. *See, e.g.*, *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52; *see also GEO Specialty Chems.*, 923 F. Supp. 2d at 147-51; *Nat'l Tobacco Co., L.P. v. District of Columbia*, 11-cv-388 RLW, 2011 WL 4442771, at *6-7 (D.D.C. Sept. 14, 2011); *Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC,* 762 F. Supp. 2d 8, 14-16 (D.D.C. 2011)*; Common Sense*, 576 F. Supp. 2d at 170; *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204-05 (D.D.C. 2005).

Finally, and significantly, with respect to both packers and suppliers, Plaintiffs appear to have generally overlooked a critical component of the irreparable injury analysis insofar as it is clear that the harm that the supplier declarants fear does not flow *directly* from the requirements of the Final Rule but is instead based on independent market variables such as how the supplier's customers and/or retail consumers might react. (*See, e.g.*, Decl. of Ricardo Pena Hinojosa ¶ 6 (predicting that

stockyards and feedlots will stop importing Mexican cattle in part "because their customers elect no longer to accept cattle other than those born and raised in the United States"); Decl. of Alan Rubin ¶ 14 (stating that packers will be unable to pass on additional costs because "customers are likely to demand the products that require the simplest labels"); Decl. of Bryan Karwal ¶ 7 ("I have serious concerns that, as a result of the new regulations, packers will stop purchasing finished Canadian-born pigs . . . ."); *see also, e.g.*, Decl. of Brad McDowell ¶ 23 (noting that the word "slaughtered . . . reinforces negative consumer misperceptions about meatpacking" and will therefore lead to "substantial" losses); Decl. of Alan Rubin ¶ 18 ("[T]he new labels will likely cause us to lose sales" because "[c]onsumers will have to think about slaughter every time they buy or prepare meat.").)  The D.C. Circuit has made clear that one who moves for a preliminary injunction "must show that the alleged harm will *directly* result from the action which the movant seeks to enjoin."  *Wisconsin Gas Co.*, 758 F.2d at 674 (emphasis added).  It would be one thing if Plaintiffs were making a substantiated allegation that the demands of complying with the Final Rules segregation and labeling requirements are in-and-of-themselves impossible to meet without destroying their companies.  But here, to the contrary, Plaintiffs' declarants appear most concerned that they will ultimately lose future business because others may respond to the new labeling rules and react in a manner that may ultimately affect their companies negatively.  This Circuit's precedents suggest that such indirect harm is neither certain nor immediate, and thus cannot be the basis for a finding of irreparable harm.  *See, e.g.*, *Hunter v. FERC*, 527 F. Supp. 2d 9, 14-15 (D.D.C. 2007) (noting that even "where the threat is to the very existence of the plaintiff's business, it must still occur as a *direct*

71

*result* of the action the movant seeks to enjoin."); *Bloomberg L.P. v. Commodity Futures Trading Comm'n*, 13-523(BAH), 2013 WL 2458283, at *27 (D.D.C. June 7, 2013) (finding no irreparable harm where the plaintiff's theory of harm was "based upon a series of worst-case scenarios").

Consequently, and for all of the reasons discussed above, the Court concludes that Plaintiffs have failed to establish the irreparable harm factor as required to warrant injunctive relief.

## VI.    BALANCE OF HARMS

The third factor to be weighed on the sliding scale in ruling on a preliminary injunction requires the Court to "balance the competing claims of injury," which involves "consider[ing] the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. 7, 24 (2008).

Plaintiffs argue that they will suffer the greatest harm because they are potentially subject to serious financial losses if the Final Rule is not enjoined. (*See* Pl. Br. at 44; *see also id.*, Decl. of Jerry Holbrook, ECF No. 24-16, ¶ 7 (estimating cost of compliance for Tyson Foods as $70 million); Decl. of Brad McDowell ¶¶ 14, 15 (estimating $7 million annual lost opportunity costs and $18 million in additional storage costs under the Final Rule).) Plaintiffs also argue that the delay in implementing the Final Rule if an injunction is granted will cause no harm to the government, which the AMS itself has tacitly admitted by setting up a six-month education period to help the industry conform to the new regulations. (Pl. Br. at 44-45.)

The agency responds that, because Plaintiffs' claims of irreparable harm are largely unsubstantiated, they should be given little weight. (Def. Br. at 39.) The

agency also argues that there is inherent harm in enjoining regulatory agencies from enforcing validly promulgated rules.  (*Id.*)  Adding to the harm-to-the-government side of the scale, Defendant-Intervenors additionally point out that an injunction would ensure that the United States would be in violation of its WTO obligations, and would thereby put the country at risk for retaliatory sanctions that have been estimated at $1-2 billion.  (Int. Br. at 43 (citing Remy Jurenas & Joel L. Greene, Cong. Research Serv., RS22955, Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling 30 (2013)).)

Regardless of whether Plaintiffs have sufficiently shown irreparable harm either in the form of a First Amendment violation or due to severe economic losses, there is no doubt that the Final Rule imposes significant compliance costs on some companies in the meat production industry—costs that the agency itself estimated at between $53.1 and $137.8 million.  Final Rule, 78 Fed. Reg. at 31,368.  However, it is also true that granting an injunction could cause the United States to be deemed out of compliance with its international trade obligations, which apparently is also a costly proposition. *See* Appellate Body Report*, United States – Import Prohibition of Certain Shrimp and Shrimp Products,* WT/DS58/AB/R (Nov. 6, 1998) (a WTO member "bears responsibility for acts of all of its departments of government, including its judiciary").  If Canada and Mexico have agreed not to seek any retaliation until the WTO issues a decision about whether the Final Rule complies with the United States' WTO obligations, as Plaintiffs' counsel represented at oral argument (*see* Hr'g Tr. at 68:11-18); *see also* 147 Canada Gazette No. 24, June 15, 2013, 1459, then retaliation due to

the issuance of an injunction is unlikely, and the cost to the government of imposing the injunction should be significantly discounted.

Consequently, the Court concludes that the balance of harms swings slightly in favor of Plaintiffs. Nevertheless, in terms of the overall sliding scale, Plaintiffs' advantage on the balance of harms factor is not enough to tip the totality of the injunction scale in their favor given that they have failed to show a likelihood of success on the merits or irreparable harm.

## VII.    PUBLIC INTEREST

The final factor that the Court must consider is the effect on the public's interest of granting or withholding the requested injunction. "In exercising their sound discretion" when deciding a motion for preliminary injunction, "courts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks and citations omitted). Here, the parties' arguments regarding the public interest are largely dependent upon their merits arguments. Plaintiffs argue that there is a public interest both in not enforcing unconstitutional laws, particularly where such laws have severe economic effects, and in ensuring that regulatory agencies do not overstep their statutory limits. (Pl. Br. at 45.) The Government responds that the public has an interest in allowing regulatory agencies to function pursuant to their legislatively designated authority, and that there is also a significant public interest in achieving Congress' goal of providing more country-of-origin information to consumers. (Def. Br. at 39.)

Because the parties' public interest arguments are essentially derivative of the parties' arguments on the merits of the case, it follows that the public interest factor of the preliminary injunction test should weigh in favor of whoever has the stronger arguments on the merits—in this case, Defendants. *See, e.g.*, *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, also offers [plaintiff] no support because it is inextricably linked with the merits of the case. If, as we have held, [plaintiff] is not likely to establish [a likelihood of success in the merits], then public interest considerations weigh against an injunction."); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 29-30 (D.D.C. 2012) (where plaintiff was unlikely to establish that agency action did not comply with the law, the public interest factor weighed against granting an injunction); *Hubbard v. United States*, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) ("Because it concludes that the plaintiff has not demonstrated a likelihood of success on the merits, the court need not linger long to discuss . . . public interest considerations [as] . . . [i]t is in the public interest to deny injunctive relief when the relief is not likely deserved under law." (internal quotations marks and citations omitted) (second alteration in original)). Thus, like the likelihood of success and irreparable harm factors, the public interest factor weighs against granting an injunction in the instant case.

VIII.    CONCLUSION

The parties' arguments for and against the issuance of a preliminary injunction have focused primarily on the likelihood of success and irreparable harm factors, and the Court rests its conclusion regarding the requested preliminary injunction primarily on its evaluation of those two factors. For the reasons set forth above, and especially

Plaintiffs' failure to demonstrate either a likelihood of success on the merits or irreparable injury, Plaintiffs' Motion for a preliminary injunction is **DENIED**. A separate order will follow.

DATE: September 11, 2013

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

# APPENDIX

## § 1638a. Notice of country of origin

### (a) In general

### (1) Requirement

Except as provided in subsection (b) of this section, a retailer of a covered commodity shall inform consumers, at the final point of sale of the covered commodity to consumers, of the country of origin of the covered commodity.

### (2) Designation of country of origin for beef, lamb, pork, chicken, and goat meat

### (A) United States country of origin

A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat may designate the covered commodity as exclusively having a United States country of origin only if the covered commodity is derived from an animal that was--

**(i)** exclusively born, raised, and slaughtered in the United States;

**(ii)** born and raised in Alaska or Hawaii and transported for a period of not more than 60 days through Canada to the United States and slaughtered in the United States; or

**(iii)** present in the United States on or before July 15, 2008, and once present in the United States, remained continuously in the United States.

### (B) Multiple countries of origin

### (i) In general

A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat that is derived from an animal that is--

**(I)** not exclusively born, raised, and slaughtered in the United States,

**(II)** born, raised, or slaughtered in the United States, and

**(III)** not imported into the United States for immediate slaughter,

may designate the country of origin of such covered commodity as all of the countries in which the animal may have been born, raised, or slaughtered.

**(ii) Relation to general requirement**

Nothing in this subparagraph alters the mandatory requirement to inform consumers of the country of origin of covered commodities under paragraph (1).

**(C) Imported for immediate slaughter**

A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat that is derived from an animal that is imported into the United States for immediate slaughter shall designate the origin of such covered commodity as--

**(i)** the country from which the animal was imported; and

**(ii)** the United States.

**(D) Foreign country of origin**

A retailer of a covered commodity that is beef, lamb, pork, chicken, or goat meat that is derived from an animal that is not born, raised, or slaughtered in the United States shall designate a country other than the United States as the country of origin of such commodity.

**(E) Ground beef, pork, lamb, chicken, and goat**

The notice of country of origin for ground beef, ground pork, ground lamb, ground chicken, or ground goat shall include--

**(i)** a list of all countries of origin of such ground beef, ground pork, ground lamb, ground chicken, or ground goat; or

**(ii)** a list of all reasonably possible countries of origin of such ground beef, ground pork, ground lamb, ground chicken, or ground goat.

✷ ✷ ✷

**(b) Exemption for food service establishments**

Subsection (a) of this section shall not apply to a covered commodity if the covered commodity is--

**(1)** prepared or served in a food service establishment; and

**(2)(A)** offered for sale or sold at the food service establishment in normal retail quantities; or

**(B)** served to consumers at the food service establishment.

**(c) Method of notification**

**(1) In general**

The information required by subsection (a) of this section may be provided to consumers by means of a label, stamp, mark, placard, or other clear and visible sign on the covered commodity or on the package, display, holding unit, or bin containing the commodity at the final point of sale to consumers.

**(2) Labeled commodities**

If the covered commodity is already individually labeled for retail sale regarding country of origin, the retailer shall not be required to provide any additional information to comply with this section.

**(d) Audit verification system**

**(1) In general**

The Secretary may conduct an audit of any person that prepares, stores, handles, or distributes a covered commodity for retail sale to verify compliance with this subchapter (including the regulations promulgated under section 1638c(b) of this title).

**(2) Record requirements**

**(A) In general**

A person subject to an audit under paragraph (1) shall provide the Secretary with verification of the country of origin of covered commodities. Records maintained in the course of the normal conduct of the business of such person, including animal health papers, import or customs documents, or producer affidavits, may serve as such verification.

**(B) Prohibition on requirement of additional records**

The Secretary may not require a person that prepares, stores, handles, or distributes a covered commodity to maintain a record of the country of origin of a covered commodity other than those maintained in the course of the normal conduct of the business of such person.

✻ ✻ ✻